Daniel S. Robinson (SBN 244245)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax (949) 720-1292
drobinson@robinsonfirm.com

Tina Wolfson (SBN 174806)
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024
(310) 474-9111; Fax: 310.474.8585
twolfson@ahdootwolfson.com

*Co-Lead Counsel for the Proposed Class*

[Additional Counsel Listed on the Signature Page]

Jean Martin (*Pro Hac Vice*)
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
(813) 559-4908; Fax: (813) 223-5402
jeanmartin@ForThe People.com

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

|  |  |
|---|---|
| *In Re: Ambry Genetics Data Breach Litigation* <br><br> This Documents Relates To: All Cases | Hon. Cormac J. Carney <br> Courtroom 7C <br><br> Lead Case No.: 8:20-cv-00791 CJC (KESx) <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** |

Plaintiffs Alma Fidela Cercas, Kaitlyn Nakagoshi, Michele Pascoe, Colette Domingues, Marion Farrier, Deborah Pancoast, Rosemary O'Hara, Michael Annoni, Lisa Neumann, Cheryl Terrano, Sandra Brodsky, Ariann Tagioli, Debra Volk, Beth Velardi, Rachel Harkness, Benjamin Cooperson II, Laura Jasielum, Debera Hensley, Linda Stewart, Ann Hoekstra, Rula Kanawati, Elizabeth Nakagoshi, individually and as parent and guardian of E.N., Jill Barduca, Jonee Coleman, and Nicole McMurphy (collectively, "Plaintiffs") bring this Consolidated Class Action Complaint against Ambry Genetics Corporation ("Ambry") and Konica Minolta Precision Medicine, Inc. ("KMPM") (collectively, Ambry and KMPM are referred to as "Defendants") in their respective individual capacities and on behalf of all others similarly situated, and allege,

1

upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I.  INTRODUCTION

1.  Ambry is a provider of healthcare services throughout the United States. Through its online services, Ambry offers a comprehensive genetic testing menu of more than 300 tests for screening and diagnosis for inherited and non-inherited diseases, such as cancer, heart disease, neurodevelopmental disorders, and other medical issues.

2.  On or about April 15, 2020, Ambry announced a security incident involving the personally identifiable information ("PII") and protected health information ("PHI") of its patients (collectively, "Private Information").[1]  The exposed Private Information included patients' names, dates of birth, health insurance information, medical information, and for some patients, Social Security Numbers, diagnosis information, and other Private Information (the "Data Breach").  The patients affected by the Data Breach consist of individuals of a potentially vulnerable population who used Defendants' services to determine whether they have or are susceptible to an inherited or non-inherited disease, and also include children whose Private Information, such as a medical diagnosis, is now forever exposed.

3.  Although the Data Breach occurred between January 22, 2020, and January 24, 2020, and Ambry reported the Data Breach to government authorities in March 2020, Ambry waited three months before notifying patients in April 2020.

---

[1] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"), protected health information ("PHI") is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, *available at*:  https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Sep. 14, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT

4.     The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' Private Information. In particular, the Private Information was maintained on Ambry's computer network in a condition vulnerable to cyberattacks, including access to and disclosure of Plaintiffs' Private Information through infiltration of certain Ambry employee e-mail accounts. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Ambry, and thus Ambry was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left that property in a vulnerable position.

5.     Defendants disregarded the rights of Plaintiffs and Class Members by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions; failing to disclose that they did not have reasonable or adequately robust computer systems and security practices to safeguard patients' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice regarding the Data Breach.

6.     As a result of Defendants' failure to implement and follow reasonable security procedures, Plaintiffs' and Class Members' Private Information is now in the hands of, and has been viewed by, identity thieves. Plaintiffs and Class Members have suffered identity theft and fraud, have had to spend and will continue to spend significant amounts of time and/or money in an effort to protect themselves from the adverse ramifications of the Data Breach, and will forever be at a heightened risk of identity theft and fraud.

7.     Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Plaintiffs' and Class Members' Private Information that Defendants collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information

1   was accessed.

2       8.      Plaintiffs, on behalf of all others similarly situated, allege claims for (1)

3   negligence; (2) invasion of privacy; (3) breach of contract; (4) breach of implied contract; (5)

4   unjust enrichment; (6) breach of fiduciary duty; (7) breach of confidence; (8) violation of the

5   California Unfair Competition Law (Cal. Business & Professions Code § 17200, *et seq.*) for

6   unlawful business practice; (9) violation of the California Unfair Competition Law (Cal. Business

7   & Professions Code § 17200, *et seq.*) for unfair business practice; (10) violation of the

8   Confidentiality of Medical Information Act (Cal. Civ. Code § 56, *et seq.*); (11) Violation of

9   California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*); (12) violation of

10  California Consumer Records Act (Cal. Civ. Code § 1798.82 *et seq.*); and (13) injunctive and

11  declaratory relief.

12      9.      Plaintiffs seek remedies including, but not limited to, compensatory damages for

13  identity theft, fraud, and time spent, reimbursement of out-of-pocket costs, adequate credit

14  monitoring services funded by Defendants, and injunctive relief including improvements to

15  Defendants' data security systems and practices to ensure they have reasonably sufficient security

16  practices to safeguard patients' Private Information that remains in Defendants' custody to prevent

17  incidents like the Data Breach from reoccurring in the future.

18                              **II.    PARTIES**

19      10.     Plaintiff Alma Fidela Cercas is a resident of Orange County, California, and an

20  Ambry patient. On or about April 15, 2020, Plaintiff Cercas received notice from Ambry that her

21  Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed

22  her name, date of birth, Ambry account number, health insurance information and confidential

23  medical information.

24      11.     Plaintiff Kaitlyn Nakagoshi is a resident of St. Petersburg, Florida, and an Ambry

25  patient. In or around April 2020, Ms. Nakagoshi's sister-in-law informed Ms. Nakagoshi that she

26  received a letter in the mail from Ambry at her sister-in-law's address in San Francisco, where

27  Ms. Nakagoshi had previously resided. The letter from Ambry notified Ms. Nakagoshi that her

28  Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed

her health insurance information and confidential medical information.

12.     Plaintiff Michele Pascoe is a resident of Rocklin, California, and an Ambry patient. On or around April 15, 2020, Ms. Pascoe received a letter in the mail from Ambry notifying her that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information and confidential medical information.

13.     Plaintiff Colette Domingues is a resident of New York, New York, and an Ambry patient. On or about April 15, 2020, Plaintiff Domingues received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information and confidential medical information.

14.     Plaintiff Marion Farrier is a resident of New York, New York. On or about April 15, 2020, Plaintiff Farrier received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

15.     Plaintiff Deborah Pancoast is a resident of Prescott, Arizona, and an Ambry patient. On or about April 15, 2020, Ms. Pancoast received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Not only did Ambry disclose her name, date of birth, Ambry account number, health insurance information, and confidential medical information, Ambry also disclosed Ms. Pancoast's Social Security number and diagnosis.

16.     Plaintiff Rosemary O'Hara is a resident of Fort Lauderdale, Florida. In or around April 2020, Ms. O'Hara received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information and confidential medical information.

17.     Plaintiff Michael Annoni is a resident of Elko New Market, Minnesota, and an Ambry patient. On or about April 15, 2020, Mr. Annoni received notice from Ambry that his Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed his name, date of birth, Ambry account number, health insurance information and confidential

CONSOLIDATED CLASS ACTION COMPLAINT

1 | medical information.

2 | 18. Plaintiff Lisa Neumann is a resident of Savannah, Georgia. On or about April 17,
3 | 2020, Plaintiff Neumann received notice from Ambry that her Private Information had been
4 | improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry
5 | account number, health insurance information, and confidential medical information.

6 | 19. Plaintiff Cheryl Terrano is a resident of Buckhannon, West Virginia, and an Ambry
7 | patient. On or about April 15, 2020, Ms. Terrano received notice from Ambry that her Private
8 | Information had been improperly exposed to unauthorized third parties. Ambry disclosed her
9 | name, health insurance information, and confidential medical information.

10 | 20. Plaintiff Sandra Brodsky is a resident of Parkland, Florida. On or about April 15,
11 | 2020, Plaintiff Brodsky received notice from Ambry that her Private Information had been
12 | improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry
13 | account number, health insurance information, and confidential medical information.

14 | 21. Plaintiff Ariann Taglioli is a resident of Morrisonville, Illinois, and an Ambry
15 | patient. On or about April 15, 2020, Plaintiff Taglioli received notice from Ambry that her Private
16 | Information had been improperly exposed to unauthorized third parties. Ambry disclosed her
17 | name, date of birth, Ambry account number, health insurance information, and confidential
18 | medical information.

19 | 22. Plaintiff Debra Volk is a resident of Talking Rock, Georgia. On or about April 15,
20 | 2020, Plaintiff Volk received notice from Ambry that her Private Information had been improperly
21 | exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account
22 | number, health insurance information, and confidential medical information.

23 | 23. Plaintiff Beth Velardi is a resident of New City, New York, and an Ambry patient.
24 | In or around April 2020, Ms. Velardi received notice from Ambry that her Private Information
25 | had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of
26 | birth, Ambry account number, health insurance information, and confidential medical
27 | information.

28 | 24. Plaintiff Rachel Harkness is a resident of Lavonia, Michigan. On or about April

CONSOLIDATED CLASS ACTION COMPLAINT

17, 2020, Plaintiff Harkness received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties without her consent. Ambry disclosed her name, date of birth, Ambry account number, and insurance information.

25.     Plaintiff Benjamin Cooperson II is a resident of Palmyra, Pennsylvania, and an Ambry patient. On or about April 17, 2020, Mr. Cooperson received notice from Ambry that his Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed his name, date of birth, Ambry account number, and confidential medical information.

26.     Plaintiff Laura Jasielum is a resident of Cambridge, Ohio and an Ambry patient. On or about April 15, 2020, Plaintiff Jasielum received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her Ambry account number, health insurance information and confidential medical information.

27.     Plaintiff Debera Hensley is a resident of Bulls Gap, Tennessee, and an Ambry patient. On or about April 15, 2020, Plaintiff Hensley received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information and confidential medical information.

28.     Plaintiff Linda Stewart is a resident of Pedro, Ohio, and an Ambry patient. On or about April 15, 2020, Plaintiff Stewart received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information and medical information.

29.     Plaintiff Ann Hoekstra is a resident of Plymouth, Minnesota, and an Ambry patient. On or about July 13, 2020, Ms. Hoekstra received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties.  Ambry disclosed her name, date of birth, Ambry account number, health insurance information and confidential medical information.

30.     Plaintiff Rula Kanawati is a resident of Hackensack, New Jersey, and an Ambry patient. On or about April 15, 2020, Plaintiff Kanawati received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information and confidential

medical information.

31.     Plaintiff Elizabeth Nakagoshi, individually and as parent and guardian of E.N., is a resident of Albany, California, Ms. Nakagoshi's minor daughter is an Ambry patient and also a resident of Albany, California. In or around April 2020, Plaintiff Nakagoshi received notice from Ambry that her minor daughter's Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her minor daughter's name, date of birth, Ambry account number, insurance information, diagnosis and confidential medical information.

32.     Plaintiff Jill Barduca is a resident of Riverview, Michigan, and an Ambry patient. On or about April 27, 2020, Plaintiff Barduca received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. In addition to Ambry disclosing her name, date of birth, health insurance information, and confidential medical information, Ambry notified Ms. Barduca that Ambry also disclosed her "diagnosis."

33.     Plaintiff Jonee Coleman is a resident of Chantilly, Virginia, and an Ambry patient. On or about April 15, 2020, Ms. Coleman received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

34.     Plaintiff Nicole McMurphy is a resident of Borden, Indiana, and an Ambry patient. On or about April 15, 2020, Plaintiff McMurphy received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. Ambry disclosed her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

35.     Defendant Ambry Genetics Corporation is a Delaware corporation with its principal place of business in Aliso Viejo, California. Ambry is a provider of health care that provides genetic testing services, including screening and diagnosis of hereditary cancers and other medical conditions, to patients in the United States.

36.     Defendant Konica Minolta Precision Medicine, Inc. ("KMPM") based in Aliso Viejo, California, is a subsidiary of Konica Minolta, Inc., which includes Ambry Genetics

Corporation and Invicro LLC.  KMPM was founded in 2018 after Konica Minolta, Inc. acquired Ambry in 2017 for up to $1 billion.

37.    Upon information and belief, KMPM exercises control over Ambry, derives profit from Ambry's genetic testing services and takes an active role in the development, distribution, and marketing of Ambry's genetic testing services.

### III.    JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

39.    This Court has personal jurisdiction over Defendants because Ambry and KMPM are headquartered in California, their principal place of business is in California, and they regularly conduct business in California.

40.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in, was directed to, and/or emanated from this District, Ambry and KMPM are based in this District, Ambry and KMPM maintain patients' Private Information in the District, and have caused harm to Plaintiffs and Class Members residing in this District.

### IV.    STATEMENT OF FACTS

#### A.  *Ambry's Business.*

41.    Ambry was founded in 1999 as a basic diagnostic laboratory and has grown over the years to a massive state-of-the-art testing behemoth. The company has performed more than 1 million genetic tests and is an in-network provider for almost 97% of patients in the U.S. who have public or private health insurance. Ambry's "highly-automated" lab operates 24/7 and performs "DNA fingerprinting of each specimen before and after testing." The comprehensive genetic testing menu of more than 300 tests for screening and diagnosis offered by Ambry includes services for oncology, cardiology, neurology, and exome and general genetics.

42.    Patients and healthcare professionals can order tests directly though Ambry's

online portal and have the results sent to the doctor or directly to the patient. Patients are billed through their healthcare insurance or personally.[2] Due to the nature of these services, Ambry must store patients' Private Information in its system. Ambry accomplishes this by keeping the Private Information electronically—even in its email systems, as evidenced by this Data Breach.

43.   In July 2017, Konica Minolta, Inc. and Ambry announced that Konica Minolta agreed to acquire Ambry for at least $800 million and up to $1 billion.

44.   Patients demand security to safeguard their Private Information. As a healthcare provider, Ambry is required to ensure that such private, personal information is not disclosed or disseminated to unauthorized third parties without the patients' express, written consent, as further detailed below.

**B. The Data Breach.**

45.   Beginning on or around January 22, 2020, unauthorized parties accessed the email account of an Ambry employee allowing unauthorized parties to access and acquire Plaintiffs' and Class Members' Private Information. For several days, unauthorized parties maintained uninterrupted access to the Private Information of Ambry patients, including Plaintiffs and Class Members.

46.   After learning of the issue, Ambry commenced an investigation. That investigation revealed that approximately 233,000 patients were victims of the cybersecurity attack. The investigation further revealed that information accessed by the hackers includes patients' names, medical information, information related to their use of Ambry's services, Social Security numbers, and other Private Information that Ambry collected and maintained. To date, the breach is the second largest health data breach in 2020.[3]

47.   To this point, Ambry has not disclosed when the breach was first discovered.

---

[2]   Healthcare professionals send Ambry patients' Private Information by email to Preverification@ambrygen.com, or by upload through ambrygen.com or portal.ambrygen.com/secure-upload/. *See Ambry's  Preverification of Benefits Form, available at:* https://www.ambrygen.com/assets/pdf/billing/preverification_benefits_request_form.pdf (last accessed Sept. 7, 2020).

[3]   Genetic Testing Lab Hack Affects 233,000, Data Breach Today (Apr. 24, 2020), https://www.databreachtoday.com/genetic-testing-lab-hack-affects-233000-a-14182?highlight=true (last accessed Sept. 17, 2020).

However, facts suggest the Data Breach went undetected for months.

48.      Beginning on or about April 15, 2020, Ambry sent over 230,000 patients a Notice of Data Breach ("Notice").[4]

49.      The Notice disclosed that there had been unauthorized access to an employee's email account between January 22-24, 2020, and that the Data Breach may have resulted in the disclosure of customers' names, medical information, diagnosis information, information related to customers' use of Ambry's services, and Social Security numbers.[5]

50.      Thomas Gnielinski, Ambry's Chief Compliance Officer based in Orange County, California, informed the affected patients that:

> Our security team identified unauthorized access to an employee's email account between January 22-24, 2020 . . .. [W]e are notifying you because your personal information may have been impacted. Specifically, while we are not aware of any misuse of your personal information, the security incident may have resulted in the disclosure of your information, including your name, date of birth, Ambry account number, insurance information, and medical information.
>
> We want to assure you that we have taken steps designed to prevent this type of event from happening again, including through an ongoing effort to enhance our security measures and to provide additional training to employees.

51.      It took Ambry nearly three months after the Data Breach to inform Plaintiffs and Class Members of the Data Breach.

52.      Ambry's Notice of Data Breach was untimely and woefully deficient, failing to provide basic details concerning the Data Breach, including, but not limited to, how unauthorized

---

[4]  *Ambry Notice of Data Breach,* archived on the California Attorney General's website, *available at*: https://oag.ca.gov/system/files/Sample%20Notification%20Letter_5.pdf (last accessed Sept. 7, 2020); *see also, Ambry's Substitute Notice, available at:* https://www.ambrygen.com/legal/substitute-notice (last accessed Sept. 7, 2020); U.S. Dept. of Health and Human Services, *Cases Currently Under Investigation, available at:* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sept. 7, 2020)(stating that Ambry reported the Data Breach to the Department of Health and Human Services on March 22, 2020 as a "Hacking/IT Incident" affecting 232,772 individuals).

[5] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT

parties accessed its employee's e-mail account, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, and how many patients were affected by the Data Breach. Even worse, Ambry offered only a single year of identity monitoring to Plaintiffs and other Class Members.

53.     Plaintiffs' and Class Members' Private Information is likely for sale to criminals on the dark web meaning unauthorized parties have accessed and viewed Plaintiffs' and Class Members' unencrypted, unredacted information, including name, date of birth, billing and insurance information, patient referral information, relevant medical records, diagnosis information, Social Security numbers, and more.

### C. Plaintiffs' Efforts to Secure Their Private Information.

54.     Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Cercas signed up with a credit monitoring agency; requested a new medical insurance number; placed fraud alerts on her accounts with all three credit bureaus; and is in the process of contacting the Social Security Administration, and contacting her various doctors to update them with her new insurance number. Plaintiff Cercas is also contacting her bank to further monitor her account. This is time Plaintiff Cercas otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

55.     Knowing that thieves stole her Private Information, potentially including her DNA and genetic medical information, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Cercas great anxiety. She is now very concerned about her healthcare coverage and identity theft in general. This Data Breach has given Plaintiff Cercas hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information.

56.     Plaintiff Cercas suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that

Plaintiff Cercas entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

57.    As a result of the Data Breach, Plaintiff Cercas will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

58.    Upon receiving Notice from Ambry in or around April 2020, Plaintiff Kaitlyn Nakagoshi spent several days thereafter reviewing her financial accounts for fraudulent charges. Ms. Nakagoshi continues to frequently monitor her accounts for suspicious activity. Ms. Nakagoshi has purchased a credit monitoring program to assist her in her review. This is time Ms. Nakagoshi otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

59.    Knowing that thieves stole her Private Information and worrying about whether her Private Information is available for sale on the dark web has caused Ms. Nakagoshi stress and worry. Ms. Nakagoshi feels violated by Ambry and is very concerned that her genetic information is available for the public to abuse.

60.    Ms. Nakagoshi suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Nakagoshi entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

61.    Subsequent to the Data Breach, Ms. Nakagoshi began receiving suspicious text messages and emails. Ms. Nakagoshi estimates she received over a dozen suspicious text messages and numerous phishing emails. Reviewing these text messages and emails to determine their legitimacy has taken time that Ms. Nakagoshi otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

62.    As a result of the Data Breach, Ms. Nakagoshi will continue to be at heightened

risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

63.     Around the time Ms. Pancoast received notice of the Ambry Data Breach in April 2020, Ms. Pancoast began experiencing an increase in emails, text messages, and telephone calls regarding solicitations for new insurance. Ms. Pancoast has had to spend her valuable time evaluating the legitimacy of these emails, text messages, and telephone calls. This is time Ms. Pancoast otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

64.     Knowing that thieves stole her Private Information, and that it is available for sale on the dark web, has caused Ms. Pancoast stress and anxiety.

65.     Ms. Pancoast suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Pancoast entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

66.     As a result of the Data Breach, Ms. Pancoast will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

67.     Ms. Volk monitors her credit accounts regularly. In or around February 2020, prior to receiving notice from Ambry concerning the Data Breach, Ms. Volk noticed unauthorized charges on her credit card. Unsure at that time the reason behind her compromised account, Ms. Volk contacted her credit card company and notified them about the unauthorized charges. Ms. Volk spent several hours disputing the charge and communicating with her credit card company to resolve this issue.

68.     After speaking with a representative from her credit card company, the fraudulent charges were immediately removed from Ms. Volk's account.  Ms. Volk was vacationing in Florida at the time and the card had to be canceled immediately.  Ms. Volk did not have the use

1   of the card until she received the new card via FedEx, about 3 days later.

2        69.    On September 3, 2020, Ms. Volk received a scam email from iYogi, a computer

3   service company, confirming the payment of $489.99 for IT service she did not order.  This

4   amount did not appear on any of Ms. Volk's accounts or credit card statements.  Ms. Volk

5   immediately contacted the company to cancel this service and she was directed to their website to

6   download a cancellation form.  Once Ms. Volk went onto their website she realized they were

7   trying to gain access to her laptop and ended the call and logged off.  As a result, Ms. Volk's

8   laptop developed a virus from this high jacking attempt which she removed using malware but

9   the laptop no longer functioned properly.  Ms. Volk had to purchase a new laptop for $1,277.09

10   and spent many hours setting up the new laptop, changing passwords, and scanning documents

11   from her old laptop to her new laptop.

12        70.    Upon learning that thieves stole her Private Information during the Data Breach,

13   potentially including her genetic medical information, and knowing that her Private Information

14   may become available for sale on the dark web, Ms. Volk has experienced anxiety. She is now

15   very concerned about identity theft in general, and what could happen to her in the future because

16   of the Data Breach.

17        71.    Plaintiff Volk suffered actual injury from having her Private Information exposed

18   as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its

19   goods and services which she would not have, had Ambry disclosed that it lacked data security

20   practices adequate to safeguard consumers' Private Information from theft; (b) damages to and

21   diminution in the value of her Private Information—a form of intangible property that Ms. Volk

22   entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent

23   and impending injury arising from the increased risk of fraud and identity theft.

24        72.    In addition to the actual fraud Ms. Volk experienced prior to Ambry's notification

25   of the Data Breach in the form of unauthorized third parties fraudulently charging purchases on

26   her credit card, Ms. Volk continued to experience hardship as a result of the Data Breach. Ms.

27   Volk spent several hours of her valuable time and energy resetting automatic billing instructions

28   tied to her compromised credit card account. Ms. Volk was forced to change her account

1   information and passwords for her telephone account, her electric account, her Amazon account,
2   her PayPal account, and her Redbox account.  Ms. Volk spent time she otherwise would have
3   spent performing other activities, such as her job and/or leisurely activities for the enjoyment of
4   life.

5        73.    Subsequent to the Data Breach, Ms. Volk experienced numerous suspicious,
6   unsolicited telephone calls and emails from medical companies trying to sell her medical
7   equipment and devices. Ms. Volk has also received, unsolicited, numerous inappropriate and
8   explicit text messages from numbers she does not recognize. These telephone calls, emails, and
9   text messages have caused Ms. Volk annoyance and worry.

10       74.    As a result of the Data Breach, Ms. Volk will continue to be at heightened risk for
11  financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

12       75.    Upon receiving Notice from Ambry on or about April 15, 2020, Ms. Terrano
13  diligently checked her credit monitoring service and her financial accounts, a process which took
14  several hours. Plaintiff immediately signed up to receive notifications when changes are made to
15  her accounts. Ms. Terrano continues to monitor her accounts to date, which she estimates takes
16  her approximately a half hour every week. This is time Ms. Terrano would have spent performing
17  other activities, such as her job and/or leisurely activities for the enjoyment of life.

18       76.    Ms. Terrano suffered actual injury from having her Private Information exposed as
19  a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods
20  and services which she would not have, had Ambry disclosed that it lacked data security practices
21  adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution
22  in the value of his Private Information—a form of intangible property that Ms. Terrano entrusted
23  to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and
24  impending injury arising from the increased risk of fraud and identity theft.

25       77.    Subsequent to the Data Breach, Ms. Terrano experienced actual fraud in the form
26  of unauthorized charges to her credit card. In or around August 2020, Ms. Terrano was notified
27  by Experian that there were a series of fraudulent charges to her account. Also around this time,
28  Ms. Terrano received a shipment of push pins in the mail that she never ordered. Ms. Terrano

spent several hours of her valuable time working with Experian to investigate the fraudulent charges.

78.    Ms. Terrano experienced a series of suspicious events surrounding her finances since the Data Breach. For example, in March 2020, Ms. Terrano sought to increase her credit limit on her credit card but was denied. Upon information and belief, Ms. Terrano believes that this denial was related to the Data Breach. Ms. Terrano's automatic billing was also compromised, causing Ms. Terrano to receive a late payment notice.

79.    Additionally, Ms. Terrano has experienced a tremendous number of suspicious, unsolicited telephone calls and emails offering Ms. Terrano medical insurance and life insurance since the Data Breach. In addition to the annoyance they cause, Ms. Terrano has had to spend her valuable time analyzing the legitimacy of these calls and emails.

80.    The Data Breach has caused Ms. Terrano significant distress. Ms. Terrano lives in fear of what additional fraud she will be subjected to in the future. As a result of the Data Breach, Ms. Terrano will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

81.    After receiving Notice from Ambry on or about April 15, 2020, Ms. Taglioli immediately conducted several hours of research to investigate whether the Notice was legitimate. This is time Ms. Taglioli otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

82.    Knowing that thieves stole her Private Information, Ms. Taglioli is now very concerned about the unauthorized disclosure of her medical information. Ms. Taglioli spends time wondering if others have her Private Information, and what could happen to her in the future because of the Data Breach.

83.    Ms. Taglioli suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Taglioli entrusted

to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

84.     Subsequent to the Data Breach, Ms. Taglioli experienced numerous instances of actual fraud. Ms. Taglioli learned that in both July and August of 2020, unauthorized third parties fraudulently attempted to charge purchases to her pre-paid debit card. A charge for $130 from Webwatcher was declined, but two charges of $6.99 each from Instant Checkmate were successful. Ms. Taglioli spent several hours reporting the fraudulent activity. Ms. Taglioli was forced to cancel her debit card and suffered from a complete loss of access to her debit funds for approximately one week. This inability to access her money caused Ms. Taglioli stress and anxiety. The time Ms. Taglioli spent disputing the fraudulent charges is time Ms. Taglioli otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

85.     In or around June 2020, Ms. Taglioli was notified that that without her authorization, a bank in South Dakota had conducted a hard inquiry on her credit. Upon information and belief, Ms. Taglioli believes that this hard inquiry was also a consequence of the Data Breach.

86.     Ms. Taglioli has experienced an increase in suspicious, unsolicited text messages from unknown phone numbers since the Data Breach. Ms. Taglioli has had to spend her valuable time and energy reviewing these test messages to determine their legitimacy.

87.     As a result of the Data Breach, Ms. Taglioli will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

88.     Upon receiving Notice from Ambry on or around April 15, 2020, Ms. Pascoe spent several hours thereafter reviewing her financial accounts for fraudulent charges. Concerned that her personal information is in the hands of thieves, Ms. Pascoe attempted to accept free credit monitoring services offered by Ambry as a result of the Data Breach. Ms. Pascoe telephoned the numbers provided in the Notice letter but was directed to a subsidiary company. Ms. Pascoe spent several hours on the phone trying to enroll in the credit monitoring services offered by Ambry but was unable to do so because of what seemed to be a wrong number provided by Ambry. This is

time Ms. Pascoe otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

89.     Knowing that thieves stole her Private Information and worrying about whether her Private Information is available for sale on the dark web has caused Ms. Pascoe stress. Ms. Pascoe is very concerned that her genetic information is available for the public to abuse.

90.     Ms. Pascoe suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Pascoe entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

91.     Subsequent to the Data Breach, Ms. Pascoe began receiving suspicious telephone calls from individuals purportedly seeking to discuss her social security information. Reviewing these calls to determine their legitimacy has taken time that Ms. Pascoe otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

92.     As a result of the Data Breach, Ms. Pascoe will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

93.     Upon receiving Notice from Ambry on or about April 17, 2020, Plaintiff Lisa Neumann diligently monitored her credit accounts. This is time Ms. Neumann otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

94.     Knowing that thieves stole her Private Information, potentially including her genetic medical information, and knowing that her Private Information may be available for sale on the dark web, has caused Ms. Neumann stress.  Ms. Neumann is experiencing heightened anxiety knowing that she provided Ambry with not only her personal information, but also that of her children for the purpose of genetic testing. Ms. Neumann worries constantly that their information was also exposed as a result of the Data Breach.

CONSOLIDATED CLASS ACTION COMPLAINT

95.     Ms. Neumann suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Neumann entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

96.     This summer, Ms. Neumann's Bank of America debit card was used to make an unauthorized charge. Ms. Neumann spent several hours of her valuable time and energy speaking with a Bank of America representative and disputing the fraudulent charge. Ultimately, Ms. Neumann was forced to freeze her account and cancel her compromised debit card. As a result, Ms. Neumann was without a debit card, which she relied on for her daily needs, for several days. During the time period where Ms. Neumann was without her debit card, Ms. Neumann had to borrow money from her daughter. Being without her primary source of money for several days caused Ms. Neumann extreme stress and anxiety.

97.     Subsequent to the Data Breach, Ms. Neumann has experienced an increased number of suspicious phone calls and emails. Ms. Neumann also received a notification from Credit Karma, her credit monitoring service, alerting Ms. Neumann that she was logged into her account on a new, unrecognized device.

98.     Ms. Neumann now spends approximately a half hour every day monitoring her accounts for additional fraudulent charges. This is time she otherwise would spend performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

99.     As a result of the Data Breach, Ms. Neumann will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

100.    Around the time Ms. Velardi received notice of the Ambry Data Breach in April 2020, Ms. Velardi began receiving suspicious emails from Chase Bank and Amazon asking for her to verify her account information. Ms. Velardi telephoned both Chase Bank and Amazon to further inquire about the email but was told that the emails did not originate from either company.

1    Ms. Velardi has had to spend her valuable time evaluating the legitimacy of these emails. This is

2    time Ms. Velardi otherwise would have spent performing other activities, such as her job and/or

3    leisurely activities for the enjoyment of life.

4         101.    After receiving the unsolicited Chase Bank and Amazon emails, Ms. Velardi's

5    email account crashed. Ms. Velardi has been unable to access her emails since June. The email

6    address associated with her email account is one that Ms. Velardi provided for her genetic testing.

7         102.    Knowing that thieves stole her Private Information, and that it is available for sale

8    on the dark web, has caused Ms. Velardi concern.

9         103.    Ms. Velardi suffered actual injury from having her Private Information exposed as

10   a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods

11   and services which she would not have, had Ambry disclosed that it lacked data security practices

12   adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution

13   in the value of her Private Information—a form of intangible property that Ms. Velardi entrusted

14   to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and

15   impending injury arising from the increased risk of fraud and identity theft.

16        104.    As a result of the Data Breach, Ms. Velardi will continue to be at heightened risk

17   for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

18        105.    Ms. O'Hara monitors her credit accounts regularly. On March 26, 2020, prior to

19   receiving notice from Ambry concerning the Data Breach, Ms. O'Hara was notified by Chase

20   fraud protection services that they had detected an unauthorized charge on her Chase credit card.

21   Ms. O'Hara spent several hours disputing the charge and communicating with her credit card

22   company to resolve this issue. After speaking with a representative from her credit card company,

23   Ms. O'Hara was informed that she would need to cancel her credit card. Subsequently, Ms.

24   O'Hara was forced to reset her automatic billing on numerous newspaper subscriptions, her

25   Sunpass, and other accounts associated with her Chase credit card.

26        106.    Upon learning that thieves stole her Private Information during the Data Breach,

27   potentially including her genetic medical information, and knowing that her Private Information

28   may become available for sale on the dark web, Ms. O'Hara has experienced anxiety.

CONSOLIDATED CLASS ACTION COMPLAINT

107.    Plaintiff O'Hara suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. O'Hara entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

108.    In addition to the actual fraud Ms. O'Hara experienced prior to Ambry's Notice of the Data Breach in the form of unauthorized third parties fraudulently charging purchases on her credit card, Ms. O'Hara also experienced fraudulent charges to her retail credit card in the amount of $145. Ms. O'Hara received an alert regarding this fraudulent activity on August 15, 2020.

109.    Further, Ms. O'Hara experienced identity theft as a result of the Data Breach. On September 13, 2020, Ms. O'Hara's personal Instagram account was hacked. An individual posing as O'Hara overtook O'Hara's account and proceeded to solicit money from O'Hara's Instagram friends. Ms. O'Hara spent time addressing this theft that she otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

110.    The number of suspicious, unsolicited telephone calls and emails Ms. O'Hara receives has increased significantly since the Data Breach.  These telephone calls and emails have caused Ms. O'Hara annoyance and worry.

111.    As a result of the Data Breach, Ms. O'Hara will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

112.    Upon receiving Notice from Ambry on or about April 17, 2020, Ms. Harkness diligently monitored her credit accounts. Ms. Harkness estimates that she spent over ten hours of her time making sure that her credit was not compromised. This is time Ms. Harkness otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

113.    Knowing that thieves stole her Private Information, potentially including her genetic medical information, and knowing that her Private Information may be available for sale

on the dark web, has caused Ms. Harkness concern. Ms. Harkness worries about the harm that can be done with her genetic information in the wrong hands.

114. Ms. Harkness suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Harkness entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

115. Subsequent to the Data Breach, Ms. Harkness has experienced an increased number of suspicious emails to her college email address. Ms. Harkness reports the emails to her college as she receives them. Evaluating the legitimacy of these suspicious emails is time Ms. Harkness otherwise would spend performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

116. As a result of the Data Breach, Ms. Harkness will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

117. Upon receiving Notice from Ambry on or about April 17, 2020, Plaintiff Benjamin Cooperson II reviewed his current credit monitoring account and attempted to sign up with the credit monitoring agency supplied by Defendant. Defendant's service was not able to resolve his technical problems with their credit monitoring service. Mr. Cooperson contacted the credit bureaus to freeze his credit and is in the process of notifying his medical insurance providers, and contacting the Social Security Administration and his various healthcare providers to alert them of the Data Breach. Mr. Cooperson has also contacted his bank to further monitor his checking account. This is time Mr. Cooperson otherwise would have spent performing other activities, such as his job and/or leisurely activities for the enjoyment of life.

118. Knowing that thieves stole his Private Information, and knowing that his Private Information may be available for sale on the dark web, has caused Mr. Cooperson great anxiety. This Data Breach has caused him to not want to share any PII or PHI electronically, although he

understands how difficult that choice is in this age of technology. He now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring his personal information. Mr. Cooperson is now also very concerned about his healthcare coverage and identity theft in general.

119.   Mr. Cooperson suffered actual injury from having his Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which he would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of his Private Information—a form of intangible property that the Plaintiff Cooperson entrusted to Ambry as a condition for healthcare services; (c) loss of his privacy; (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

120.   Subsequent to the Data Breach, Mr. Cooperson has experienced an incredible increase in phishing emails from companies soliciting for medical treatments for various conditions as well as drugs.  He has attempted to "unsubscribe" from many of these unwanted solicitations, but has been unsuccessful. This is time Mr. Cooperson otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

121.   As a result of the Data Breach, Mr. Cooperson will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

122.   Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Laura Jasielum reviewed her financial accounts and signed up with the credit monitoring agency supplied by Defendant. She notified her bank, credit card agency, medical insurance company and her various healthcare providers to alert them of the Data Breach. Ms. Jasielum continues to monitor her checking account and her various credit monitoring services on a daily basis. This is time Ms. Jasielum otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

123.   Knowing that thieves stole her Private Information, including her medical records, and knowing that her Private Information may be available for sale on the dark web, has caused

Ms. Jasielum great anxiety. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Ms. Jasielum is now also very concerned about her healthcare coverage and identity theft in general.

124.   Ms. Jasielum suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that the Plaintiff Jasielum entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

125.   Subsequent to the Data Breach, Ms. Jasielum experienced numerous suspicious telephone calls. The number of calls has caused Ms. Jasielum to stop answering calls from numbers she does not recognize. This is time Ms. Jasielum otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

126.   As a result of the Data Breach, Ms. Jasielum will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

127.   Upon receiving Notice from Ambry on or about April 21, 2020, Plaintiff Colette Domingues reviewed her financial accounts and signed up with the credit monitoring agency supplied by Defendant. She notified her banks and credit card agencies to alert them of the Data Breach. Ms. Domingues continues to monitor her bank accounts and her various credit monitoring services on a regular basis. This is time Ms. Domingues otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

128.   Knowing that thieves stole her Private Information, including her medical records, and knowing that her Private Information may be available for sale on the dark web, has caused Ms. Domingues great anxiety. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology.

She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Ms. Domingues is now also very concerned about her healthcare coverage and identity theft in general.

129.   Ms. Domingues suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that the Plaintiff Domingues entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

130.   Subsequent to the Data Breach, Ms. Domingues experienced an increase in phishing telephone calls from domestic and foreign sources. Moreover, following the Data Breach she received a warning from Google that an unauthorized third party obtained her passwords for 141 of Ms. Domingues' online accounts. She was forced to change all the passwords to protect her identity. This is time Ms. Domingues otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

131.   As a result of the Data Breach, Ms. Domingues will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

132.   Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Debera Hensley reviewed her financial accounts and signed up with the credit monitoring service supplied by Defendant. At least once or twice daily she spends time reviewing her financial and email accounts for fraudulent charges. This is time Ms. Hensley otherwise would have spent performing other activities and leisurely events for the enjoyment of life.

133.   Knowing that thieves stole her Private Information, and that it is available for sale on the dark web, has caused Ms. Hensley stress. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this

CONSOLIDATED CLASS ACTION COMPLAINT

age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information.

134.    Ms. Hensley suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Hensley entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

135.    Subsequent to the Data Breach, Ms. Hensley experienced numerous suspicious telephone calls. This is time Ms. Hensley otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

136.    As a result of the Data Breach, Ms. Hensley will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

137.    Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Linda Stewart is a resident of Pedro, Ohio, and an Ambry patient. On or about April 15, 2020, Plaintiff Stewart researched the credit monitoring service offered by Defendant. At least once or twice a month, she spends time reviewing her financial accounts for fraudulent charges.  She also made trips to the bank to receive a new debit card as well as took time to change her telephone number. This is time Ms. Stewart otherwise would have spent performing other activities and leisurely events for the enjoyment of life.

138.    Knowing that thieves stole her Private Information, and that it is available for sale on the dark web, has caused Ms. Stewart incredible stress. She trusted Ambry to protect her very precious genetic code information and all the other information they requested to perform the test. She had a level of expectation that Ambry would respect her "most private" information. She is now suffering from high level of anxiety, loss of trust, and constantly worrying about the misuse of her information, her husbands and her young children.  This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is

in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information.

139.    Ms. Stewart suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Stewart entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

140.    As a result of the Data Breach, Ms. Stewart is seriously considering a credit freeze. Since changing her telephone number, she did receive a suspicious call. This is time Ms. Stewart otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

141.    As a result of the Data Breach, Ms. Stewart will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

142.    Since receiving Notice from Ambry on or about July 13, 2020, Plaintiff Ann Hoekstra has reviewed and monitored her credit one time per week through her credit union. She also telephoned her healthcare provider to inquire about any unusual information or activity. Ms. Hoekstra monitored her current credit monitoring account which is supplied through her credit union and was made aware of the credit monitoring supplied by Defendant. Ms. Hoekstra also placed a credit freeze on her account. This is time Ms. Hoekstra otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

143.    Knowing that thieves stole her Private Information, and knowing that her Private Information may be available for sale on the dark web, has caused Ms. Hoekstra great anxiety. Ms. Hoekstra is now also very concerned about her genetic information being "out there" and identity theft in general. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting

other online activities requiring her personal information.

144. Ms. Hoekstra suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that the Plaintiff Hoekstra entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

145. As a result of the Data Breach, Ms. Hoekstra will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

146. Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Rula Kanawati was made aware of the credit monitoring service supplied by Defendant and decided to use LifeLock credit monitoring instead. She called the credit bureaus to place credit freezes on her accounts. Ms. Kanawati has spent numerous hours per week reviewing her financial accounts for fraudulent charges, calling credit bureaus and banks to manage her accounts. This is time Ms. Kanawati otherwise would have spent performing her job and/or other leisurely events for the enjoyment of life.

147. Knowing that thieves stole her Private Information, and that it is available for sale on the dark web, has caused Ms. Kanawati incredible stress. She is now suffering from high level of anxiety due to the hundreds of hours she has had to spend on the misuse of her Private Information.  This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information.

148. Ms. Kanawati suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and

diminution in the value of her Private Information—a form of intangible property that Ms. Kanawati entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

149.     Subsequent to the Data Breach, Ms. Kanawati received notice from her bank that someone attempted to pass bad checks through the use of her identity. The bank did not cash the check; however, another fraudulent check was cashed at a different branch of her bank, for which Ms. Kanawati was eventually reimbursed. Because of this, her bank froze her account and took over one month to reimburse her. Ms. Kanawati also had to reset automatic billing instructions which were tied to her compromised accounts. As a result of this financial burden, Ms. Kanawati was unable to pay for her health insurance for two months.

150.     Moreover, Ms. Kanawati has experienced a tremendous increase in suspicious texts, phone calls and emails, and unauthorized password changes on her various accounts. She was forced to review the suspicious contact and rectify her changed passwords. This is time Ms. Kanawati otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

151.     As a result of the Data Breach, Ms. Kanawati will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

152.     Upon receiving Notice from Ambry in April 2020, Plaintiff Elizabeth Nakagoshi researched the credit monitoring service offered by Defendant but decided to use Identity Guard instead. She spent time searching for fraudulent charges, researching a reputable credit monitoring company, and speaking to others about the Data Breach. This is time Ms. Nakagoshi otherwise would have spent performing her job and/or other leisurely events for the enjoyment of life.

153.     Knowing that thieves stole her Private Information, and that it is available for sale on the dark web, has caused Ms. Nakagoshi incredible stress. She is now suffering from high level of anxiety due to the concern of her minor daughter's digital footprint.  This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her

CONSOLIDATED CLASS ACTION COMPLAINT

personal information.

154.   Ms. Nakagoshi suffered actual injury from having her minor daughter's Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her minor daughter's Private Information—a form of intangible property that Ms. Nakagoshi entrusted to Ambry as a condition for healthcare services; (c) loss of her minor daughter's privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

155.   Subsequent to the Data Breach, Ms. Nakagoshi has experienced an increase in suspicious phone calls. Additionally, Ms. Nakagoshi's husband received a fraudulent charge on their joint credit card. Ms. Nakagoshi was alerted of the suspicious charge via the banking institutions' mobile app. The charge was reimbursed, but Ms. Nakagoshi was without the use of her credit card until a new card arrived.  Ms. Nakagoshi froze her credit card to prevent any further fraudulent charges. This is time Ms. Nakagoshi otherwise would have spent performing other activities, such as her job and other leisurely activities for the enjoyment of life.

156.   As a result of the Data Breach, Ms. Nakagoshi and E.N. will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

157.   Upon receiving Notice from Ambry on or about April 27, 2020, Plaintiff Jill Barduca reviewed her medical records and financial accounts, and signed up with the credit monitoring service supplied by Defendant. She notified her medical insurance company and her various healthcare providers to alert them of the Data Breach. Ms. Barduca cancelled her credit card and contacted her bank to further monitor her checking account. This is time Ms. Barduca otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

158.   Knowing that thieves stole her Private Information, including her "diagnosis," and knowing that her Private Information may be available for sale on the dark web, has caused Ms.

Barduca "endless hours" of worry. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Ms. Barduca is now also very concerned about her healthcare coverage and identity theft in general.

159.    Ms. Barduca suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Barduca entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

160.    Subsequent to the Data Breach, Ms. Barduca experienced numerous suspicious telephone calls. The number of calls has caused Ms. Barduca to consider changing her cell phone number. This is time Ms. Barduca otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

161.    As a result of the Data Breach, Ms. Barduca will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

162.    Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Jonee Coleman reviewed her medical records, financial accounts and her various credit monitoring services that she used before and after the Data Breach. Ms. Coleman was notified by her credit monitoring service that her Private Information appeared on the dark web. Ms. Coleman also signed up with the credit monitoring service supplied by Defendant. In addition, she contacted her bank to monitor her account, and she also closed her existing checking account and opened a new one as a precaution. This is time Ms. Coleman otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

163.    Knowing that thieves stole her Private Information, and that it is available for sale on the dark web, has caused Ms. Coleman stress. This Data Breach has caused her to be reluctant

in sharing any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has some hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information.

164.     Ms. Coleman suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Coleman entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

165.     Beginning shortly after receiving the Data Breach, Ms. Coleman experienced phishing emails and a suspicious telephone call where the parties attempted to extract additional personal information and money from Ms. Coleman. This is time Ms. Coleman otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

166.     As a result of the Data Breach, Ms. Coleman will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

167.     Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Marion Farrier discussed the Data Breach with a third party whose Private Information was also disclosed by Ambry in the Data Breach. Ms. Farrier also conducted research online to understand the scope of the negative effects the Data Breach will have on the security of her identity, finances and healthcare.

168.     Knowing that thieves stole her Private Information, potentially including her genetic medical information, and knowing that her Private Information may become available for sale on the dark web, has caused Ms. Farrier anxiety. She is now very concerned about identity theft in general, and what could happen to her in the future because of the Data Breach.

169.     Plaintiff Farrier suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security

practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. Farrier entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

170.   Subsequent to the Data Breach, Ms. Farrier experienced actual fraud in the form of unauthorized third parties fraudulently charging purchases on her credit card. Her bank notified Ms. Farrier of the fraudulent activity, declined one of the charges and reimbursed her for the other within a day or two. Ms. Farrier had her bank change her credit card account number and she received a new credit card in approximately one week. In response to this fraud, Ms. Farrier was forced to spend time contacting her bank and resetting automatic billing instructions tied to the compromised account. This is time Ms. Farrier otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

171.   Subsequent to the Data Breach, Ms. Farrier also experienced numerous suspicious, unsolicited telephone calls and emails from medical companies trying to sell her medications.

172.   As a result of the Data Breach, Ms. Farrier will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

173.   Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Sandra Brodsky diligently monitored her current credit monitoring service. This is time Ms. Brodsky otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

174.   Knowing that thieves stole her Private Information, potentially including her genetic medical information, and knowing that her Private Information may be available for sale on the dark web, has caused Ms. Brodsky anxiety. She is now very concerned about identity theft in general, and what could happen to her in the future because of the Data Breach.

175.   Ms. Brodsky suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and

diminution in the value of her Private Information—a form of intangible property that Ms. Brodsky entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

176.   Subsequent to the Data Breach, Ms. Brodsky also experienced an increased amount of suspicious, unsolicited phishing telephone calls and emails. This is time Ms. Brodsky otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

177.   As a result of the Data Breach, Ms. Brodsky will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

178.   Upon receiving Notice from Ambry on or about April 15, 2020, Plaintiff Michael Annoni diligently checked his credit monitoring service and his financial accounts. This is time Mr. Annoni otherwise would have spent performing other activities or leisurely events for the enjoyment of life, rather than trips to the bank as a result of the breach.

179.   Mr. Annoni suffered actual injury from having his Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which he would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of his Private Information—a form of intangible property that Mr. Annoni entrusted to Ambry as a condition for healthcare services; (c) loss of his privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

180.   Subsequent to the Data Breach, Mr. Annoni experienced actual fraud in the form of numerous suspicious telephone calls, and an unauthorized third party fraudulently charged purchases on his credit card on or about September 8, 2020. His bank notified Mr. Annoni of the fraudulent activity. This is time Mr. Annoni otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

181.   As a result of the Data Breach, Mr. Annoni will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

182.   After receiving Notice from Ambry on or about April 15, 2020, Plaintiff Nicole McMurphy reviewed financial accounts for any signs of fraud. Ms. McMurphy also signed up

with the credit monitoring service supplied by Defendant. This is time Ms. McMurphy otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

183. Knowing that thieves stole her Private Information, Ms. McMurphy accepted the free credit monitoring offer from Ambry. Even so, she is now very concerned about identity theft in general, wondering if others have her Private Information, and what could happen to her in the future because of the Data Breach.

184. Ms. McMurphy suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Ms. McMurphy entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

185. Subsequent to the Data Breach, Ms. McMurphy experienced actual fraud in the form of unauthorized third parties fraudulently charging purchases on her credit card. Her bank notified Ms. McMurphy of the fraudulent activity and reimbursed her. This was incredibly problematic as Ms. McMurphy and her husband were unable to use their credit card, not able to charge for gas or other necessary household supplies. It took about a week to get new cards for the both of them, leaving them with a loss of access to funds for about a week. In response to this fraud, Ms. McMurphy was forced to spend time contacting her bank and ordering new cards tied to the compromised account. This is time Ms. McMurphy otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

186. As a result of the Data Breach, Ms. McMurphy will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**D. Ambry's Privacy Policies.**

187. Ambry makes numerous promises to its patients that it will maintain the security

and privacy of their Private Information.

188.     In its Terms and Conditions, Ambry states that "Ambry is committed to protecting the privacy of all users of the Services. We have published a Privacy Policy and a Cookie Policy, which together explain in detail our online information practices and the choices you, as a visitor, can make about the way your information is collected and used when using or accessing the Website or Services."

189.     Ambry's Information Security Statement[6] states:

> Ambry Genetics cares about your patients and your data as much as you do. We are committed to protecting the information you have entrusted to us. In order to demonstrate our commitment to information security, we have attained the SOC 2 Type 2 certification, which is independently audited by an AICPA organization. We undergo this rigorous testing every year, along with many other practices, to ensure patient health information is secure.

190.     Ambry's Privacy Policy[7] provides, in part:

> Ambry Genetics Corporation ("Ambry," "we," or "us") is committed to protecting your privacy. We have established this Privacy Policy to inform you of the specific practices and guidelines that protect the security and confidentiality of your personal information. By using our website, ambrygen.com, or any application or online services available on ambrygen.com (collectively, the "Services"), or by transmitting information to us by email or other electronic means, you agree to the terms of this Privacy Policy.
>
> **Security Measures**
>
> Information that you provide to Ambry through ambrygen.com is encrypted using industry standard Secure Sockets Layer (SSL) technology. Your information is processed and stored on controlled servers with restricted access.

191.     Ambry's Notice of Privacy Practices[8] provides, in part:

---

[6] *Information Security Statement*, https://www.ambrygen.com/legal/information-security-statement (last visited Sept. 7, 2020).
[7] *Ambry's Privacy Policy, available at*: https://www.ambrygen.com/legal/privacy-policy (last accessed Sept. 7, 2020).
[8] *Ambry Notice of Privacy Practices, available at*: https://www.ambrygen.com/legal/notice-of-privacy-practices (last accessed Sept. 7, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT

**We are required by law to:**

- Maintain the confidentiality of your protected health information in accordance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and applicable state law;
- Comply with the terms of this Notice, including any amendments; and
- Give you this Notice of our legal duties and privacy practices with respect to your PHI that we maintain. …

**Your Authorization Is Needed for Other Uses and Disclosures**

Unless otherwise permitted by applicable law, we will not use or disclose your PHI for purposes not described in this Notice unless you give us written authorization to do so (including via electronic signature). If you give us such written authorization, then, in most cases, you may revoke it in writing at any time as described in the authorization. Your revocation will be effective with respect to all of your PHI that we maintain, unless we have already taken action in reliance on your authorization.

192.    Ambry also ensures its patients in its Notice of Privacy Policy that it will only use their Private Information for certain limited purposes, such as for treatment, payment, and health care operations, among other, and further provides the following:

Unless otherwise permitted by applicable law, we will not use or disclose your PHI for purposes not described in this Notice unless you give us written authorization to do so (including via electronic signature). If you give us such written authorization, then, in most cases, you may revoke it in writing at any time as described in the authorization. Your revocation will be effective with respect to all of your PHI that we maintain, unless we have already taken action in reliance on your authorization.

193.    Ambry describes how it may use and disclose medical information for each category of uses or disclosures, none of which provide it a right to expose patients' Private Information in the manner it was exposed to unauthorized third parties in the Data Breach.

194.    By failing to protect Plaintiffs' and Class Members' Private Information, and by allowing the Data Breach to occur, Ambry broke these promises to Plaintiffs and Class Members. ///

CONSOLIDATED CLASS ACTION COMPLAINT

1

2
### E. The Healthcare Sector is Particularly Susceptible to Cyberattacks.

3    195.    Defendants were on notice that companies in the healthcare industry were targets

4    for cyberattacks.

5    196.    Defendants were also on notice that the FBI has been concerned about data security

6    in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems,

7    Inc., the FBI warned companies within the healthcare industry that hackers were targeting them.

8    The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related

9    systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or

10    Personally Identifiable Information (PII)."[9]

11    197.    The American Medical Association ("AMA") has also warned healthcare

12    companies about the importance of protecting their patients' confidential information:

13    > Cybersecurity is not just a technical issue; it's a patient safety issue.
14    > AMA research has revealed that 83% of physicians work in a practice
15    > that has experienced some kind of cyberattack. Unfortunately, practices
16    > are learning that cyberattacks not only threaten the privacy and security
    > of patients' health and financial information, but also patient access to
    > care.[10]

17    198.    The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a

18    forty percent increase in the number of data breaches from the previous year.[11] In 2017, a new

19    record high of 1,579 breaches were reported representing a 44.7 percent increase.[12] That trend

20    continues.

21

22    [9] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug.
23    2014),    https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited Sept. 7, 2020).

24    [10] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med.
25    Ass'n    (Oct.    4,    2019),    https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals    (last
26    visited Sept. 7, 2020).
27    [11] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report
    From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at:*
    https://www.idtheftcenter.org/surveys-studys (last accessed Sept. 18, 2020).
28    [12] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review, available at:*
    https://www.idtheftcenter.org/2017-data-breaches/ (last accessed Sept. 18, 2020).

199. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[13] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[14] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[15]

200. Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[16] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[17]

201. In the healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a recent report from

---

[13] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last accessed Sept. 18, 2020).
[14] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Sept. 18, 2020).
[15] *Id.*
[16] *2019 HIMSS Cybersecurity Survey, available at*: https://www.himss.org/2019-himss-cybersecurity-survey (last accessed Sept. 18, 2020).
[17] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last accessed Sept. 18, 2020).

40

CONSOLIDATED CLASS ACTION COMPLAINT

the Healthcare Information and Management Systems Society (HIMSS). And yet, 18% of healthcare organizations fail to conduct phishing tests, a finding HIMSS describes as 'incredible.'"[18]

202.   The report from Proofpoint was published March 27, 2019, and summarized findings of recent healthcare industry cyber threat surveys and recounted good, common sense steps that the targeted healthcare companies should follow to prevent email-related cyberattacks.

203.   One of the best protections against email related threats is security awareness training and testing on a regular basis. This should be a key part of a company's on-going training of its employees. "[S]ince phishing is still a significant, initial point of compromise, additional work needs to be done to further lower the click rate," the HIMSS report states. "This can be done through more frequent security awareness training, phishing simulation, and better monitoring of metrics pertaining to phishing (including whether there are any particular repeat offenders)."[19]

204.   ProtonMail Technologies publishes a guide for IT Security to small businesses (i.e., companies without the heightened standard of care applicable in the healthcare industry). In its 2019 guide, ProtonMail dedicates a full chapter of its Book guide to the danger of phishing and ways to prevent a small business from falling prey to it. It reports:

> Phishing and fraud are becoming ever more extensive problems. A recent threat survey from the cybersecurity firm Proofpoint stated that between 2017 and 2018, email-based attacks on businesses increased 476 percent. The FBI reported that these types of attacks cost companies around the world $12 billion annually.
>
> Similar to your overall IT security, your email security relies on training your employees to implement security best practices and to recognize possible phishing attempts. This must be deeply ingrained into every staff member so that every time they check their emails, they are alert to the possibility of malicious action.[20]

---

[18] Aaron Jensen, Healthcare Phishing Statistics: 2019 HIMSS Survey Results (Mar. 27, 2019), https://www.proofpoint.com/us/security-awareness/post/healthcare-phishing-statistics-2019-himss-survey-results (last visited Sept. 7, 2020).

[19] *Id.*

[20] *The ProtonMail Guide to IT Security for Small Businesses*, ProtonMail (2019), *available at* https://protonmail.com/it-security-complete-guide-for-businesses (last visited Sept. 7, 2020).

205.    The guidance that ProtonMail provides non-healthcare industry small businesses is likely still not adequate for a company like Ambry, with the heightened healthcare standard of care based on HIPAA, CMIA, and the increased danger from the sensitivity and wealth of Private Information it retains, but ProtonMail's guidance is informative for showing how inadequately Ambry protected the Private Information of the Plaintiffs and Class Members. ProofPoint lists numerous tools under the heading, "How to Prevent Phishing":

a.  **Training:** "Training your employees on how to recognize phishing emails and what to do when they encounter one is the first and most important step in maintaining email security. *This training should be continuous as well. . . .*"

b.  **Limit Public Information:** "Attackers cannot target your employees if they don't know their email addresses. Don't publish non-essential contact details on your website or any public directories . . . .

c.  **Carefully check emails:** "First off, your employees should be skeptical anytime they receive an email from an unknown sender. Second, most phishing emails are riddled with typos, odd syntax, or stilted language. Finally, check the 'From' address to see if it is odd . . . . If an email looks suspicious, employees should report it."

d.  **Beware of links and attachments:** "Do not click on links or download attachments without verifying the source first and establishing the legitimacy of the link or attachment. . . ."

e.  **Do not automatically download remote content:** "Remote content in emails, like photos, can run scripts on your computer that you are not expecting, and advanced hackers can hide malicious code in them. You should configure your email service provider to not automatically download remote content. This will allow you to verify an email is legitimate before you run any unknown scripts contained in it."

f.  **Hover over hyperlinks:** "Never click on hyperlinked text without hovering your cursor over the link first to check the destination URL, which should appear in the lower corner of your window. Sometimes the hacker might disguise a malicious link as a short URL." [Proofpoint notes that there are tools online available for retrieving original URLs from shortened ones.]

g.  **If in doubt, investigate:** "Often phishing emails will try to create a false sense of urgency by saying something requires your immediate action. However, if your employees are not sure if an email is genuine, they should not be afraid to take extra time to verify the email. This might include asking a colleague, your IT security lead, looking up the website of the service the email is purportedly from, or, if they have a phone number, calling the institution, colleague, or client that sent the email."

h. **Take preventative measures:** "Using an end-to-end encrypted email service gives your business's emails an added layer of protection in the case of a data breach. A spam filter will remove the numerous random emails that you might receive, making it more difficult for a phishing attack to get through. Finally, other tools, like Domain-based Message Authentication, Reporting, and Conformance (DMARC) help you be sure that the email came from the person it claims to come from, making it easier to identify potential phishing attacks."[21]

206.     These are basic, common-sense email security measures that every business, not only healthcare businesses, should be doing. Ambry, with its heightened standard of care should be doing even more. But by adequately taking these common-sense solutions, Ambry could have prevented this Data Breach from occurring.

207.     As a healthcare provider, Ambry knew, or should have known, the importance of safeguarding the patients' Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Ambry's patients as a result of a breach. Ambry failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**F. *Ambry Acquires, Collects and Stores Its Patients' Private Information.***

208.     Ambry acquires, collects, and stores a massive amount of its patients' protected health information and other personally identifiable data.

209.     As a condition of engaging in health services, Ambry requires that these patients entrust them with highly confidential Private Information.

210.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Ambry assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

211.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information, and, as current and former patients, they relied on Ambry to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

---

[21] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT

### G.  The Value of Private Information and the Effects of Unauthorized Disclosure.

212.    Ambry was well aware that the Private Information it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

213.    Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[22] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and PHI on multiple underground Internet websites, commonly referred to as the dark web.

214.    While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363 according to the Infosec Institute.[23]

215.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

216.    Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[24]

217.    Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

---

[22] Federal Trade Commission, *Warning Signs of Identity Theft, available at:* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed Apr. 21, 2020).

[23] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at:* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last accessed Apr. 21, 2020).

[24] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited Sept. 7 , 2020).

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

218.    The ramifications of Ambry's failure to keep its patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

219.    Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

220.    Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[25] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[26]

221.    Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[27] Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did

---

[25] *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last accessed Sept. 7, 2020).

[26] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches* ("*Potential Damages*"), *available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accesses Sept. 7, 2020).

[27] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://notified.idtheftcenter.org/s/resource (last accessed Sept.7, 2020).

not receive in order to restore coverage.[28] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[29]

222.    As a healthcare provider, Ambry knew, or should have known, the importance of safeguarding its patients' Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Ambry's patients as a result of a breach. Ambry failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### H.  Ambry's Conduct Violates HIPAA.

223.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[30]

224.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

---

[28] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Sept. 7, 2020); *see also*, National Survey on Medical Identity Theft, Feb. 22, 2010, cited at p. 2.

[29] *Id.*

[30] HIPAA Journal, *What is Considered Protected Health Information Under HIPAA?*, *available at:* https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last accessed Sept. 7, 2020).

225.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[31]

226.    Based on information and belief, Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations. Ambry's security failures include, but are not limited to, the following:

a.  Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

b.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

c.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

d.  Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f.  Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy

---

[31]    Breach   Notification   Rule,   U.S.   Dep't   of   Health   &   Human   Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html   (emphasis   added) (last visited Sept. 7, 2020).

rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g.  Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

h.  Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

i.  Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

### I.   *Ambry Failed to Comply with FTC Guidelines*.

227.   Ambry was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

228.   The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[32]

---

[32] Federal Trade Commission, *Start With Security: A Guide for Business*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf   (last accessed Sept. 7, 2020).

229.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[33] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

230.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[34]

231.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

232.    Ambry failed to properly implement basic data security practices. Ambry's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

233.    Ambry was at all times fully aware of its obligation to protect the Private Information of patients because of its position as a trusted healthcare provider. Ambry was also aware of the significant repercussions that would result from its failure to do so.

---

[33] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at:    https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Sept. 7, 2020).
[34] FTC, *Start With Security*, *supra* note 16.

### J.   Ambry Failed to Comply with Healthcare Industry Standards.

234.   HHS's Office for Civil Rights notes:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[35]

235.   HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

236.   Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because the of value of the Private Information which they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[36] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

237.   Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Ambry chose to ignore them. These best practices were known, or should have been known by Ambry, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

### K.   Plaintiffs and Class Members Suffered Damages.

238.   The ramifications of Ambry's failure to keep patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information

---

[35]   HIPAA Journal, Cybersecurity Best Practices for Healthcare Organizations, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last accessed Sept. 7, 2020).

[36]   *See e.g.,* INFOSEC, *10 Best Practices For Healthcare Security, available at:* https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref (last accessed Sept. 7, 2020).

and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[37]

239.    According to one security consulting agency who reported about the Data Breach at Ambry:

> Genetic information is considered to be especially private because it is unique to the individual, cannot be de-identified and will forever be linked to only one person in the world.
> ***
> Federal laws recognize the harmful effects from the use of genetic information by prohibiting the use of this data in the offering or underwriting of health insurance and in employment decisions. Some states go further in prohibiting discrimination on the basis of genetic data in most circumstances including housing, education and financial services.[38]

240.    The state of California generally prohibits healthcare providers from disclosing a patient's confidential medical information without prior authorization. California's Confidentiality of Medical Information Act ("CMIA") (Cal. Civ. Code § 56.10(a)) states that "a provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or enrollee or subscriber of a health care service plan without first obtaining an authorization except as provided in subdivision (b) or (c)." (*See also* Cal. Civ. Code §§ 1798.80, *et seq.*)

241.    In addition to their obligations under state laws and regulations, Defendants owed a common law duty to Plaintiffs and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

---

[37] *2014 LexisNexis True Cost of Fraud Study*, *available at:* https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last accessed Sept. 7, 2020).

[38] *Genetic Testing Lab Hack Affects 2333,000*, Data Breach Today (Apr. 24, 2020), https://www.databreachtoday.com/genetic-testing-lab-hack-affects-233000-a-14182?highlight=true (last accessed Sept. 17, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT

242.     Defendants further owed and breached its duty to Plaintiffs and Class Members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

243.     The risks associated with identity theft are serious.  While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record.  Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of negative information on their credit reports.  In rare cases, they may even be arrested for crimes they did not commit.

244.     Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

245.     Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in their agreements with Ambry and they were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

246.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information has diminished in value.

247.     The Private Information belonging to Plaintiffs and Class Members is private, private in nature, and was left inadequately protected by Defendants who did not obtain Plaintiffs' or Class Members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.

248.     The Data Breach was a direct and proximate result of Defendants' failure to (a) properly safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative,

technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

249.    Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect patient data.

250.    Had Defendants remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiffs' and Class Members' Private Information.

251.    As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

252.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[39]

253.    In the Data Breach Notice, Ambry made an ambiguous and vague offer of identity monitoring service to patients without providing information as to the terms of service, benefits offered, or length of service. Ambry has not offered or provided victims any fraud insurance or medical identity theft protection. Ambry's offer fails to address the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information.

---

[39] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013, *available at*: https://www.bjs.gov/content/pub/pdf/vit12.pdf (last accessed Sept. 7, 2020).

254. Other than providing 12 months of credit monitoring, Defendants do not appear to be taking any measures to assist Plaintiffs and Class Members other than telling them to simply do the following:

- "remain vigilant for incidents of fraud and identity theft";
- "review[] account statements and monitor[] your credit report for unauthorized activity";
- obtain a copy of free credit reports;
- contact the FTC and/or the state Attorney General's office;
- enact a security freeze on credit files; and
- create a fraud alert.

None of these recommendations, however, require Defendants to expend any effort to protect Plaintiffs' and Class Members' Private Information.

255. Defendants' failure to adequately protect Plaintiffs' and Class Members' Private Information has resulted in Plaintiffs and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money – while Defendants sit by and do nothing to assist those affected by the incident. Instead, as Ambry's Data Breach Notice indicates, it is putting the burden on Plaintiffs and Class Members to discover possible fraudulent activity and identity theft.

256. Ambry's offer of 12 months of identity monitoring to Plaintiffs and Class Members is woefully inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is acquired and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's Private Information) – it does not prevent identity theft.[40]

---

[40] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html (last visited Apr. 30, 2020).

This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

257.    As a result of Defendants' failures to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, and are at increased risk of suffering:

a.    The compromise, publication, theft and/or unauthorized use of their Private Information;

b.    Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

c.    Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

d.    The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect the Private Information in their possession;

e.    Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and

f.    Anxiety and distress resulting from fear of misuse of their genetic medical information.

258.    In addition to a remedy for the economic harm, Plaintiffs and Class Members maintain an undeniable interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

### L. Ambry's Delay in Identifying & Reporting the Breach Caused Additional Harm.

259.    It is axiomatic that:

The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an

account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act.[41]

260.    Indeed, once a data breach has occurred:

[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills, insurance invoices, and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves (internal citations omitted).[42]

261.    Although their Private Information was improperly exposed on or about January 22-24, 2020, Plaintiffs and Class Members were not notified of the Data Breach until mid-April 2020, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

262.    Defendants notified HHS on or about March 22, 2020, but waited almost an entire month to notify the California Attorney General, Plaintiffs, and Class Members.[43]

263.    As a result of Defendants' delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiffs and Class Members has been driven even higher.

## V.    CHOICE OF LAW

264.    The State of California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of all California residents and citizens of the United States against a company headquartered and doing

---

[41] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire¸ *available at:* https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million (last accessed Sept. 7, 2020).

[42] Consumer Reports, *The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too*, January 31, 2019, *available at:* https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last accessed Sept. 7, 2020).

[43] U.S. Department of Health and Human Services, *Cases Currently Under Investigation, available at:* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sept. 7, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT

business in California. California has a greater interest in the nationwide claims of Plaintiffs and members of the Nationwide Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

265.    The corporate headquarters of Ambry and KMPM, located in Aliso Viejo, California, is the "nerve center" of their business activities – the place where their officers direct, control, and coordinate the companies' activities, including their data security functions and policy, financial, and legal decisions.

266.    Ambry's response to the Data Breach at issue here, and corporate decisions surrounding such response, were made from and in California.

267.    Ambry's breaches of duty to Plaintiffs and Nationwide Class members emanated from California.

268.    Application of California law to the Nationwide Class with respect to Plaintiffs' and Class Members' claims is neither arbitrary nor fundamentally unfair because California has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Nationwide Class.

269.    Under California's choice of law principles, which are applicable to this action, the common law of California applies to the nationwide common law claims of all Nationwide Class members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's Unfair Competition Law and Confidentiality of Medical Information Act may be applied to non-resident plaintiffs as against Ambry.

## VI.    CLASS ALLEGATIONS

270.    Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

271.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> **Nationwide Class: All individuals whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

272.    In the alternative to the Nationwide Class, Plaintiffs seek certification of the following additional Nationwide Sub-Classes:

**Nationwide Adult Subclass:  All adult individuals in the United States whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Nationwide Minor Subclass:  All minor individuals in the United States whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

273.    In the alternative to the Nationwide Class, Plaintiffs seek certification of the following state Sub-Classes:

**Arizona Sub-Class:  All persons residing in Arizona whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**California Sub-Class:  All persons residing in California whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Florida Sub-Class:  All persons residing in Florida whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Georgia Sub-Class:  All persons residing in Georgia whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Illinois Sub-Class:  All persons residing in Illinois whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Indiana Sub-Class:  All persons residing in Indiana whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Michigan Sub-Class:  All persons residing in Michigan whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Minnesota Sub-Class:  All persons residing in Minnesota whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

CONSOLIDATED CLASS ACTION COMPLAINT

**New Jersey Sub-Class**: All persons residing in New Jersey whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**New York Sub-Class**: All persons residing in New York whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**Ohio Sub-Class**: All persons residing in Ohio whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**Pennsylvania Sub-Class**: All persons residing in Pennsylvania whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**Tennessee Sub-Class**: All persons residing in Tennessee whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**Virginia Sub-Class**: All persons residing in Virginia whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**West Virginia Sub-Class**: All persons residing in West Virginia whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

274.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

275.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

276.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Nationwide Class, Nationwide Sub-Classes, and State Subclasses (the "Classes") are so numerous that joinder of all members is impracticable. Defendants have identified hundreds of thousands of patients whose Private

CONSOLIDATED CLASS ACTION COMPLAINT

Information may have been improperly accessed in the Data Breach, and the Classes are apparently identifiable within Defendants' records.

277.   <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

      a.   Whether and when Defendants actually learned of the Data Breach and whether their response was adequate;

      b.   Whether Defendants owed a duty to the Classes to exercise due care in collecting, storing, safeguarding and/or obtaining their Private Information;

      c.   Whether Defendants breached that duty;

      d.   Whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiffs' and Class Members' Private Information;

      e.   Whether Defendants acted negligently in connection with the monitoring and/or protecting of Plaintiffs' and Class Members' PII/PHI;

      f.   Whether Defendants knew or should have known that they did not employ reasonable measures to keep Plaintiffs' and Class Members' PII/PHI secure and prevent loss or misuse of that Private Information;

      g.   Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

      h.   Whether Defendants caused Plaintiffs' and Class Members' damages;

      i.   Whether Defendants violated the law by failing to promptly notify Class Members that their Private Information had been compromised;

      j.   Whether Plaintiffs' and the Class Members' Private Information were recorded onto Defendants' internet portal on or before March 3, 2020;

      k.   Whether Plaintiffs and the other Class Members are entitled to actual damages, credit monitoring, and other monetary relief;

      l.   Whether Defendants violated the California Unfair Competition Law (Business

& Professions Code § 17200, *et seq.*); and

m. Whether Defendants violated the Confidentiality of Medical Information Act (Cal. Civ. Code § 56, *et seq.*).

278. <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendants' misfeasance.

279. <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

280. <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

281. <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporations,

1    like Defendants. Further, even for those class members who could afford to litigate such a claim,

2    it would still be economically impractical and impose a burden on the courts.

3    282. The nature of this action and the nature of laws available to Plaintiffs and the Class

4    make the use of the class action device a particularly efficient and appropriate procedure to afford

5    relief to Plaintiffs and the Class for the wrongs alleged because Defendants would necessarily

6    gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the

7    limited resources of each individual Class Member with superior financial and legal resources;

8    the costs of individual suits could unreasonably consume the amounts that would be recovered;

9    proof of a common course of conduct to which Plaintiffs were exposed is representative of that

10   experienced by the Class and will establish the right of each Class Member to recover on the cause

11   of action alleged; and individual actions would create a risk of inconsistent results and would be

12   unnecessary and duplicative of this litigation.

13   283. Ambry and KMPM are based in Aliso Viejo, California, and on information and

14   belief, all managerial decisions emanate from there, the representations on Ambry's website

15   originate from there, Ambry's misrepresentations originated from California, and therefore

16   application of California law to the Nationwide Class is appropriate.

17   284. The litigation of the claims brought herein is manageable. Defendants' uniform

18   conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

19   Members demonstrates that there would be no significant manageability problems with

20   prosecuting this lawsuit as a class action.

21   285. Adequate notice can be given to Class Members directly using information

22   maintained in Defendants' records.

23   286. Unless a Class-wide injunction is issued, Defendants may continue in their failure

24   to properly secure the Private Information of Class Members, Defendants may continue to refuse

25   to provide proper notification to Class Members regarding the Data Breach, and Defendants may

26   continue to act unlawfully as set forth in this Complaint.

27   287. Further, Defendants have acted or refused to act on grounds generally applicable

28   to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to

the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

288.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

    a.   Whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b.   Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.   Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

    d.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

    e.   Whether Class Members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Classes)**

289.    Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

290.    As a condition of receiving services, Plaintiffs and Class Members were obligated to provide Ambry directly, or through their other healthcare providers, with their Private Information.

291.    Plaintiffs and Class Members entrusted their Private Information to Ambry with

63
CONSOLIDATED CLASS ACTION COMPLAINT

1    the understanding that Ambry would safeguard their information.

2         292.    Defendants had full knowledge of the sensitivity of the Private Information and the

3    types of harm that Plaintiffs and Class Members could and would suffer if the Private Information

4    were wrongfully disclosed.

5         293.    Defendants had a duty to exercise reasonable care in safeguarding, securing and

6    protecting such information from being compromised, lost, stolen, misused, and/or disclosed to

7    unauthorized parties.  This duty includes, among other things, designing, maintaining and testing

8    its security protocols to ensure that Private Information in its possession was adequately secured

9    and protected and that employees tasked with maintaining such information were adequately

10   training on relevant cybersecurity measures.

11        294.    Plaintiffs and Class Members were the foreseeable and probable victims of any

12   inadequate security practices and procedures. Defendants knew of or should have known of the

13   inherent risks in collecting and storing the Private Information of Plaintiffs and Class Members,

14   the critical importance of providing adequate security of that Private Information, the current

15   cyber scams being perpetrated, and that they had inadequate employee training and education and

16   IT security protocols in place to secure the Private Information of Plaintiffs and Class Members.

17        295.    Defendants' own conduct created a foreseeable risk of harm to Plaintiffs and Class

18   Members. Defendants' misconduct included, but was not limited to, their failure to take the steps

19   and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also

20   included their decision not to comply with HIPAA and industry standards for the safekeeping and

21   encrypted authorized disclosure of the Private Information of Plaintiffs and Class Members.

22        296.    Plaintiffs and Class Members had no ability to protect their Private Information

23   that was in Defendants' possession.

24        297.    Defendants were in a position to protect against the harm suffered by Plaintiffs and

25   Class Members as a result of the Data Breach.

26        298.    Defendants had a duty to put proper procedures in place to prevent the

27   unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

28        299.    Defendants have admitted that Plaintiffs' and Class Members' Private Information

1   was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

2       300.   Defendants, through their actions and/or omissions, unlawfully breached their duty

3   to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and

4   safeguarding Plaintiffs' and Class Members' Private Information while it was within Defendants'

5   possession or control.

6       301.   Defendants improperly and inadequately safeguarded Plaintiffs' and Class

7   Members' Private Information in deviation of standard industry rules, regulations and practices at

8   the time of the Data Breach.

9       302.    Defendants, through their actions and/or omissions, unlawfully breached their

10  duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect

11  and prevent dissemination of its Plaintiffs' and Class Members' Private Information.

12      303.   Defendants, through their actions and/or omissions, unlawfully breached their duty

13  to adequately disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

14      304.   But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and

15  Class Members, Plaintiffs' and Class Members' Private Information would not have been

16  compromised.

17      305.   There is a temporal and close causal connection between Defendants' failure to

18  implement security measures to protect the Private Information and the harm suffered, or risk of

19  imminent harm suffered, by Plaintiffs and the Class.

20      306.   As a result of Defendants' negligence, Plaintiffs and Class Members have suffered

21  and will continue to suffer damages and injury including, but not limited to out-of-pocket expenses

22  associated with procuring robust identity protection and restoration services; increased risk of

23  future identity theft and fraud and the costs associated therewith; time spent monitoring,

24  addressing  and correcting the current and future consequences of the Data Breach; diminished

25  value of the Private Information; payment for medical record privacy services they did not receive;

26  and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

27      307.   Violations of statutes which establish a duty to take precautions to protect a

28  particular class of persons from a particular injury or type of injury may constitute negligence *per*

CONSOLIDATED CLASS ACTION COMPLAINT

1   *se*.

2       308.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce,"

3   including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such

4   as Ambry, of failing to use reasonable measures to protect Private Information. The FTC

5   publications and orders described above also form part of the basis of Defendant's duty in this

6   regard.

7       309.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures

8   to protect Plaintiffs' and Class Members' Private Information and not complying with applicable

9   industry standards, as described in detail herein. Defendants' conduct was particularly

10  unreasonable given the nature and amount of Private Information they obtained and stored, and

11  the foreseeable consequences of a data breach including, specifically, the damages that would

12  result to Plaintiffs and Class Members.

13      310.    Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

14      311.    Plaintiffs and Class Members are within the class of persons that the FTC Act was

15  intended to protect.

16      312.    The harm that occurred as a result of the Data Breach is the type of harm the FTC

17  Act was intended to guard against. The FTC has pursued enforcement actions against businesses,

18  which, as a result of their failure to employ reasonable data security measures and avoid unfair

19  and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

20      313.    Defendants' violation of HIPAA also independently constitutes negligence *per se*.

21      314.    HIPAA privacy laws were enacted with the objective of protecting the

22  confidentiality of patients' healthcare information and set forth the conditions under which such

23  information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to

24  healthcare providers and the organizations they work for, but to any entity that may have access

25  to healthcare information about a patient that—if it were to fall into the wrong hands—could

26  present a risk of harm to the patient's finances or reputation.

27      315.    Plaintiffs and Class Members are within the class of persons that HIPAA privacy

28  laws were intended to protect.

CONSOLIDATED CLASS ACTION COMPLAINT

316. The harm that occurred as a result of the Data Breach is the type of harm HIPAA privacy laws were intended to guard against.

317. As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

318. Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

## COUNT II
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Classes)

319. Plaintiffs restate and realleges all of the foregoing Paragraphs as if fully set forth herein.

320. California established the right to privacy in Article 1, Section 1 of the California Constitution.

321. The State of California recognizes the tort of Intrusion into Private Affairs, and adopts the formulation of that tort found in the Restatement (Second) of Torts which states:

322. One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652B (1977).

323.     Plaintiffs and Class Members had a legitimate and reasonable expectation of privacy with respect to their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

324.     Defendants owed a duty to patients in their network, including Plaintiffs and Class Members, to keep their Private Information confidential.

325.     The unauthorized release of Private Information, especially the type related to personal health information, is highly offensive to a reasonable person.

326.     The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class Members disclosed their Private Information to Defendants as part of their use of Defendants' services, but privately, with the intention that the Private Information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

327.     The Data Breach constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

328.     Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew its information security practices were inadequate.

329.     Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and Class Members.

330.     As a proximate result of Defendants' acts and omissions, Plaintiffs' and Class Members' Private Information was disclosed to and used by third parties without authorization, causing Plaintiffs and Class Members to suffer damages.

331.     Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons.

332.     Plaintiffs and Class Members have no adequate remedy at law for the injuries in

that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and Class Members.

## COUNT III
## BREACH OF CONTRACT
### (On Behalf of Plaintiffs and the Classes)

333.    Plaintiffs restate and realleges all of the foregoing Paragraphs as if fully set forth

334.    As healthcare providers, Defendants entered into contracts with Plaintiffs and Class Members.

335.    The promises and representations described above relating to HIPAA, CMIA, and industry practices, and about Defendants' purported concern about their patients' privacy rights became terms of the contract between Defendants and their patients, including Plaintiffs and Class Members.

336.    Defendants breached these promises by failing to comply with HIPAA, CMIA, and reasonable industry practices.

337.    As a result of Defendants' breach of these terms, Plaintiffs and Class Members have been harmed and put at risk of future harm.

338.    Plaintiffs and Class Members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Classes)

339.    Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

340.    Plaintiffs and Class Members were required to provide their Private Information, including their names, Social Security numbers, addresses, medical record numbers, dates of birth, telephone numbers, email addresses, and various health related information to Defendants as a condition of their use of Defendants' services.

341.     Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services, along with Defendants' promise to protect their health information and other Private Information from unauthorized disclosure.

342.     In their written privacy policies, Ambry expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

343.     Ambry promised to comply with HIPAA standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

344.     Implicit in the agreement between Plaintiffs and Class Members and the Defendants to provide Private Information was Defendants' obligation to (a) use such Private Information for business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized disclosures of the Private Information; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses; and (f) retain the Private Information only under conditions that kept such information secure and confidential.

345.     Without such implied contracts, Plaintiffs and Class Members would not have provided their Private Information to Defendants.

346.     Plaintiffs and Class Members fully performed their obligations under the implied contract with Defendants; however, Defendants did not.

347.     Defendants breached the implied contracts with Plaintiffs and Class Members by failing to conduct the following:

a.    reasonably safeguard and protect Plaintiffs' and Class Members' Private Information, which was compromised as a result of the Data Breach;

b.    comply with their promise to abide by HIPAA;

c.    ensure the confidentiality and integrity of electronic protected health information that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R 164.306(a)(1);

d.   implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R 164.312(a)(1);

e.   implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R 164.308(a)(1);

f.   identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R 164.308(a)(6)(ii); and

g.   protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R 164.306(a)(2).

348.   As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

## COUNT V
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Classes)

349.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

350.   Plaintiffs and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased goods and services from Defendants and in so doing provided Defendants with their Private Information. In exchange, Plaintiffs and Class Members should have

received from Defendants the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

351.   Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

352.   The amounts Plaintiffs and Class Members paid for goods and services were used, in part, to pay for use of Defendants' network and the administrative costs of data management and security.

353.   Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

354.   Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

355.   Defendants acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

356.   If Plaintiffs and Class Members knew that Defendants had not reasonably secured their Private Information, they would not have agreed to Defendants' services.

357.   Plaintiffs and Class Members have no adequate remedy at law.

358.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and

recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

359.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

360.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Classes)**

361.    Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

362.    In light of their special relationship, Defendants have become the guardian of Plaintiffs' and Class Members' PII and/ PHI. Defendants have become a fiduciary, created by its undertaking and guardianship of patients' Private Information, to act primarily for the benefit of its patients, including Plaintiffs and Class Members. This duty included the obligation to safeguard Plaintiffs' and Class Members' Private Information and to timely notify them in the event of a data breach.

363.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its relationship. Defendants breached its fiduciary duties owed to Plaintiffs and Class Members by failing to conduct the following:

        a.    properly encrypt and otherwise protect the integrity of the system containing

Plaintiffs' and Class Members' Private Information;

b.   timely notify and/or warn Plaintiffs and Class Members of the Data Breach;

c.   ensure the confidentiality and integrity of electronic protected health information Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R 164.306(a)(1);

d.   implement technical policies and procedures to limit access to only those persons or software programs that have been granted access rights in violation of 45 C.F.R 164.312(a)(1);

e.   implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R 164.308(a)(1);

f.   identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R 164.308(a)(6)(ii);

g.   protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R 164.306(a)(2);

h.   protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R 164.306(a)(3);

i.   ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R 164.306(a)(94);

j.   prevent the improper use and disclosure of protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R 164.502, *et seq.*;

k.   effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their

functions and to maintain security of protected health information in violation of 45 C.F.R 164.530(b) and 45 C.F.R 164.308(a)(5);

l.   design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R 164.530(c); and otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

364.   As a direct and proximate result of Defendants' breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with the effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect patients' Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

365.   As a direct and proximate result of Defendants' breach of their fiduciary duty, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

///

///

///

///

CONSOLIDATED CLASS ACTION COMPLAINT

## COUNT VII
### BREACH OF CONFIDENCE
### (On Behalf of Plaintiffs and the Classes)

366.    Plaintiffs restate and reallege paragraphs all of the foregoing Paragraphs as if fully set forth herein.

367.    At all times during Plaintiffs' and Class Members' interactions with Defendants, Defendants were fully aware of the confidential nature of the Private Information that Plaintiffs and Class Members provided to Defendant.

368.    As alleged herein and above, Defendants' relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' Private Information would be collected, stored, and protected in confidence, and would not be disclosed the unauthorized third parties.

369.    Plaintiffs and Class Members provided their respective Private Information to Defendants with the explicit and implicit understandings that Defendants would protect and not permit the Private Information to be disseminated to any unauthorized parties.

370.    Plaintiffs and Class Members also provided their Private Information to Defendants with the explicit and implicit understandings that Defendants would take precautions to protect that Private Information from unauthorized disclosure, such as following basic principles of protecting their networks and data systems, including employees' email accounts.

371.    Defendants voluntarily received in confidence Plaintiffs' and Class Members' Private Information with the understanding that the Private Information would not be disclosed or disseminated to the public or any unauthorized third parties.

372.    Due to Defendants' failure to prevent, detect, and avoid the Data Breach from occurring by, *inter alia*, following best information security practices to secure Plaintiffs' and Class Members' Private Information, Plaintiffs' and Class Members' Private Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

///

373.   As a direct and proximate cause of Defendants' actions and/or omissions, Plaintiffs and Class Members have suffered damages.

374.   But for Defendants' disclosure of Plaintiffs' and Class Members' Private Information in violation of the parties' understanding of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendants' Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' Private Information, as well as the resulting damages.

375.   The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiffs' and Class Members' Private Information. Defendants knew their computer systems and technologies for accepting and securing Plaintiffs' and Class Members' Private Information had numerous security and other vulnerabilities that placed Plaintiffs' and Class Members' Private Information in jeopardy.

376.   As a direct and proximate result of Defendants' breaches of confidence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to (a) actual identity theft; (b) the compromise, publication, and/or theft of their Private Information; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (g) the diminished value of Defendants' services they received.

377.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT VIII**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. – UNLAWFUL BUSINESS PRACTICES**
**(On Behalf of Plaintiffs and the Nationwide Class and Nationwide Subclasses, or,**
**alternatively, Plaintiffs Cercas, Pascoe and Nakagoshi and the California Subclass)**

378.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

379.   Defendants have violated Cal. Bus. and Prof. Code § 17200, *et seq*., by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Nationwide Class.

380.   Defendants engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class Members' Private Information with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and Class Members' Private Information in an unsecure electronic environment in violation of HIPAA and California's data breach statute, Cal. Civ. Code § 1798.81.5, which require Defendants to take reasonable methods of safeguarding the Private Information of Plaintiffs and the Class Members.

381.   In addition, Defendants engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82 and Cal. Health & Safety Code §1280.15(b)(2).[44]

382.   As a direct and proximate result of Defendants' unlawful practices and acts, Plaintiffs and Class Members were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of Plaintiffs' and Class Members' legally protected interest in the confidentiality and privacy of their Private Information, nominal

---

[44] Ambry's Notice of Privacy acknowledges its duty to report a breach of medical information to affected patients within five (5) business days.
https://www.ambrygen.com/assets/pdf/licenses/notice_of_privacy.pdf (last accessed Sept. 18, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT

damages, and additional losses as described herein.

383.    Defendants knew or should have known that Defendants' computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class Members' Private Information and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class Members.

384.    Plaintiffs, on behalf of the Class, seek relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, restitution to Plaintiffs and Class Members of money or property that Defendants may have acquired by means of Defendants' unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of Defendants' unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

**COUNT IX**
**VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT,**
**CAL. CIV. CODE § 56, *ET SEQ.***
**(On Behalf of Plaintiffs and the Nationwide Class and Nationwide Subclasses, or, alternatively, Plaintiffs Cercas, Pascoe and Nakagoshi and the California Subclass)**

385.    Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

386.    At all relevant times, Defendants were health care providers because they had the "purpose of maintaining medical information to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage his or her information, or for the diagnosis or treatment of the individual."

387.    Defendants are providers of healthcare within the meaning of Civil Code § 56.06(a) and maintains medical information as defined by Civil Code § 56.05.

388.    Plaintiffs and Class Members are patients of Defendants, as defined in Civil Code § 56.05(k).

389.    Plaintiffs and Class Members provided their personal medical information to

79
CONSOLIDATED CLASS ACTION COMPLAINT

Defendants.

390.    At all relevant times, Defendants collected, stored, managed, and transmitted Plaintiff's and Class Members' personal medical information.

391.    Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

392.    As a result of the Data Breach, Defendants have misused, disclosed, and/or allowed third parties to access and view the Plaintiffs' and Class Members' personal medical information without their written authorization compliant with the provisions of Civil Code §§ 56, *et seq*.

393.    Defendants' misuse and/or disclosure of medical information regarding Plaintiffs and Class Members constitutes a violation of Civil Code §§ 56.10, 56.11, 56.13, and 56.26.

394.    As a direct and proximate result of Defendants' wrongful actions, inaction, omissions, and want of ordinary care, Plaintiffs' and Class Members' personal medical information was disclosed without written authorization.

395.    By disclosing Plaintiffs' and Class Members' PHI without their written authorization, Defendants violated California Civil Code § 56, *et seq*., and their legal duty to protect the confidentiality of such information.

396.    Defendants also violated Sections 56.06 and 56.101 of the California CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information.

397.    As a direct and proximate result of Defendants' wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs' and Class Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiffs' and Class Members' written authorization.

398.    As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violation of the CMIA, Plaintiffs and Class Members are entitled to (i) actual

damages, (ii) nominal damages of $1,000 per Plaintiff and Class Member, (iii) punitive damages of up to $3,000 per Plaintiff and Class Member, and (iv) attorneys' fees, litigation expenses and court costs under California Civil Code § 56.35.

**COUNT X**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE § 1750,** *ET SEQ.*
**(On Behalf of Plaintiffs and the Nationwide Class and Nationwide Subclasses, or,**
**alternatively, Plaintiffs Cercas, Pascoe, Nakagoshi and the California Subclass)**

399.     Plaintiffs restate and reallege all the foregoing paragraphs as if fully set forth herein.

400.     This cause of action is brought pursuant to the California Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, et seq.

401.     Defendants have long had notice of Plaintiffs' allegations, claims and demands, including from the filing of numerous underlying actions against it arising from the Data Breach, the first of which were filed on or about April 22, 2020.  Further, Defendants are the parties with the most knowledge of the underlying facts giving rise to Plaintiffs' allegations, so that any pre-suit notice would not put Defendants in a better position to evaluate those claims.  To the extent additional notice is required, Plaintiffs will issue separate demands under Cal. Civ. Code § 1782(a).

402.     Plaintiffs and Class Members are "consumers," as the term is defined by California Civil Code § 1761(d).

403.     Plaintiffs, Class Members, and Defendants have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

404.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants was likely to deceive consumers.

405.     Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

406.   Defendants violated this provision by representing that it took appropriate measures to protect Plaintiffs' and the Class Members' Private Information.   Additionally, Defendants improperly handled, stored, or protected either unencrypted or partially encrypted data.

407.   As a result, Plaintiffs and Class Members were induced to enter into a relationship with Defendant and provide their Private Information.

408.   As a result of engaging in such conduct, Defendants have violated Civil Code § 1770.

409.   Pursuant to Civil Code § 1780(a)(2) and (a)(5), Plaintiffs seek an order of this Court that includes, but is not limited to, an order enjoining Defendants from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

410.   Plaintiffs and Class Members suffered injuries caused by Defendants' misrepresentations, because they provided their Private Information believing that Defendants would adequately protect this information.

411.   Plaintiffs and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

412.   The unfair and deceptive acts and practices of Defendants, as described above, present a serious threat to Plaintiffs and Class Members.

## COUNT XI
### VIOLATION OF CALIFORNIA CONSUMER RECORDS ACT
### CAL. CIV. CODE § 1798.80 *ET SEQ.*
### (On Behalf of Plaintiffs and the Nationwide Class, or
### alternatively, Plaintiffs Cercas, Pascoe and Nakagoshi and the California Subclass)

413.   Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

414.   Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose

unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under section 1798.82, the disclosure "shall be made in the most expedient time possible and without unreasonable delay . . . ."

415.    The CCRA further provides: "Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b).

416.    Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

    a.    The security breach notification shall be written in plain language;

    b.    The security breach notification shall include, at a minimum, the following information:

        i.    The name and contact information of the reporting person or business subject to this section;

        ii.    A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

        iii.    If the information is possible to determine at the time the notice is provided, then any of the following:

            1.   The date of the breach;

            2.   The estimated date of the breach; or

            3.   The date range within which the breach occurred. The notification shall also include the date of the notice.

        iv.    Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

        v.    A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

vi.     The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

417.    The Data Breach described herein constituted a "breach of the security system" of Defendants.

418.    As alleged above, Defendants unreasonably delayed informing Plaintiffs and Class Members about the Data Breach, affecting their Personal and Medical Information, after Defendants knew the Data Breach had occurred.

419.    Defendants failed to disclose to Plaintiffs and Class Members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Personal and Medical Information when Defendants knew or reasonably believed such information had been compromised.

420.    Defendants' ongoing business interests gave Defendants incentive to conceal the Data Breach from the public to ensure continued revenue.

421.    Upon information and belief, no law enforcement agency instructed Defendants that timely notification to Plaintiffs and Class Members would impede its investigation.

422.    As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiffs and Class Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiffs and Class Members because their stolen information would have had less value to identity thieves.

423.    As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiffs and Class Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

424.    Plaintiffs and Class Members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to the damages suffered by Plaintiffs and Class Members as alleged above and equitable relief.

425.    Defendants' misconduct as alleged herein is fraud under Cal. Civ. Code §

3294(c)(3) in that it was deceit or concealment of a material fact known to the Defendants conducted with the intent on the part of Defendants of depriving Plaintiffs and Class Members of "legal rights or otherwise causing injury." In addition, Defendants' misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) in that it was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights or safety of Plaintiffs and Class Members and despicable conduct that has subjected Plaintiffs and Class Members to hardship in conscious disregard of their rights. As a result, Plaintiffs and Class Members are entitled to punitive damages against Defendants under Cal. Civ. Code § 3294(a).

**COUNT XII**
**INJUNCTIVE / DECLARATORY RELIEF**
**(On Behalf of Plaintiffs and the Nationwide Class)**

426.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

427.   This count is brought on behalf of all Classes.

428.   This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

429.   As previously alleged, Plaintiffs and Class Members entered into an implied contract that required Defendants to provide adequate security for the Private Information they collected from Plaintiffs and Class Members.

430.   Defendants owe a duty of care to Plaintiffs and Class Members requiring them to adequately secure Private Information.

431.   Defendants still possesses Private Information regarding Plaintiffs and Class Members.

432.   Since the Data Breach, Defendants have announced few if any changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent further attacks.

433.   Defendants have not satisfied their contractual obligations and legal duties to

Plaintiffs and Class Members. In fact, now that Defendants' insufficient data security is known to hackers, the Private Information in Defendants' possession is even more vulnerable to cyberattack.

434.   Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendants' failure to address the security failings that lead to such exposure.

435.   There is no reason to believe that Defendants' security measures are any more adequate now than they were before the Data Breach to meet Defendants' contractual obligations and legal duties.

436.   Plaintiffs, therefore, seek a declaration (1) that Defendants' existing security measures do not comply with their contractual obligations and duties of care to provide adequate security, and (2) that to comply with their contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

      a.   Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

      b.   Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

      c.   Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

      d.   Ordering that Defendants segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants'

systems;

e.   Ordering that Defendants not transmit Private Information via unencrypted email;

f.   Ordering that Defendants not store Private Information in email accounts;

g.   Ordering that Defendants purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

h.   Ordering that Defendants conduct regular computer system scanning and security checks;

i.   Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j.   Ordering Defendants to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Classes, request judgment against the Defendants and that the Court grant the following relief:

A.   An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

B.   Injunctive relief requiring Defendants to (1) strengthen their data security systems that maintain personally identifying information to comply with the applicable state laws alleged herein (including, but not limited to, the California Customer Records Act) and best practices under industry standards; (2) engage third-party auditors and internal personnel to conduct security testing and audits on Defendants' systems on a periodic basis; (3) promptly correct any problems or

issues detected by such audits and testing; and (4) routinely and continually conduct training to inform internal security personnel how to prevent, identify and contain a breach, and how to appropriately respond;

C.     An order requiring Defendant to pay all costs associated with class notice and administration of class-wide relief;

D.     An award to Plaintiffs and all members of the Classes of compensatory, consequential, incidental, and statutory damages, restitution, and disgorgement, in an amount to be determined at trial;

E.     An award of nominal damages of $1,000 per Plaintiff and Class Member to Plaintiffs and all members of the Classes under California Civil Code § 56.35;

F.     An award of punitive damages of up to $3,000 per Plaintiff and Class Member under California Civil Code § 56.35;

G.     An award of credit monitoring and identity theft protection services to Plaintiffs and all members of the Classes;

H.     An award of attorneys' fees, costs, and expenses, as provided by law or equity;

I.     An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

J.     An order requiring Defendants to pay pre-judgment and post-judgment interest, as provided by law or equity; and

K.     Such other and further relief as this Court may deem just and proper.

Dated: September 21, 2020

By:     */s/ Daniel S. Robinson*
Daniel S. Robinson (SBN 244245)
Wesley K. Polischuk (SBN 254121)
Michael W. Olson (SBN 312857)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax (949) 720-1292
drobinson@robinsonfirm.com
wpolischuk@robinsonfirm.com
molson@robinsonfirm.com

CONSOLIDATED CLASS ACTION COMPLAINT

Jean S. Martin (Admitted Pro Hac Vice)
Ryan J. McGee (Admitted Pro Hac Vice)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908; Fax (813) 222-4795
jeanmartin@ForThePeople.com
rmcgee@ForThePeople.com

Tina Wolfson (SBN 174806)
Bradley K. King (SBN 274399)
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, CA  90024
(310) 474.9111; Fax 310.474.8585
twolfson@ahdootwolfson.com
bking@ahdootwolfson.com

*Plaintiffs' Co-Lead Counsel*

Gary E. Mason (Pro Hac Vice Forthcoming)
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Ave., NW, Ste. 305
Washington, DC 20016
(202) 640-1160
gmason@masonllp.com

Melissa R. Emert (Pro Hac Vice Forthcoming)
**KANTROWITZ GOLDHAMER &**
**GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
(845) 356-2570; Fax (845) 356-4335
ggraifman@kgglaw.com

Plaintiffs' Executive Committee

*Attorneys for Plaintiffs and the*
*Proposed Class*

CONSOLIDATED CLASS ACTION COMPLAINT

1                             **DEMAND FOR JURY TRIAL**

2        Plaintiffs demand a trial by jury of all issues in this action so triable of right.

3 Dated: September 21, 2020      By:     _/s/ Daniel S. Robinson_

4
5                          Daniel S. Robinson (SBN 244245)
                         Wesley K. Polischuk (SBN 254121)
                         Michael W. Olson (SBN 312857)

6                          **ROBINSON CALCAGNIE, INC.**
                         19 Corporate Plaza Drive

7                          Newport Beach, CA 92660
                         (949) 720-1288; Fax (949) 720-1292

8                          drobinson@robinsonfirm.com
                         wpolischuk@robinsonfirm.com

9                          molson@robinsonfirm.com

10                          Jean S. Martin (Admitted Pro Hac Vice)
                         Ryan J. McGee (Admitted Pro Hac Vice)

11                          **MORGAN & MORGAN**
                         **COMPLEX LITIGATION GROUP**

12                          201 N. Franklin Street, 7th Floor
                         Tampa, Florida 33602

13                          (813) 559-4908; Fax (813) 222-4795
                         jeanmartin@ForThePeople.com

14                          rmcgee@ForThePeople.com

15                          Tina Wolfson (SBN 174806)
                         Bradley K. King (SBN 274399)

16                          **AHDOOT & WOLFSON, PC**
                         10728 Lindbrook Drive

17                          Los Angeles, CA  90024
                         (310) 474.9111; Fax 310.474.8585

18                          twolfson@ahdootwolfson.com
                         bking@ahdootwolfson.com

19

20                          *Plaintiffs' Co-Lead Counsel*

21                          Gary E. Mason (Pro Hac Vice Forthcoming)
                         **MASON LIETZ & KLINGER LLP**

22                          5101 Wisconsin Ave., NW, Ste. 305
                         Washington, DC 20016

23                          (202) 640-1160
                         gmason@masonllp.com

24                          Melissa R. Emert (Pro Hac Vice Forthcoming)
                         **KANTROWITZ GOLDHAMER &**

25                          **GRAIFMAN, P.C.**
                         747 Chestnut Ridge Road

26                          Chestnut Ridge, New York 10977
                         (845) 356-2570; Fax (845) 356-4335

27                          ggraifman@kgglaw.com
                         Plaintiffs' Executive Committee

28                          *Attorneys for Plaintiffs and the Proposed Class*

CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 21, 2020, I caused the foregoing to be filed electronically using the Court's electronic case filing (ECF) system, which will automatically send a notice of electronic filing to the email addresses of all counsel of record.

Dated: September 21. 2020                    */s/ Daniel S. Robinson*
                                                                 Daniel S. Robinson