Daniel S. Robinson (SBN 244245)
Wesley K. Polischuk (SBN 254121)
Michael W. Olson (SBN 312857)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax (949) 720-1292
drobinson@robinsonfirm.com
wpolischuk@robinsonfirm.com
molson@robinsonfirm.com

Tina Wolfson (SBN 174806)
Theodore Walter Maya (SBN 223242)
Bradley K. King (SBN 274399)
**AHDOOT & WOLFSON, PC**
2600 West Olive Ave., Suite 500
Burbank, CA 91505
(310) 474-9111; Fax: 310.474.8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com

Jean Martin (*Pro Hac Vice*)
Ryan J. McGee (*Pro Hac Vice*)
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
(813) 559-4908; Fax: (813) 223-5402
jeanmartin@ForThePeople.com
rmcgee@ForThePeople.com

*Co-Lead Counsel for the Proposed Class*

[Additional Counsel Listed on the Signature Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| *In re Ambry Genetics Data Breach Litigation*<br><br>This Document Relates To: All Cases | Hon. Cormac J. Carney<br>Courtroom 7C<br><br>Lead Case No.: 8:20-cv-00791 CJC (KESx)<br><br>**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

Plaintiffs Alma Fidela Cercas, Kaitlyn Nakagoshi, Michele Pascoe, Colette Domingues, Marion Farrier, Rosemary O'Hara, Michael Annoni, Lisa Neumann, Cheryl Terrano, Sandra Brodsky, Ariann Tagioli, Debra Volk, Beth Velardi, Rachel Harkness, Benjamin Cooperson II, Laura Jasielum, Debera Hensley, Linda Stewart, Ann Hoekstra, Rula Kanawati, Elizabeth Nakagoshi, individually and as parent and guardian of E.N., Jill Barduca, Jonee Coleman, Debora Pancoast and Nicole McMurphy (collectively, "Plaintiffs") bring this Second Amended Consolidated Class Action Complaint against Ambry Genetics Corporation ("Ambry") and Realm IDX, Inc. (f/k/a Konica Minolta Precision Medicine, Inc.) ("Realm IDX") (collectively, Ambry and Realm IDX are referred to as "Defendants") in their respective individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I.      INTRODUCTION

1.      Ambry is a provider of healthcare services throughout the United States. Through its online services, Ambry offers a comprehensive genetic testing menu of more than 300 tests for screening and diagnosis for inherited and non-inherited diseases, such as cancer, heart disease, neurodevelopmental disorders, and other medical issues.

2.      On or about April 15, 2020, Ambry announced a security incident during which unauthorized parties accessed an employee's email account between January 22-24, 2020, and obtained the personally identifiable information ("PII") and protected health information ("PHI") of its patients (collectively, "Private Information").[1] The

---

[1] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"), protected health information ("PHI") is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

exposed Private Information included patients' names, dates of birth, health insurance information, medical information, and for some patients, Social Security Numbers, diagnosis information, and other Private Information (the "Data Breach").

3.     The Substitute Notice published on Ambry's website further provided that the security incident may have also resulted in the disclosure of "information related to customers' use of Ambry's services." Based on information and belief, this information may include billing information including addresses, email addresses, telephone numbers, account information, and other sensitive information related to Ambry's services.[2]

4.     The patients affected by the Data Breach consist of individuals of a potentially vulnerable population who used Defendants' services to determine whether they have or are susceptible to an inherited or non-inherited disease, and also include children whose Private Information, such as a medical diagnosis, is now forever exposed.

5.     Although the Data Breach occurred between January 22, 2020, and January 24, 2020, and Ambry reported the Data Breach to government authorities in March 2020, Ambry waited three months before notifying patients in April 2020.

6.     To date, Ambry has not yet disclosed full details of the Data Breach or the results and findings of any investigation it undertook.  Without such disclosure, questions remain as to the full extent of the cyberattack, the number of patients involved, the actual data accessed and compromised, and what measures, if any, Ambry has taken to secure the Private Information still in its possession. Through this litigation, Plaintiffs will determine the scope of the Data Breach, the information involved, obtain relief that redresses Plaintiffs' harms, and ensure Ambry has proper measures in place to prevent another breach from occurring in the future.

---

demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, *available at*: https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html    (last accessed Sep. 14, 2020).

[2] *Ambry's Substitute Notice, available at:* https://www.ambrygen.com/legal/substitute-notice (last accessed April 14, 2021).

7.     The post-breach investigative reports produced by Defendants provide a more detailed account of the events of the Data Breach.  A former Senior Director for Ambry, who "provide[s] leadership and oversight to a team of 80+ FTEs supporting pre-registration, insurance verification, authorization, and collections (including institutional billing and collections)," allowed unauthorized parties to access her email account after having her credentials harvested via a social engineering phishing attack.  Based on information and belief, in this email account, the Senior Director maintained the Private Information (including, but not limited to, PHI) of approximately 233,000 patients—a complete violation of industry standards.

8.     Perhaps most egregious, although Ambry's security team detected the unauthorized activity within two hours of the unauthorized access of the employee's email address, the security team failed to prevent the unauthorized access for almost two entire days.  Instead of immediately shutting down the account, which would have prevented exfiltration of any data, or implementing multi-factor authentication (the lack of such multi-factor authentication alone is negligent and falls below industry standards), the security team did not stop the unauthorized access until two days later on the morning of January 24, 2020.

9.     The security team discovered multiple logins from geographically separated locations in a short timeframe. Specifically, the security team detected that two IP addresses (one from Australia and one from New Jersey) were accessing the employee's email address.  Rather than shutting down and preventing the access immediately, the security team reached out to the employee to confirm the activity, allowing the unauthorized parties to access the email account while the security team watched.  On January 23, 2020, a third IP address (from the United Kingdom) accessed the employee's email address, and the various IP addresses began accessing and viewing the employee's emails and were ultimately able to access, view, acquire, and transfer Plaintiffs' and Class Members' Private Information.

///

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

10.     The Crypsis Group ("Crypsis"), who was engaged by Ambry to conduct a post-breach investigation, "identified approximately 1GB of outbound traffic," but it "was unable to identify the contents of or that it was directly associated with [the employee's] account."  In essence, Ambry did not maintain sufficient logs to determine the precise information acquired by unauthorized parties during the Data Breach.  The post-breach investigative reports make it clear that the hackers who exfiltrated this data from Ambry acted deliberately, with a clear intent to procure such data for malevolent purposes, and were successful in procuring this data.

11.     Optiv Security, Inc. ("Optiv"), who Ambry also engaged to perform a post-incident forensic investigation, noted that "[t]he initial means of compromise and actions taken during unauthorized access were not identified due to evidence lost during a scheduled account upgrade for the user by Ambry Genetics, but social engineering via phishing is suspected."  Optiv further noted that "[a]fter incident, the scheduled upgrade of her email account to O365 resulted in the destruction of vital evidence for the investigation. Proper log retention and forwarding to the InsightIDR instance could have prevented this problem."

12.     In essence, Defendants not only failed to take immediate and reasonable remedial measures to prevent the exfiltration of any information from Ambry's systems, but they also failed to maintain adequate logs that would have specified the files and information acquired as a result of the Data Breach, and allowed critical evidence concerning the breach to be destroyed via an upgrade of the affected email account. As such, Defendants' conduct has resulted in the spoliation of evidence that would have been used by Plaintiffs at trial and Plaintiffs may seek a negative instruction and all other appropriate measures regarding the information acquired by the unauthorized parties.

13.     The notices Defendants provided to Plaintiffs and Class Members were unclear and devoid of many of the details surrounding the Data Breach, requiring Plaintiffs to spend time and money taking additional steps to protect themselves from the harmful effects of the Data Breach.  It is unclear to many Plaintiffs whether Ambry ever

conclusively determined, or even has the ability to determine, whether their Social Security numbers in fact were or were not disclosed.  As a result, each Plaintiff believes that his or her Social Security numbers may have been acquired by unauthorized parties as a result of the Data Breach, and Plaintiffs had to spend additional time and money to protect themselves from the harmful effects of the Data Breach.

14.     The notices provided to Plaintiffs and Class Members further suggest that through its investigation, "Ambry was unable to determine whether there was unauthorized access to, or acquisition of, any particular information from the email account, and we are not aware of any misuse of any personal information." While this may technically be true, it is entirely misleading given the details discussed above.  The lack of details concerning the precise information taken for each Plaintiff further justified each the time and effort spent by each Plaintiff to mitigate the harm that the Data Breach caused, that Defendants' own expert acknowledged in its report.

15.     Optiv determined that "[w]ith the information the attacker was potentially able to discover, there are two likely courses of continued malicious activity following this incident. The first is selling or maliciously using any PHI information the attacker was able to compromise during the period of unauthorized account access. The second would be to use knowledge derived from [the employee's] position of authority to spoof billing with the clients of Ambry Genetics to receive payments through falsified invoice or redirect legitimate payments to an account belonging to the attacker." Thus, Defendants' own security consultant recognizes that Plaintiffs are at a heightened risk of harm given the unauthorized parties could sell or maliciously use Plaintiffs' and Class Members' PHI.

16.     Optiv further explained that Defendants failed to maintain "[p]roper log retention" and "if [multi-factor authentication] were already in use, the attack may have proved completely unsuccessful from the start."  Not only is multi-factor authentication industry standard, but Optiv explains that "[o]ne of the most severe issues observed within many of Optiv's incident response engagements is that an adversary has little difficulty

accessing a user's account when only using password-based authentication" instead of multi-factor authentication.

17.      The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' Private Information. In particular, the Private Information was maintained on Ambry's computer network in a condition vulnerable to cyberattacks, including through infiltration of certain Ambry employee e-mail accounts. Upon information and belief, the mechanism of the cyberattack and the potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Ambry, and thus Ambry was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left the Private Information in a vulnerable position.

18.      Defendants disregarded the rights of Plaintiffs and Class Members by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions; failing to disclose that they did not have reasonable or adequately robust computer systems and security practices to safeguard patients' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice regarding the Data Breach.

19.      As a result of Defendants' failure to implement and follow reasonable security procedures, Plaintiffs' and Class Members' Private Information is now in the hands of, and has been viewed by, identity thieves. Plaintiffs and Class Members have suffered identity theft and fraud, have had to spend and will continue to spend significant amounts of time and/or money in an effort to protect themselves from the adverse ramifications of the Data Breach, and will forever be at a heightened risk of identity theft and fraud.

20.      Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Plaintiffs' and Class Members' Private

Information that Defendants collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

21.  Plaintiffs, on behalf of all others similarly situated, allege claims for (1) negligence; (2) invasion of privacy; (3) breach of contract; (4) breach of implied contract; (5) unjust enrichment; (6) breach of fiduciary duty; (7) breach of confidence; (8) violation of the California Unfair Competition Law (Cal. Business & Professions Code § 17200, *et seq.*) for unlawful, fraudulent, and unfair business practice; (9) violation of the Confidentiality of Medical Information Act (Cal. Civ. Code § 56, *et seq.*); (10) violation of California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*); (11) violation of California Consumer Records Act (Cal. Civ. Code § 1798.82 *et seq.*); (12) violation of the Illinois Genetic Information Privacy Act (410 Ill. Comp. Stat. Ann. 513); and (13) injunctive and declaratory relief.

22.  Plaintiffs seek remedies including, but not limited to, compensatory damages for identity theft, fraud, and time spent, reimbursement of out-of-pocket costs, adequate credit monitoring services funded by Defendants, and injunctive relief including improvements to Defendants' data security systems and practices to ensure they have reasonably sufficient security practices to safeguard patients' Private Information that remains in Defendants' custody to prevent incidents like the Data Breach from reoccurring in the future.

23.  As a direct and proximate result of Defendants' wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs' and Class Members' PII, Plaintiffs have incurred (and will continue to incur) economic damages, and other actual injury and harm, in the form of (i) actual identity theft or identity fraud; (ii) the untimely and/or inadequate notification of the Data Breach; (iii) unauthorized disclosure of their Private Information; (iv) breach of the statutorily-protected confidentiality of their Private Information; (v) out-of-pocket expenses incurred

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

to mitigate the increased risk of identity theft and/or identity fraud caused by the Data Breach; (vi) the value of their time spent mitigating the impact of the Data Breach and mitigating increased risk of identity theft and/or identity fraud; (vii) deprivation of the value of their Private Information, for which there is a well-established national and international market; and (viii) the impending, imminent, and ongoing increased risk of future identity theft, identity fraud, economic damages, and other actual injury and harm.

## II.   PARTIES

24.   Plaintiff Alma Fidela Cercas is a resident of Garden Grove, California, and an Ambry patient. On or about April 15, 2020, Plaintiff Cercas received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Cercas that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

25.   Plaintiff Kaitlyn Nakagoshi is a resident of St. Petersburg, Florida, and an Ambry patient. In or around April 2020, Plaintiff Nakagoshi's sister-in-law informed Plaintiff Nakagoshi that she received a letter in the mail from Ambry at her sister-in-law's address in San Francisco, where Plaintiff Nakagoshi had previously resided. The letter from Ambry notified Plaintiff Nakagoshi that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Nakagoshi that it disclosed, a minimum, her name, date of birth, and Ambry account number, health insurance information, and confidential medical information.

26.   Plaintiff Michele Pascoe is a resident of Rocklin, California, and an Ambry patient. On or about April 15, 2020, Plaintiff Pascoe received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely

in the possession of Ambry at this time, Ambry notified Plaintiff Pascoe that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

27.    Plaintiff Colette Domingues is a resident of New York, New York, and an Ambry patient. On or about April 15, 2020, Plaintiff Domingues received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Domingues that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

28.    Plaintiff Marion Farrier is a resident of New York, New York. On or about April 15, 2020, Plaintiff Farrier received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Farrier that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

29.    Plaintiff Rosemary O'Hara is a resident of Fort Lauderdale, Florida, and an Ambry patient. On or about April 15, 2020, Plaintiff O'Hara received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff O'Hara that it disclosed, a minimum,  her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

30.    Plaintiff Michael Annoni is a resident of Elko New Market, Minnesota, and an Ambry patient. On or about April 15, 2020, Plaintiff Annoni received notice from Ambry that his Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the

Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Annoni that it disclosed, a minimum,  his name, date of birth, Ambry account number, health insurance information, and confidential medical information.

31.    Plaintiff Lisa Neumann is a resident of Savannah, Georgia. On or about April 17, 2020, Plaintiff Neumann received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Neumann that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

32.    Plaintiff Cheryl Terrano is a resident of Buckhannon, West Virginia, and an Ambry patient. On or about April 15, 2020, Plaintiff Terrano received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Terrano that it disclosed, a minimum, her name, health insurance information, and confidential medical information.

33.    Plaintiff Sandra Brodsky is a resident of Parkland, Florida. On or about April 15, 2020, Plaintiff Brodsky received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Brodsky that it disclosed, a minimum,  her name, date of birth, Ambry account number, health insurance information, and medical information.

34.    Plaintiff Ariann Taglioli is a resident of Morrisonville, Illinois, and an Ambry patient. On or about April 15, 2020, Plaintiff Taglioli received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data

Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Taglioli that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

35. Plaintiff Debra Volk is a resident of Talking Rock, Georgia. On or about April 15, 2020, Plaintiff Volk received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Volk that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

36. Plaintiff Beth Velardi is a resident of New York City, New York, and an Ambry patient. On or about April 15, 2020, Plaintiff Velardi received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Velardi that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

37. Plaintiff Rachel Harkness is a resident of Lavonia, Michigan, and an Ambry patient. Plaintiff Harkness received genetic testing from Ambry and provided confidential and sensitive private and health information to Ambry. On or about April 17, 2020, Plaintiff Harkness received notice from Ambry that his Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Harkness that it disclosed, a minimum, her name, date of birth, Ambry account number, and insurance information.

38. Plaintiff Benjamin Cooperson II is a resident of Palmyra, Pennsylvania, and an Ambry patient. On or about April 17, 2020, Plaintiff Cooperson received notice from Ambry that his Private Information had been improperly exposed to unauthorized third

parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Cooperson that it disclosed, a minimum,  his name, date of birth, Ambry account number, and confidential medical information.

39.    Plaintiff Laura Jasielum is a resident of Cambridge, Ohio and an Ambry patient. On or about April 15, 2020, Plaintiff Jasielum received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Jasielum that it disclosed, a minimum, her Ambry account number, health insurance information, and confidential medical information.

40.    Plaintiff Debera Hensley is a resident of Bulls Gap, Tennessee, and an Ambry patient. On or about April 15, 2020, Plaintiff Hensley received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Hensley that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

41.    Plaintiff Linda Stewart is a resident of Pedro, Ohio, and an Ambry patient. On or about April 15, 2020, Plaintiff Stewart received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Stewart that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

42.    Plaintiff Ann Hoekstra is a resident of Plymouth, Minnesota, and an Ambry patient. On or about July 13, 2020, Plaintiff Hoekstra received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Hoekstra that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

43. Plaintiff Rula Kanawati is a resident of Hackensack, New Jersey, and an Ambry patient. On or about April 15, 2020, Plaintiff Kanawati received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Kanawati that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

44. Plaintiff Elizabeth Nakagoshi and her minor daughter are residents of Albany, California, and Plaintiff Nakagoshi's minor daughter is an Ambry patient. In or around April 2020, Plaintiff Nakagoshi received notice from Ambry that her minor daughter's Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Nakagoshi that it disclosed, a minimum, her minor daughter's name, date of birth, Ambry account number, insurance information, medical diagnosis, and confidential medical information.

45. Plaintiff Jill Barduca is a resident of Riverview, Michigan, and an Ambry patient. On or about April 27, 2020, Plaintiff Barduca received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Barduca that it disclosed, a minimum, In addition to Ambry disclosing her name, date of birth, health insurance information, medical information, and medical diagnosis.

46. Plaintiff Jonee Coleman is a resident of Chantilly, Virginia, and an Ambry

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

patient. On or about April 15, 2020, Plaintiff Coleman received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Coleman that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

47.   Plaintiff Debora Pancoast is a resident of Prescott, Arizona, and an Ambry patient. On or about April 15, 2020, Plaintiff Coleman received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff Pancoast that it disclosed, a minimum, her name, date of birth, Social Security Number, Ambry account number, health insurance information, and confidential medical information.

48.   Plaintiff Nicole McMurphy is a resident of Borden Indiana, and an Ambry patient. On or about April 15, 2020, Plaintiff McMurphy received notice from Ambry that her Private Information had been improperly exposed to unauthorized third parties. While the full extent of the Private Information compromised as a result of the Data Breach is solely in the possession of Ambry at this time, Ambry notified Plaintiff McMurphy that it disclosed, a minimum, her name, date of birth, Ambry account number, health insurance information, and confidential medical information.

49.   Defendant Ambry Genetics Corporation is a Delaware corporation with its principal place of business in Aliso Viejo, California. Ambry is a provider of health care that provides genetic testing services, including screening and diagnosis of hereditary cancers and other medical conditions, to patients in the United States.

50.   Defendant Realm IDX, Inc. (f/k/a Konica Minolta Precision Medicine, Inc.) ("Realm IDX") based in Aliso Viejo, California, is a subsidiary of Konica Minolta, Inc., which includes Ambry Genetics Corporation and Invicro LLC. Konica Minolta Precision Medicine, Inc. was founded in 2018 after Konica Minolta, Inc. acquired Ambry in 2017

- 14 -

for up to $1 billion.  Based on information and belief, Konica Minolta Precision Medicine, Inc. changed its name to Realm IDX, Inc. on or about August 26, 2021.  All references to Realm IDX herein refer to both Realm IDX, Inc. and Konica Minolta Precision Medicine, Inc., which Plaintiffs understand to be the same entity.

51.     Upon information and belief, Ambry and Realm IDX are both headquartered in the same office in Aliso Viejo; Konica reported to its investors in its 2019 Integrated Report that Realm IDX oversees Ambry[3]; and Realm IDX presently operates without employees but its management controls the day-to-day operations of Ambry with the ultimate intention of transferring all Ambry employees and assets to Realm IDX.[4]  Upon information and belief, Plaintiffs allege that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

52.     Upon information and belief, Plaintiffs allege that at all times mentioned herein there existed a unity of interest in ownership between Ambry, on the one hand, and Realm IDX, on the other hand, such that the individuality and separateness between them ceased where they were the alter ego of one another, in that, among other things, Realm IDX controlled, dominated, managed and operated Ambry as its alter ego.

53.     Upon information and belief, Konica Minolta, Inc. should have, would have,

---

[3]     *See* Konica Minolta, Inc., Integrated Report 2019, at 26, https://www.konicaminolta.com/shared/changeable/investors/include/ir_library/ar/ar2019/pdf/konica_minolta_ar2019_e.pdf (last accessed February 8, 2021).

[4]     *See* Konica Minolta, Inc., Integrated Report 2017, at 34, https://www.konicaminolta.com/about/investors/pdf/ar/konicaminolta/ar2017/konica_minolta_ar2017_e.pdf (last accessed February 8, 2021) ("By combining . . . technologies unique to Konica Minolta with genetic diagnostic technologies developed by [Ambry], we are within shooting distance of establishing a global leading company.").

and did perform cybersecurity due diligence prior to the acquisition of Ambry, consistent with industry standard, which would include researching undisclosed or unknown data breaches, as well as identifying information technology ("IT") security risks and shortfalls in operations and governance of the target company, the results of which should have or would have been shared with Ambry and Realm IDX.

54.     Upon information and belief, Konica Minolta, Inc. performed a full and complete cyber-security assessment prior to and as a result of the acquisition of Ambry, to understand the state of Ambry's computer networks, systems, and its vulnerabilities, the results of which would have been shared with Ambry and Realm IDX.

55.     Upon information and belief, Konica Minolta, Inc. and Ambry could have, would have, and did retain respective financial advisors and legal counsel to analyze business records and make a financial assessment of the merger, which would have or should have included retaining a cybersecurity analyst to audit Ambry's information security risks and shortfalls, IT operations, technology and governance, the results of which would have been shared with Ambry and Realm IDX.

56.     Upon information and belief, Ambry and Konica Minolta, Inc. either failed to engage in the above-described due diligence or failed to take appropriate and necessary measures as a result of the due diligence that would have protected the Private Information of Plaintiffs and Class Members.

57.     Upon information and belief, Realm IDX exercises direct control over Ambry, derives profit from Ambry's genetic testing services, and takes an active role in the development, distribution, management, and marketing of Ambry's genetic testing services.

58.     Upon information and belief, Realm IDX intentionally, willfully, recklessly, or negligently failed to take adequate and reasonable measures to ensure Ambry's data systems were protected against unauthorized intrusions, even though it knew or should have known as a result of the due diligence prior to the acquisition of Ambry, resulting in the Data Breach.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

### III.   JURISDICTION AND VENUE

59.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

60.     This Court has personal jurisdiction over Defendants because Ambry and Realm IDX are headquartered in California, their principal place of business is in California, and they regularly conduct business in California.

61.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in, was directed to, and/or emanated from this District, Ambry and Realm IDX are based in this District, Ambry and Realm IDX maintain patients' Private Information in the District, and have caused harm to Plaintiffs and Class Members residing in this District.

### IV.   STATEMENT OF FACTS

#### A.   *Ambry's Business.*

62.     Ambry was founded in 1999 as a basic diagnostic laboratory and has grown over the years to a massive state-of-the-art testing behemoth. The company has performed more than 1 million genetic tests and is an in-network provider for almost 97% of patients in the U.S. who have public or private health insurance. Ambry's "highly-automated" lab operates 24/7 and performs "DNA fingerprinting of each specimen before and after testing." The comprehensive genetic testing menu of more than 300 tests for screening and diagnosis offered by Ambry includes services for oncology, cardiology, neurology, and exome and general genetics.

63.     Patients and healthcare professionals can order tests directly though Ambry's online portal and have the results sent to the doctor or directly to the patient.

///

///

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

64.     Patients are billed through their healthcare insurance or personally.[5] Due to the nature of these services, Ambry must store patients' Private Information in its system. Ambry accomplishes this by keeping the Private Information electronically—even in its email systems, as evidenced by this Data Breach.

65.     In July 2017, Konica Minolta, Inc. and Ambry announced that Konica Minolta agreed to acquire Ambry for at least $800 million and up to $1 billion.

66.     Patients demand security to safeguard their Private Information. As a healthcare provider, Ambry is required to ensure that such private, personal information is not disclosed or disseminated to unauthorized third parties without the patients' express, written consent, as further detailed below.

### B.     The Data Breach.

67.     Beginning on or around January 22, 2020, unauthorized parties accessed the email account of an Ambry employee allowing unauthorized parties to access and acquire Plaintiffs' and Class Members' Private Information. For several days, unauthorized parties maintained uninterrupted access to the Private Information of Ambry patients, including Plaintiffs and Class Members.

68.     After learning of the issue, Ambry commenced an investigation. That investigation revealed that approximately 233,000 patients were victims of the cybersecurity attack. The investigation further revealed that information accessed by the hackers includes patients' names, medical information, information related to their use of Ambry's services, Social Security numbers, and other Private Information that Ambry collected and maintained. To date, the breach is the second largest health data breach in

---

[5] Healthcare professionals send Ambry patients' Private Information by email to Preverification@ambrygen.com, or by upload through ambrygen.com or portal.ambrygen.com/secure-upload/. *See Ambry's Preverification of Benefits Form, available at:* https://www.ambrygen.com/assets/pdf/billing/preverification_benefits_request_form.pdf (last accessed Sept. 7, 2020). Patients execute forms in connection with this transfer including test requisition forms and patient signature cards.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

2020.[6]

69.    The investigation also revealed that, in addition to having unfettered access to the entirety of the Ambry employee's email account, which contained the Private Information of Ambry patients, the unauthorized users exfiltrated over 1 GB of (possibly compressed) data.

70.    Due to Ambry's failure to retain logs, Ambry is unable to identify precisely what Private Information was exfiltrated or what messages and other contents of the employee's email account were accessed or downloaded by the unauthorized users. However, Crypsis analyzed the firewall logs and "identified unauthorized access totaling over 61 hours . . . ." Upon information and belief, the unauthorized parties had unfettered access for over 61 hours into the employee's email account, and used this time to access, view, acquire, and transfer Plaintiffs' and Class Members' Private Information.

71.    Beginning on or about April 15, 2020, Ambry sent over 230,000 patients a Notice of Data Breach ("Notice").[7]

72.    The Notice disclosed that there had been unauthorized access to an employee's email account between January 22-24, 2020, and that the Data Breach may have resulted in the disclosure of customers' names, medical information, diagnosis information, information related to customers' use of Ambry's services, and Social Security numbers.[8]

73.    The employee whose email account was compromised handles patient issues

---

[6] Genetic Testing Lab Hack Affects 233,000, Data Breach Today (Apr. 24, 2020), https://www.databreachtoday.com/genetic-testing-lab-hack-affects-233000-a-14182?highlight=true (last accessed Sept. 17, 2020).

[7] *Ambry Notice of Data Breach,* archived on the California Attorney General's website, *available at*: https://oag.ca.gov/system/files/Sample%20Notification%20Letter_5.pdf (last accessed Sept. 7, 2020); *see also, Ambry's Substitute Notice, available at:* https://www.ambrygen.com/legal/substitute-notice (last accessed Sept. 7, 2020); U.S. Dept. of Health and Human Services, *Cases Currently Under Investigation, available at:* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sept. 7, 2020)(stating that Ambry reported the Data Breach to the Department of Health and Human Services on March 22, 2020 as a "Hacking/IT Incident" affecting 232,772 individuals).

[8] *Id.*

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

such as pre-registration, insurance verification and authorization, billing, and collections. From the nature of these duties, "information related to customers' use of Ambry services" would include personal contact, medical, insurance, and financial information.

74.     Thomas Gnielinski, Ambry's Chief Compliance Officer based in Orange County, California, informed the affected patients that:

> Our security team identified unauthorized access to an employee's email account between January 22-24, 2020 . . .. [W]e are notifying you because your personal information may have been impacted. Specifically, while we are not aware of any misuse of your personal information, the security incident may have resulted in the disclosure of your information, including your name, date of birth, Ambry account number, insurance information, and medical information.
>
> We want to assure you that we have taken steps designed to prevent this type of event from happening again, including through an ongoing effort to enhance our security measures and to provide additional training to employees.

75.     It took Ambry nearly three months after the Data Breach to inform Plaintiffs and Class Members of the Data Breach, resulting in Plaintiffs and Class Members suffering harm they otherwise may have been able to avoid had Ambry announced the Data Breach sooner.

76.     Ambry's Notice of Data Breach was untimely and woefully deficient, failing to provide basic details concerning the Data Breach, including, but not limited to, how unauthorized parties accessed its employee's e-mail account, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the breach was a system-wide breach, whether servers storing information were accessed, and how many patients were affected by the Data Breach. Even worse, Ambry offered only a single year of identity monitoring to Plaintiffs and other Class Members.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

77.    Plaintiffs' and Class Members' Private Information is likely for sale to criminals on the dark web meaning unauthorized parties have accessed and viewed Plaintiffs' and Class Members' unencrypted, unredacted information, including name, date of birth, billing and insurance information, patient referral information, relevant medical records, diagnosis information, Social Security numbers, and more.

### C.    *The California Attorney General Notice.*

78.    On or about April 17, 2020, Ambry began filing with various state Attorneys General (including California) sample Notice of Data Breach letters that mirrored the language of the Notices Ambry sent to Plaintiffs and Class Members.

79.    The Notices explained that Ambry was "writing to make [recipients] aware of a security incident at Ambry Genetics that may have involved [their] personal information." The Notices also explained that Ambry's "security team identified unauthorized access to an employee's email account between January 22-24, 2020. [Ambry] promptly initiated an investigation, with the assistance of outside experts. The investigation was unable to determine whether there was unauthorized access to, or acquisition of, any particular information from the email account. Nevertheless, [Ambry is] notifying [recipients] because [their] personal information may have been impacted."

80.    Ambry's Notices acknowledged the very real threat that the incident would result in identity theft, fraud, and other similar risks by further informing recipients of the letter—Plaintiffs and Class Members— to "remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring your credit report for unauthorized activity."

81.    Ambry's Notices also instructed victims that "[i]f you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you should immediately contact the Federal Trade Commission and/or the Attorney General's office in your home state."

82.    Ambry's own statements confirm that the Plaintiffs and the Class Members are subject to continued, future risk of identity theft, fraudulent activity, and other

damages.

83. Ambry's sample Notice letter was filed with the Attorney General of California in accordance with California Civ. Code § 1798.82(f).

84. Pursuant to California Civ. Code § 1798.82(f), "[a] person or business that is required to issue a security breach notification pursuant to [§ 1798.82(a)] to more than 500 California residents as a result of a single breach of the security system shall electronically submit a single sample copy of that security breach notification, excluding any personally identifiable information, to the Attorney General."

85. Plaintiffs' and Class Members' Personal and Medical Information is "personal information" as defined by California Civ. Code § 1798.82(h).

86. Pursuant to California Civ. Code § 1798.82(a)(1), data breach notification letters are sent to residents of California "whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person" due to a "breach of the security of the system".

87. California Civ. Code § 1798.82(g) defines "breach of the security of the system" as the "unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business."

88. The Data Breach was a "breach of the security of the system" as defined by California Civ. Code § 1798.82(g).

89. Plaintiffs' and Class Members' unencrypted personal information was acquired by an unauthorized person or persons as a result of the Data Breach.

90. Ambry reasonably believes Plaintiffs' and Class Members' unencrypted personal information was acquired by an unauthorized person as a result of the Data Breach.

91. The security, confidentiality, or integrity of Plaintiffs' and Class Members' unencrypted personal information was compromised by Ambry as a result of the Data Breach.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

92.    Ambry reasonably believes the security, confidentiality, or integrity of Plaintiffs' and Class Members' unencrypted personal information was compromised by Ambry as a result of the Data Breach.

93.    Plaintiffs' and Class Members' unencrypted personal information that was acquired by an unauthorized person as a result of the Data Breach, was viewed by unauthorized persons.

94.    Ambry reasonably believes Plaintiffs' and Class Members' unencrypted personal information that was acquired by an unauthorized person as a result of the Data Breach, was viewed by unauthorized persons.

95.    It is reasonable to infer that Plaintiffs' and Class Members' unencrypted personal information that was acquired by an unauthorized person as a result of the Data Breach, was viewed by unauthorized persons.

96.    It should be rebuttably presumed that Plaintiffs' and Class Members' unencrypted personal information that was acquired by an unauthorized person as a result of the Data Breach, was viewed by unauthorized persons.

97.    After receiving letters sent pursuant to California Civ. Code § 1798.82(a)(1) – and filed with the Attorney General of California in accordance with California Civ. Code § 1798.82(f) – it is reasonable for recipients, including Plaintiffs and Class Members in this case, to believe that future harm (including identity theft) is real and imminent, and to take steps to mitigate that risk of future harm.

### D.    *The U.S. Department of Health and Human Services Breach Report.*

98.    A Breach Report regarding the Data Breach filed by Ambry with the Secretary of the U.S. Department of Health and Human Services on March 22, 2020, states that 232,772 individuals were affected by the Data Breach. The March 22, 2020, Breach Report characterizes the Data Breach as a "Hacking/IT Incident" and further indicates that the "Location of Breached Information" was "Email".

99.    The Breach Report filed by Ambry on March 22, 2020, with the Secretary of the U.S. Department of Health and Human Services was filed in accordance with 45

CFR § 164.408(a).

100. Plaintiffs' and Class Members' Personal and Medical Information is "protected health information" as defined by 45 CFR § 160.103.

101. Pursuant to 45 CFR § 164.408(a), Breach Reports are filed with the Secretary of the U.S. Department of Health and Human Services "following the discovery of a breach of unsecured protected health information".

102. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

103. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

104. Plaintiffs' and Class Members' Personal and Medical Information is "unsecured protected health information" as defined by 45 CFR § 164.402.

105. Plaintiffs' and Class Members' unsecured protected health information has been acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach.

106. Ambry reasonably believes Plaintiffs' and Class Members' unsecured protected health information has been acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach.

107. Plaintiffs' and Class Members' unsecured protected health information acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

108. Ambry reasonably believes Plaintiffs' and Class Members' unsecured protected health information acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach was not rendered

unusable, unreadable, or indecipherable to unauthorized persons.

109.  Plaintiffs' and Class Members' unsecured protected health information that was acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

110.  Plaintiffs' and Class Members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach.

111.  Ambry reasonably believes Plaintiffs' and Class Members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach.

112.  It is reasonable to infer that Plaintiffs' and Class Members' unsecured protected health information that was acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

113.  It should be rebuttably presumed that unsecured protected health information acquired, accessed, used, or disclosed in a manner not permitted under 45 CFR Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

114.  After receiving notice that they were victims of a data breach that required the filing of a Breach Report in accordance with 45 CFR § 164.408(a), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that future harm (including identity theft) is real and imminent, and to take steps to mitigate that risk of future harm.

///

///

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

### E.   Plaintiffs' Efforts to Secure Their Private Information.

**Michael Annoni**

115.   In October 2018, Plaintiff Annoni went for genetic counseling in Minneapolis, Minnesota. In connection with genetic testing that was to be performed by Ambry, Plaintiff Annoni authorized the genetic counselor to send his confidential and sensitive private and health information to Ambry in connection with his genetic testing and expected that this information would be kept confidential.

116.   After he received the Ambry breach notification letter, Plaintiff Annoni spent numerous hours taking action to mitigate the impact of the Data Breach, which included diligently checking his credit monitoring service and his financial accounts. This is time Plaintiff Annoni otherwise would have spent performing other activities or leisurely events for the enjoyment of life, rather than trips to the bank.  This loss of time was a direct result of the Data Breach.

117.   Subsequent to the Data Breach, Plaintiff Annoni experienced actual fraud in the form of numerous suspicious telephone calls.

118.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Annoni's contact information was included among the compromised information concerning him.

119.   As a result of the Data Breach, Plaintiff Annoni has suffered emotional distress as a result of the release of his protected health information which he expected Ambry to protect from disclosure, including anxiety, concern, and unease about unauthorized parties viewing and potentially using his personal and medical information. Plaintiff Annoni further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

120.   Plaintiff Annoni suffered actual injury from having his Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which he would not have had Ambry disclosed that it

lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff Annoni entrusted to Ambry as a condition for healthcare services; (c) loss of his privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

121.   As a result of the Data Breach, Plaintiff Annoni will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Jill Barduca**

122.   In September 2017, Plaintiff Barduca went for genetic counseling in Dearborn, Michigan. In connection with genetic testing that was to be performed by Ambry, Plaintiff Barduca authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

123.   After she received the Ambry data breach notification letter, Plaintiff Barduca spent at least five hours taking action to mitigate the impact of the Data Breach which included reviewing her medical records and financial accounts, signing up with the credit monitoring service supplied by Defendant. In addition, she notified her medical insurance company and her various healthcare providers to alert them of the Data Breach and cancelled her credit card and contacted her bank to further monitor her checking account. This is time Plaintiff Barduca otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

124.   Knowing that thieves stole her Private Information, including her "diagnosis," and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Barduca "endless hours" of worry. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about

using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Barduca is now also very concerned about her healthcare coverage and identity theft in general.  Plaintiff Barduca further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

125.   Plaintiff Barduca suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Barduca entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

126.   As a result of the Data Breach, Plaintiff Barduca will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Sandra Brodsky**

127.   In December 2018 Plaintiff Brodsky went for genetic counseling in Boca Raton, Florida. In connection with genetic testing that was to be performed by Ambry, Plaintiff Brodsky authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

128.   After she received the Ambry data breach notification letter, Plaintiff Brodsky spent numerous hours taking action to mitigate the impact of the Data Breach, which included reviewing her medical records and financial accounts. This is time Plaintiff Brodsky otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.  This loss of time was a direct result

of the Data Breach.

129.   Knowing that thieves stole her Private Information, potentially including her genetic medical information, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Brodsky anxiety. She is now very concerned about identity theft in general, and what could happen to her in the future because of the Data Breach. Plaintiff Brodsky further has concerns and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

130.   Plaintiff Brodsky suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Brodsky entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (d) imminent and impending injury arising from the increased risk of fraud and identity theft.

131.   Subsequent to the Data Breach, Plaintiff Brodsky also experienced an increased amount of suspicious, unsolicited phishing telephone calls and emails. This is time Plaintiff Brodsky otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

132.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Brodsky's contact information was included among the compromised information concerning her.

133.   As a result of the Data Breach, Plaintiff Brodsky will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Alma Fidela Cercas**

134.   In June 2017, Plaintiff Cercas went for genetic counseling in Orange,

California. In connection with genetic testing that was to be performed by Ambry, Plaintiff Cercas authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

135.   After she received the Ambry data breach notification letter, Plaintiff Cercas spent numerous hours taking action to mitigate the impact of the Data Breach, including, signing up with the credit monitoring service supplied by Defendant; requesting a new medical insurance number; placing fraud alerts on her accounts with all three credit bureaus; contacting the Social Security Administration, and contacting her various doctors to update them with her new insurance number. Plaintiff Cercas has also contacted her bank to further monitor her account. This is time Plaintiff Cercas otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.  This loss of time was a direct result of the Data Breach.

136.   Knowing that thieves stole her Private Information, potentially including her DNA and genetic medical information, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Cercas great anxiety. She is now very concerned about her healthcare coverage and identity theft in general. This Data Breach has given Plaintiff Cercas hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Cercas further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

137.   Plaintiff Cercas suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Cercas entrusted to Ambry as a condition for healthcare

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

services; (c) loss of her privacy; (d) lost time; (e) violation of her statutorily protected right to confidentiality in her medical information, which Ambry admits was compromised in the Data Breach; and (f) imminent and impending injury arising from the increased risk of fraud and identity theft.

138.   As a result of the Data Breach, Plaintiff Cercas will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Jonee Coleman**

139.   In August 2016, Plaintiff Coleman went for genetic counseling in Washington, D.C. In connection with genetic testing that was to be performed by Ambry, Plaintiff Coleman authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

140.   After she received the Ambry data breach notification letter, Plaintiff Coleman spent numerous hours taking action to mitigate the impact of the Data Breach, which included reviewing her medical records, financial accounts, and her various credit monitoring services that she used before and after the Data Breach. Plaintiff Coleman was notified by her credit monitoring service that her Private Information appeared on the dark web. Plaintiff Coleman also signed up with the credit monitoring service supplied by Defendant. In addition, she contacted her bank to monitor her account, and she also closed her existing checking account and opened a new one as a precaution. This is time Plaintiff Coleman otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

141.   Knowing that thieves stole her Private Information, and that it is available for sale on the dark web, has caused Plaintiff Coleman stress. This Data Breach has caused her to be reluctant in sharing any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has some hesitation about using

electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Coleman further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

142.   Plaintiff Coleman suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Coleman entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

143.   Beginning shortly after receiving the Data Breach, Plaintiff Coleman experienced phishing emails and a suspicious telephone call where the parties attempted to extract additional personal information and money from Plaintiff Coleman. In or around March 5, 2020, Plaintiff Coleman received a fraudulent phone call from someone attempting to elicit money from Plaintiff Coleman through an unauthorized manner. In or around September 2020 Plaintiff Coleman received scam messages from an unauthorized party that had her name, address, and contact information.  In addition, Coleman received alerts that her Private Information was found on the dark web.

144.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Coleman's contact information was included among the compromised information concerning her.

145.   As a result of the Data Breach, Plaintiff Coleman will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Ben Cooperson**

146.   In 2018, Plaintiff Cooperson went for genetic counseling in Orlando, Florida.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

In connection with genetic testing that was to be performed by Ambry, Plaintiff Cooperson authorized the genetic counselor to send his confidential and sensitive private and health information to Ambry in connection with his genetic testing and expected that this information would be kept confidential.

147.   Plaintiff Cooperson spent well over 100 hours taking action to mitigate the impact of the Data Breach after he received the Ambry data breach notification letter, which included reviewing his current credit monitoring account and attempted to sign up with the credit monitoring agency supplied by Defendant. Defendant's service was not able to resolve his technical problems with their credit monitoring service. Plaintiff Cooperson contacted the credit bureaus to freeze his credit and is in the process of notifying his medical insurance providers, and contacting the Social Security Administration and his various healthcare providers to alert them of the Data Breach. Plaintiff Cooperson has also contacted his bank to further monitor his checking account. This is time Plaintiff Cooperson otherwise would have spent performing other activities, such as his job and/or leisurely activities for the enjoyment of life.  This loss of time was a direct result of the Data Breach.

148.   Knowing that thieves stole his Private Information, and knowing that his Private Information may be available for sale on the dark web, has caused Plaintiff Cooperson great anxiety. This Data Breach has caused him to not want to share any PII or PHI electronically, although he understands how difficult that choice is in this age of technology. He now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring his personal information. Plaintiff Cooperson is now also very concerned about his healthcare coverage and identity theft in general. Plaintiff Cooperson further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

149.   Plaintiff Cooperson suffered actual injury from having his Private Information exposed as a result of the Data Breach including, but not limited to: (a) paying

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

monies to Ambry for its goods and services which he would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of his Private Information—a form of intangible property that the Plaintiff Cooperson entrusted to Ambry as a condition for healthcare services; (c) loss of his privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

150.   Subsequent to the Data Breach, Plaintiff Cooperson has experienced an incredible increase in phishing emails from companies soliciting for medical treatments for various conditions as well as drugs. He has attempted to "unsubscribe" from many of these unwanted solicitations, but has been unsuccessful. This is time Plaintiff Cooperson otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

151.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Cooperson's contact information was included among the compromised information concerning him.

152.   As a result of the Data Breach, Plaintiff Cooperson will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Colette Domingues**

153.   In December 2018, Plaintiff Domingues went for genetic counseling in New York, New York. In connection with genetic testing that was to be performed by Ambry, Plaintiff Domingues authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

154.   Plaintiff Domingues spent approximately 60 hours taking action to mitigate the impact of the Data Breach after she received the Ambry data breach notification letter, which included reviewing her financial accounts and signing up with the credit monitoring agency supplied by Defendant. She notified her banks and credit card agencies

- 34 -

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

to alert them of the Data Breach and changed at least 141 passwords on accounts that are associated with the same email that she used for her genetic testing. Plaintiff Domingues continues to monitor her bank accounts and her various credit monitoring services on a regular basis. This is time Plaintiff Domingues otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

155.   Knowing that thieves stole her Private Information, including her medical records, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Domingues great anxiety. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Domingues is now also very concerned about her healthcare coverage and identity theft in general.  Plaintiff Domingues further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

156.   Plaintiff Domingues suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that the Plaintiff Domingues entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

157.   Subsequent to the Data Breach, Plaintiff Domingues experienced an increase in phishing telephone calls from domestic and foreign sources. Moreover, following the Data Breach she received a warning from Google that an unauthorized third party

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

obtained her passwords for 141 of Plaintiff Domingues' online accounts. She was forced to change all the passwords to protect her identity. This is time Plaintiff Domingues otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

158.   As a result of the Data Breach, Plaintiff Domingues will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Marion Farrier**

159.   In August 2018, Plaintiff Farrier went for genetic counseling in New York, New York. In connection with genetic testing that was to be performed by Ambry, Plaintiff Farrier authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

160.   Plaintiff Farrier spent at least four hours taking action to mitigate the impact of the Data Breach after she received the Ambry data breach notification letter, which included conducting research online to understand the scope of the negative effects the Data Breach will have on the security of her identity, finances and healthcare. Discussing the Data Breach with a third party whose Private Information was also disclosed by Ambry in the Data Breach. This loss of time was a direct result of the Data Breach.

161.   Knowing that thieves stole her Private Information, including her medical records, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Farrier great anxiety. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Farrier is now also very concerned about her healthcare coverage and identity theft in general.  Plaintiff Farrier further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise

disclosing Plaintiff's personal and medical information in the future.

162.   Plaintiff Farrier suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that the Plaintiff Farrier entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

163.   Subsequent to the Data Breach, Plaintiff Farrier also experienced numerous suspicious, unsolicited telephone calls and emails from medical companies trying to sell her medications.

164.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Farrier's contact information was included among the compromised information concerning her.

165.   As a result of the Data Breach, Plaintiff Farrier will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Rachel Harkness**

166.   In November 2017, Plaintiff Harkness went for genetic counseling in Livonia, Michigan. In connection with genetic testing that was to be performed by Ambry, Plaintiff Harkness authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

167.   Plaintiff Harkness spent over ten hours taking action to mitigate the impact of the Data Breach after she received the Ambry data breach notification letter, which included diligently monitoring her credit accounts. This is time Plaintiff Harkness otherwise would have spent performing other activities, such as her job and/or leisurely

activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

168.   Knowing that thieves stole her Private Information, potentially including her DNA and genetic medical information, Plaintiff Harkness has suffered emotional distress as a result of the release of her protected health information which she expected Ambry to protect from disclosure, including anxiety, concern and unease about unauthorized parties viewing and potentially using her personal and medical information.  Plaintiff Harkness further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

169.   Plaintiff Harkness suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Harkness entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

170.   Subsequent to the Data Breach, Plaintiff Harkness has experienced an increased number of suspicious emails to her college email address. Plaintiff Harkness reports the emails to her college as she receives them. Evaluating the legitimacy of these suspicious emails is time Plaintiff Harkness otherwise would spend performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

171.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Harkness's contact information was included among the compromised information concerning her.

172.   As a result of the Data Breach, Plaintiff Harkness will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Debera Hensley**

173.  In September 2017, Plaintiff Hensley went for genetic counseling in Knoxville, Tennessee. In connection with genetic testing that was to be performed by Ambry, Plaintiff Hensley authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

174.  Plaintiff Hensley subsequently researched twice daily looking for fraudulent activity in an effort to take action to mitigate the impact of the Data Breach, totaling 30-40 hours. This included diligently checking her financial accounts, checking her emails and signing up with a credit monitoring service which was supplied by Defendant. Plaintiff Hensley at least once or twice daily spent time reviewing her financial and email accounts for fraudulent activity to make sure that her credit was not compromised. This is time Plaintiff Hensley otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

175.  Knowing that thieves stole her Private Information, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Hensley "endless hours" of worry. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Hensley is now also very concerned about her healthcare coverage and identity theft in general.  Plaintiff Hensley further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

176.  Plaintiff Hensley suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Hensley entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

177.  As a result of the Data Breach, Plaintiff Hensley will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Ann Hoekstra**

178.  In or about March and/or April 2017, Plaintiff Hoekstra went for genetic counseling in Maple Grove, Minnesota. In connection with genetic testing that was to be performed by Ambry, Plaintiff Hoekstra authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

179.  Plaintiff Hoekstra subsequently spent hours taking action to mitigate the impact of the Data Breach, this included diligently reviewing and monitoring her credit one time per week through her credit union. She also telephoned her healthcare provider to inquire about any unusual information or activity. Plaintiff Hoekstra monitored her current credit monitoring account which is supplied through her credit union and was made aware of the credit monitoring supplied by Defendant. This is time Plaintiff Hoekstra otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

180.  Knowing that thieves stole her Private Information and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Hoekstra "endless hours" of worry. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services,

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

and reservations about conducting other online activities requiring her personal information. Plaintiff Hoekstra is now also very concerned about her healthcare coverage and identity theft in general.  Plaintiff Hoekstra further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

181.   Plaintiff Hoekstra suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Hoekstra entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

182.   As a result of the Data Breach, Plaintiff Hoekstra will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Laura Jasielum**

183.   On or about November 12, 2018, Plaintiff Jasielum went for genetic counseling in Cleveland, Ohio. In connection with genetic testing that was to be performed by Ambry, Plaintiff Jasielum signed an Ambry patient signature card and an Ambry patient consent for multi-gene cancer panels form as well as authorizing the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

184.   Plaintiff Jasielum subsequently spent at least nine hours taking action to mitigate the impact of the Data Breach after she received the Ambry data breach notification letter, which included reviewing her financial accounts and signing up with the credit monitoring agency supplied by Defendant. This does not include 15 minutes

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

each day checking her accounts from the day that she received the notice from Ambry. She notified her bank, credit card agency, medical insurance company and her various healthcare providers to alert them of the Data Breach. Plaintiff Jasielum continues to monitor her checking account and her various credit monitoring services on a daily basis. This is time Plaintiff Jasielum otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

185.   Knowing that thieves stole her Private Information, including her medical records, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Jasielum "endless hours" of worry. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Jasielum is now also very concerned about her healthcare coverage and identity theft in general.  Plaintiff Jasielum further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

186.   Plaintiff Jasielum suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Jasielum entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

187.   Subsequent to the Data Breach, Plaintiff Jasielum experienced numerous suspicious telephone calls. The number of calls has caused Plaintiff Jasielum to stop

answering calls from numbers she does not recognize. This is time Plaintiff Jasielum otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

188.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Jasielum's contact information was included among the compromised information concerning her.

189.   As a result of the Data Breach, Plaintiff Jasielum will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Rula Kanawati**

190.   In November 2017, Plaintiff Kanawati went for genetic counseling in Paramus, New Jersey. In connection with genetic testing that was to be performed by Ambry, Plaintiff Kanawati authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

191.   Plaintiff Kanawati subsequently spent between 30-40 hours taking action to mitigate the impact of the Data Breach after she received the Ambry data breach notification letter. Plaintiff Kanawati was made aware of the credit monitoring service supplied by Defendant and decided to use LifeLock credit monitoring instead. She called the credit bureaus to place credit freezes on her accounts. Plaintiff Kanawati has spent numerous hours per week reviewing her financial accounts for fraudulent activity, calling credit bureaus and banks to manage her accounts. This is time Plaintiff Kanawati otherwise would have spent performing her job and/or other leisurely events for the enjoyment of life. This loss of time was a direct result of the Data Breach.

192.   Subsequent to the Data Breach, in or around April 2020, Plaintiff Kanawati received notice from her bank that someone had attempted to pass bad checks through the use of her identity. The bank did not cash the check; however, another fraudulent check was cashed at a different branch of her bank, for which Plaintiff Kanawati was eventually

reimbursed. Because of this, her bank froze her account and took over one month to reimburse her. Plaintiff Kanawati has had to reset automatic billing instructions which were tied to her compromised accounts. As a result of this financial burden, Plaintiff Kanawati was unable to pay for her health insurance for two months.

193.   Moreover, Plaintiff Kanawati has experienced a tremendous increase in suspicious texts, phone calls and emails, and unauthorized password changes on her various accounts. She was forced to review the suspicious contact and rectify her changed passwords. This is time Plaintiff Kanawati otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

194.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Kanawati's contact information and other information that could be used to commit this fraudulent activity was included among the compromised information concerning her.

195.   Knowing that thieves stole her Private Information, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Kanawati "endless hours" of worry. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Kanawati is now also very concerned about her healthcare coverage and identity theft in general.  Plaintiff Kanawati further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

196.   Plaintiff Kanawati suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private

Information—a form of intangible property that Plaintiff Kanawati entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

197.   As a result of the Data Breach, Plaintiff Kanawati will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Nicole McMurphy**

198.   In July 2018, Plaintiff McMurphy went for genetic counseling in New Albany, Indiana. In connection with genetic testing that was to be performed by Ambry, Plaintiff McMurphy authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

199.   Plaintiff McMurphy subsequently spent at least six hours taking action to mitigate the impact of the Data Breach after she received the Ambry data breach notification letter. Plaintiff McMurphy reviewed financial accounts for any signs of fraud and spent time going to the bank personally. She also had the inconvenience of having to wait for new credit cards. Plaintiff McMurphy also signed up with the credit monitoring service supplied by Defendant. This is time Plaintiff McMurphy otherwise would have spent performing other activities leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

200.   Knowing that thieves stole her Private Information, and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff McMurphy "endless hours" of worry. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff McMurphy is now also very concerned about her healthcare coverage and identity theft in general. Plaintiff McMurphy further suffers from

- 45 -

additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

201. Plaintiff McMurphy suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff McMurphy entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

202. As a result of the Data Breach, Plaintiff McMurphy will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Elizabeth Nakagoshi**

203. In August 2017, Plaintiff Elizabeth Nakagoshi went for genetic counseling in San Francisco, California for genetic testing of her minor daughter. In connection with genetic testing that was to be performed by Ambry, Plaintiff Nakagoshi signed authorization forms authorizing the genetic counselor to send her minor daughter's confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

204. Plaintiff Elizabeth Nakagoshi spent approximately 50 hours taking action to mitigate the impact of the Data Breach after she received the Ambry data breach notification letter, which included researching the credit monitoring service offered by Defendant, researching a reputable credit monitoring company and ultimately deciding to sign up and spend money with a separate credit monitoring service instead for a family plan. She spent time searching for fraudulent activity, and speaking to others about the Data Breach. This is time Plaintiff Nakagoshi otherwise would have spent performing her job and/or other leisurely events for the enjoyment of life. This loss of time was a direct

- 46 -

result of the Data Breach.

205.   Knowing that thieves stole her Private Information, and that it is available for sale on the dark web, has caused Plaintiff Elizabeth Nakagoshi incredible stress. She is now suffering from high level of anxiety due to the concern of her minor daughter's digital footprint. This Data Breach has caused her to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Nakagoshi further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

206.   Plaintiff Elizabeth Nakagoshi suffered actual injury from having her minor daughter's Private Information exposed as a result of the Data Breach including, but not limited to: (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her minor daughter's Private Information—a form of intangible property that Plaintiff Elizabeth Nakagoshi entrusted to Ambry as a condition for healthcare services; (c) loss of her minor daughter's privacy; (d) lost time; (e) violation of her statutorily protected right to confidentiality in her medical information, which Ambry admits was compromised in the Data Breach; and (f) imminent and impending injury arising from the increased risk of fraud and identity theft.

207.   Subsequent to the Data Breach, Plaintiff Elizabeth Nakagoshi has experienced an increase in suspicious phone calls. This is time Plaintiff Nakagoshi otherwise would have spent performing other activities, such as her job and other leisurely activities for the enjoyment of life.

208.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Elizabeth Nakagoshi's contact information was

included among the compromised information concerning her.

209.   As a result of the Data Breach, Plaintiff Elizabeth Nakagoshi will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Kaitlyn Nakagoshi**

210.   In or around March 2016, Plaintiff Kaitlyn Nakagoshi went for genetic counseling in San Francisco, California. In connection with genetic testing that was to be performed by Ambry, Plaintiff Nakagoshi signed a release form authorizing the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

211.   Plaintiff Kaitlyn Nakagoshi spent approximately six hours taking action to mitigate the impact of the Data Breach after she received the Ambry data breach notification letter, which included immediately placing a credit freeze on her accounts. Plaintiff Nakagoshi spent several days thereafter reviewing her financial accounts for fraudulent activity. Plaintiff Nakagoshi continues to frequently monitor her accounts for suspicious activity. Plaintiff Nakagoshi has purchased a credit monitoring program to assist her in her review. This is time Plaintiff Nakagoshi otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

212.   Knowing that thieves stole her Private Information and worrying about whether her Private Information is available for sale on the dark web has caused Plaintiff Kaitlyn Nakagoshi stress and worry. Plaintiff Nakagoshi feels violated by Ambry and is very concerned that her genetic information is available for the public to abuse.  Plaintiff Nakagoshi further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

213.   Plaintiff Nakagoshi suffered actual injury from having her Private

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have, had Ambry disclosed that it lacked data security practices adequate to safeguard consumers' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Nakagoshi entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; (e) violation of her statutorily protected right to confidentiality in her medical information, which Ambry admits was compromised in the Data Breach; and (f) imminent and impending injury arising from the increased risk of fraud and identity theft.

214.   Subsequent to the Data Breach, Plaintiff Kaitlyn Nakagoshi began receiving suspicious text messages and emails. Plaintiff Nakagoshi estimates she received over a dozen suspicious text messages and numerous phishing emails. Plaintiff Kaitlyn Nakagoshi has also received numerous fraudulent emails informing her that she failed to pay outstanding invoices. Reviewing these text messages and emails to determine their legitimacy has taken time that Plaintiff Nakagoshi otherwise would have spent performing other activities, such as leisurely activities for the enjoyment of life.

215.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Kaitlyn Nakagoshi's contact information was included among the compromised information concerning her.

216.   The spoof billing emails received by Plaintiff Kaitlyn Nakagoshi after the Data Breach are the type of fraudulent activity that Ambry's forensic investigators forecasted given the information compromised.

217.   As a result of the Data Breach, Plaintiff Kaitlyn Nakagoshi will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Lisa Neumann**

218.   In October 2018, Plaintiff Neumann went for genetic counseling in New York. Plaintiff was told that her genetic testing would be performed by Ambry. Plaintiff

Neumann authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing and expected that this information would be kept confidential.

219.   Knowing that thieves stole her Private Information and knowing that her Private Information may be available for sale on the dark web has caused Plaintiff Neumann significant stress. Plaintiff Neumann is experiencing heightened anxiety knowing that she provided Ambry with not only her personal information, but also that of her children for the purpose of genetic testing. Plaintiff Neumann is very concerned that their Private Information was also exposed as a result of the Data Breach.

220.   Plaintiff Neumann suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Neumann entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

221.   Plaintiff Neumann has, over the last several months, experienced an increased number of suspicious phone calls and emails. Plaintiff Neumann also received a notification from her credit monitoring service alerting Plaintiff Neumann that she was logged into her account on a new, unrecognized device.

222.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Neumann's contact information was included among the compromised information concerning her.

223.   Plaintiff Neumann spent approximately eight hours of her time taking action to mitigate the impact of the Data Breach, which included reviewing her financial accounts and disputing the fraudulent activity that appeared on her bank account. She now spends approximately thirty minutes per day monitoring her financial and medical

accounts for suspicious activity. This is time Plaintiff Neumann otherwise would spend performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

224.   As a result of the Data Breach, Plaintiff Neumann will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Rosemary O'Hara**

225.   In June 2019, Plaintiff O'Hara went to her doctor to discuss genetic counseling. As part of this process, Plaintiff O'Hara filled out forms which sought her detailed family history. Plaintiff O'Hara was aware that in connection with genetic testing, her information would be provided to a third-party testing company. Plaintiff O'Hara authorized her doctor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing. Plaintiff O'Hara expected that this information would be kept confidential.

226.   Upon receiving notice of the Data Breach, Plaintiff O'Hara spent approximately ten hours taking action to mitigate the impact of the Data Breach, which included reviewing her medical records and financial accounts and calling her doctor. This is time Plaintiff O'Hara otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

227.   Knowing that thieves stole her Private Information and worrying about whether her Private Information is available for sale on the dark web has caused Plaintiff Kaitlyn O'Hara stress and worry. Plaintiff O'Hara feels violated by Ambry and is very concerned that her genetic information is available for the public to abuse.  Plaintiff O'Hara further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

228.   Further, Plaintiff O'Hara experienced identity theft as a result of the Data

Breach. On September 13, 2020, Plaintiff O'Hara's personal social media account was hacked. An individual posing as Plaintiff O'Hara overtook Plaintiff O'Hara's account and proceeded to solicit money from Plaintiff O'Hara's social media friends. Plaintiff O'Hara spent time addressing this identity theft that she otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

229.   The number of suspicious, unsolicited telephone calls and emails Plaintiff O'Hara receives has increased significantly since the Data Breach. These telephone calls and emails have caused Plaintiff O'Hara annoyance and worry.

230.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff O'Hara's contact information was included among the compromised information concerning her.

231.   Plaintiff O'Hara suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff O'Hara entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

232.   As a result of the Data Breach, Plaintiff O'Hara will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Debora Pancoast**

233.   In January of 2018, Plaintiff Pancoast went for genetic counseling at a medical center in Arizona. In connection with genetic testing that was to be performed by Ambry, Plaintiff Pancoast authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing.

Plaintiff was shown documents that stated that her personal and medical information would remain confidential.

234. Upon receiving notice from Ambry concerning the Data Breach, Plaintiff Pancoast spent several hours reviewing her financial accounts for fraudulent activity. Concerned that her personal information is in the hands of thieves, Plaintiff Pancoast put credit alerts on one of the credit reporting sites. This is time Plaintiff Pancoast otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

235. Knowing that thieves stole her Private Information and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Pancoast stress. Plaintiff Pancoast is very concerned that her genetic information is available for the public to abuse. Plaintiff Pancoast further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

236. Plaintiff Pancoast suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Pancoast entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; (e) violation of her statutorily protected right to confidentiality in her medical information, which Ambry admits was compromised in the Data Breach; and (f) imminent and impending injury arising from the increased risk of fraud and identity theft.

237. Since the Data Breach, Plaintiff Pancoast has experienced an increase in suspicious phone calls and emails. She has received numerous solicitations for health insurance.

238. Given the role of the Ambry employee whose email was compromised in the

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Data Breach, it is likely that Plaintiff Pancoast's contact information was included among the compromised information concerning her.

239.    As a result of the Data Breach, Plaintiff Pancoast will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Michele Pascoe**

240.    In late 2019, Plaintiff Pascoe went for genetic counseling at a medical center in Los Angeles, California. In connection with genetic testing that was to be performed by Ambry, Plaintiff Pascoe authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing. Plaintiff was shown documents that stated that her personal and medical information would remain confidential.

241.    Upon receiving notice from Ambry concerning the Data Breach, Plaintiff Pascoe spent several hours reviewing her financial accounts for fraudulent activity. Concerned that her personal information is in the hands of thieves, Plaintiff Pascoe attempted to accept free credit services offered by Ambry. Plaintiff Pascoe telephoned the numbers provided by Ambry but was directed to a subsidiary company. Plaintiff Pascoe spent several hours on the phone trying to enroll in the credit monitoring services offered by Ambry but was unable to do so because of what seemed to be a wrong number provided by Ambry. This is time Plaintiff Pascoe otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

242.    Knowing that thieves stole her Private Information and knowing that her Private Information may be available for sale on the dark web, has caused Plaintiff Pascoe stress. Plaintiff Pascoe is very concerned that her genetic information is available for the public to abuse.  Plaintiff Pascoe further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

243.   Plaintiff Pascoe suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Pascoe entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; (e) violation of her statutorily protected right to confidentiality in her medical information, which Ambry admits was compromised in the Data Breach; and (f) imminent and impending injury arising from the increased risk of fraud and identity theft.

244.   Since the Data Breach, Plaintiff Pascoe has experienced an increase in suspicious phone calls and emails.  Plaintiff Pascoe has received fraudulent phone calls related to her social security and received alerts that emails she received were scams.

245.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Pascoe's contact information was included among the compromised information concerning her.

246.   As a result of the Data Breach, Plaintiff Pascoe will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Linda Stewart**

247.   In December 2018, Plaintiff Stewart went for genetic counseling in West Virginia. Plaintiff Stewart was told by her nurse practitioner that genetic testing would be performed by Ambry. Plaintiff Stewart authorized the nurse practitioner to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing. Plaintiff Stewart was assured that all aspects of her genetic testing would be handled in accordance with HIPAA regulations. Plaintiff Stewart therefore fully expected that the information she provided Ambry would be kept confidential.

248.   Plaintiff Stewart spends approximately one hour twice per month taking

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

action to mitigate the impact of the Data Breach, which includes reviewing her medical records and financial accounts for suspicious activity. After learning of the Data Breach, Plaintiff Stewart made a specific trip to the bank to receive a new debit card and also took time to change her phone number. This is time Plaintiff Stewart otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

249.   Knowing that thieves stole her Private Information and knowing that her Private Information may be available for sale on the dark web has caused Plaintiff Stewart endless worry about the misuse of her information, her husbands' information, and that of her young children. The Data Breach has caused Plaintiff Stewart to not want to share any PII or PHI electronically, although she understands how difficult that choice is in this age of technology. She now has intense hesitation about using electronic services, and reservations about conducting other online activities requiring her personal information. Plaintiff Stewart had a high level of expectation that Ambry would protect her "most private" information. As a result of the Data Breach, Plaintiff Stewart now suffers from a high level of anxiety and loss of trust.  Plaintiff Stewart further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

250.   Plaintiff Stewart suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Stewart entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy;  (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

251.   As a result of the Data Breach, Plaintiff Stewart will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  damages, for years to come.

2  **Ariann Taglioli**

3      252.  Over the past approximately six years, Plaintiff Taglioli participated in
4  genetic counseling. In connection with her most recent genetic testing that was to be
5  performed by Ambry, Plaintiff Taglioli authorized the genetic counselor to send her
6  confidential and sensitive private and health information to Ambry in connection with
7  her genetic testing and expected that this information would be kept confidential.

8      253.  Plaintiff Taglioli subsequently spent at least two hours taking action to
9  mitigate the impact of the Data Breach, which included researching to determine whether
10  the Data Breach notice from Ambry was legitimate. This is time Plaintiff Taglioli
11  otherwise would have spent performing other activities, such as her job and/or leisurely
12  activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

13      254.  Knowing that thieves stole her Private Information and knowing that her
14  Private Information may be available for sale on the dark web has caused Plaintiff
15  Taglioli great concern. This Data Breach has resulted in Plaintiff Taglioli spending time
16  wondering if others have her Private Information and what dangers to herself and her
17  family could result from it.  Plaintiff Taglioli further suffers from additional anxiety,
18  concern, and unease about Defendants suffering future data breaches or otherwise
19  disclosing Plaintiff's personal and medical information in the future.

20      255.  Plaintiff Taglioli suffered actual injury from having her Private Information
21  exposed as a result of the Data Breach including, but not limited to (a) paying monies to
22  Ambry for its goods and services which she would not have had Ambry disclosed that it
23  lacked data security practices adequate to safeguard patients' Private Information from
24  theft; (b) damages to and diminution in the value of her Private Information—a form of
25  intangible property that Plaintiff Taglioli entrusted to Ambry as a condition for healthcare
26  services; (c) loss of her privacy; (d) lost time; (e) violation of her statutorily protected
27  right to confidentiality in her genetic information, which Ambry admits was
28  compromised in the Data Breach; and (f) imminent and impending injury arising from

the increased risk of fraud and identity theft.

256.   Subsequent to the Data Breach, Plaintiff Taglioli experienced numerous instances of actual fraud. In or around June 2020, Plaintiff Taglioli was notified that without her authorization, a bank in South Dakota had conducted a hard inquiry on her credit. Upon information and belief, Plaintiff Taglioli believes that this hard inquiry was a consequence of unauthorized third parties having her Private Information which was disclosed during the Data Breach.

257.   Plaintiff Taglioli has experienced an increase in suspicious, unsolicited text messages from unknown phone numbers as a result of the Data Breach. Plaintiff Taglioli has had to spend her valuable time and energy reviewing these text messages to determine their legitimacy.

258.   Given the role of the Ambry employee whose email was compromised in the Data Breach, it is likely that Plaintiff Taglioli's contact information was included among the compromised information concerning her.

259.   As a result of the Data Breach, Plaintiff Taglioli will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Cheryl Terrano**

260.   In December 2017, Plaintiff Terrano went for genetic counseling to learn more about genetic risk factors and discuss genetic testing options. Plaintiff Terrano discussed the available genetic testing options with a certified genetic counselor who recommended Ambry. Plaintiff Terrano reviewed documentation from Ambry explaining in detail the genetic testing that was to be performed. In connection with genetic testing that was to be performed by Ambry, Plaintiff Terrano authorized the genetic counselor to send her confidential and sensitive private and health information to Ambry. Plaintiff Terrano fully expected that this information would be kept confidential.

261.   Plaintiff Terrano subsequently spent at least two hours taking action to mitigate the impact of the Data Breach, which included reviewing her medical records

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

and financial accounts, checking her credit score, and adjusting her credit monitoring program to receive notifications regarding unauthorized changes to her accounts. As a result of the Data Breach, Plaintiff Terrano spends up to thirty minutes every week checking her financial statements. This is time Plaintiff Terrano otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

262.   Knowing that thieves stole her Private Information and knowing that her Private Information may be available for sale on the dark web has caused Plaintiff Terrano significant distress. Plaintiff Terrano lives in fear of what additional fraud she will be subjected to in the future. Plaintiff Terrano further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

263.   Plaintiff Terrano suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Terrano entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

264.   Subsequent to the Data Breach, Plaintiff Terrano also learned from Experian that her information was found on the dark web.

265.   Plaintiff Terrano experienced a series of suspicious events surrounding her finances since the Data Breach. For example, in March 2020, Plaintiff Terrano sought to increase her credit limit on her credit card but was denied. Upon information and belief, Plaintiff Terrano believes that this denial stems from her Private Information being disclosed during the Data Breach. Plaintiff Terrano's automatic billing was also compromised, causing Plaintiff Terrano to receive a late payment notice.

266.   As a result of the Data Breach, Plaintiff Terrano will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Beth Velardi**

267.   In approximately 2016/2017 Plaintiff Velardi went to a facility for genetic counseling in New York. In connection with genetic testing that was to be performed by Ambry, Plaintiff filled out and reviewed HIPAA compliance documents. Plaintiff Velardi then authorized her genetic counselor to send her confidential and sensitive private and health information to Ambry. Plaintiff Velardi fully expected that this information would be kept confidential.

268.   Plaintiff Velardi subsequently spent at least one hour taking action to mitigate the impact of the Data Breach, which included reviewing her medical records and financial accounts for suspicious activity. This is time Plaintiff Velardi otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

269.   Knowing that thieves stole her Private Information and knowing that her Private Information may be available for sale on the dark web has caused Plaintiff Velardi stress and anxiety. Plaintiff Velardi is now very concerned about the high likelihood of identity theft.  Plaintiff Velardi further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

270.   Plaintiff Velardi suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Velardi entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury

arising from the increased risk of fraud and identity theft.

271.  In April 2020, Plaintiff Velardi began receiving suspicious emails from a bank and an online retailer asking for her to verify her account information. Plaintiff Velardi telephoned both the bank and online retailer to further inquire about the emails but was told that the emails did not originate from either company. Plaintiff Velardi has had to spend her valuable time evaluating the legitimacy of these emails. This is time Plaintiff Velardi otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life.

272.  After receiving the unsolicited emails from her bank and the online retailer, Plaintiff Velardi's email accounts crashed. Plaintiff Velardi has been unable to access her emails since June. The email address associated with her crashed email account is the one that Plaintiff Velardi provided for her genetic testing with Ambry. In this age of technology, Plaintiff Velardi's inability to access her email account for several months caused Plaintiff Velardi significant harm.

273.  As a result of the Data Breach, Plaintiff Velardi will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

**Debra Volk**

274.  In July 2017, Plaintiff Volk went for genetic counseling in Atlanta, Georgia. In connection with genetic testing that was to be performed by Ambry, Plaintiff Volk reviewed documentation, including a notice of privacy practices, with her medical provider. Plaintiff Volk authorized her medical provider to send her confidential and sensitive private and health information to Ambry in connection with her genetic testing, fully expecting that this information would be kept confidential.

275.  Upon learning of the Data Breach in April 2020, Plaintiff Volk spent at least five hours taking action to mitigate the impact of the Data Breach, which included reviewing her medical records and financial accounts and changing her account information and passwords for her telephone account, her electric account, and her online

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

accounts. This is time Plaintiff Volk otherwise would have spent performing other activities, such as her job and/or leisurely activities for the enjoyment of life. This loss of time was a direct result of the Data Breach.

276.   Knowing that thieves stole her Private Information and knowing that her Private Information may be available for sale on the dark web has caused Plaintiff Volk anxiety. She is now very concerned about identity theft in general, and what could happen to her in the future because of the Data Breach.  Plaintiff Volk further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

277.   Plaintiff Volk suffered actual injury from having her Private Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Ambry for its goods and services which she would not have had Ambry disclosed that it lacked data security practices adequate to safeguard patients' Private Information from theft; (b) damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Volk entrusted to Ambry as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

278.   On September 3, 2020, Plaintiff Volk received a scam email on the email address that she provided when completing her genetic testing. The email confirmed a monetary payment for IT service that she did not order. This amount did not appear on any of Plaintiff Volk's accounts or credit card statements. Plaintiff Volk immediately contacted the company to cancel this service and was directed to their website to download a cancellation form. Once Plaintiff Volk logged onto their website, she realized that the company was trying to gain access to her laptop. Plaintiff Volk ended the call and logged off of her computer. As a result, however, Plaintiff Volk's laptop developed a virus. Her laptop no longer functioned properly, thus requiring her to purchase a new laptop. Plaintiff Volk spent many hours setting up the new laptop, changing passwords, and scanning documents from her old laptop to her new laptop.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

279.   As a result of the Data Breach, Plaintiff Volk will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

280.   As a result of the Data Breach, Plaintiffs and Class Members have suffered, and will continue to suffer, economic damages and other actual injury and harm (as detailed above), including, without limitation, the deprivation of the full value of their Private Information, for which there are well-established national and international markets. PII is a unique and valuable property right. *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 RICH. J.L. & TECH. 11, at \*3-\*4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

281.   Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class Members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiffs and Class Members was compromised through unauthorized access by an unknown third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

### F.   *Ambry's Privacy Policies.*

282.   Ambry makes numerous promises to its patients that it will maintain the security and privacy of their Private Information.

283.   In its Terms and Conditions, Ambry states that "Ambry is committed to protecting the privacy of all users of the Services. We have published a Privacy Policy and a Cookie Policy, which together explain in detail our online information practices and the

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

choices you, as a visitor, can make about the way your information is collected and used when using or accessing the Website or Services."

284.   Ambry's Information Security Statement[9] states:

> Ambry Genetics cares about your patients and your data as much as you do. We are committed to protecting the information you have entrusted to us. In order to demonstrate our commitment to information security, we have attained the SOC 2 Type 2 certification, which is independently audited by an AICPA organization. We undergo this rigorous testing every year, along with many other practices, to ensure patient health information is secure.

285.   Ambry's Privacy Policy[10] provides, in part:

> Ambry Genetics Corporation ("Ambry," "we," or "us") is committed to protecting your privacy. We have established this Privacy Policy to inform you of the specific practices and guidelines that protect the security and confidentiality of your personal information. By using our website, ambrygen.com, or any application or online services available on ambrygen.com (collectively, the "Services"), or by transmitting information to us by email or other electronic means, you agree to the terms of this Privacy Policy.

> **Security Measures**

> Information that you provide to Ambry through ambrygen.com is encrypted using industry standard Secure Sockets Layer (SSL)

---

[9] *Information Security Statement*, https://www.ambrygen.com/legal/information-security-statement (last visited Sept. 7, 2020).

[10] *Ambry's Privacy Policy, available at*: https://www.ambrygen.com/legal/privacy-policy (last accessed Sept. 7, 2020).

technology. Your information is processed and stored on controlled servers with restricted access.

286.   Ambry's Notice of Privacy Practices[11] provides, in part:

**We are required by law to:**

- Maintain the confidentiality of your protected health information in accordance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and applicable state law;

- Comply with the terms of this Notice, including any amendments; and

- Give you this Notice of our legal duties and privacy practices with respect to your PHI that we maintain.

\* \* \*

**Your Authorization Is Needed for Other Uses and Disclosures**

Unless otherwise permitted by applicable law, we will not use or disclose your PHI for purposes not described in this Notice unless you give us written authorization to do so (including via electronic signature). If you give us such written authorization, then, in most cases, you may revoke it in writing at any time as described in the authorization. Your revocation will be effective with respect to all of your PHI that we maintain, unless we have already taken action in reliance on your authorization.

---

[11] *Ambry Notice of Privacy Practices, available at*: https://www.ambrygen.com/legal/notice-of-privacy-practices (last accessed Sept. 7, 2020).

287.   Ambry also ensures its patients in its Notice of Privacy Policy that it will only use their Private Information for certain limited purposes, such as for treatment, payment, and health care operations, among other, and further provides the following:

> Unless otherwise permitted by applicable law, we will not use or disclose your PHI for purposes not described in this Notice unless you give us written authorization to do so (including via electronic signature). If you give us such written authorization, then, in most cases, you may revoke it in writing at any time as described in the authorization. Your revocation will be effective with respect to all of your PHI that we maintain, unless we have already taken action in reliance on your authorization.

288.   Ambry describes how it may use and disclose medical information for each category of uses or disclosures, none of which provide it a right to expose patients' Private Information in the manner it was exposed to unauthorized third parties in the Data Breach.

289.   By failing to protect Plaintiffs' and Class Members' Private Information, and by allowing the Data Breach to occur, Ambry broke these promises to Plaintiffs and Class Members.

### E.   *The Healthcare Sector is Particularly Susceptible to Cyberattacks.*

290.   Defendants were on notice that companies in the healthcare industry were targets for cyberattacks.

291.   Defendants were also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the

///

///

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[12]

292.   The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[13]

293.   The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[14] In 2017, a new record high of 1,579 breaches were reported representing a 44.7 percent increase.[15] That trend continues.

294.   The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[16] Indeed, when

[12] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited Sept. 7, 2020).

[13] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited Sept. 7, 2020).

[14] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at:* https://www.idtheftcenter.org/surveys-studys (last accessed Sept. 18, 2020).

[15] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review, available at:* https://www.idtheftcenter.org/2017-data-breaches/ (last accessed Sept. 18, 2020).

[16] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last accessed Sept. 18, 2020).

compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[17] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[18]

295.   Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[19] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[20]

296.   In the healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a

---

[17] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Sept. 18, 2020).

[18] *Id.*

[19] *2019 HIMSS Cybersecurity Survey, available at*: https://www.himss.org/2019-himss-cybersecurity-survey (last accessed Sept. 18, 2020).

[20] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last accessed Sept. 18, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

recent report from the Healthcare Information and Management Systems Society (HIMSS). And yet, 18% of healthcare organizations fail to conduct phishing tests, a finding HIMSS describes as 'incredible.'"[21]

297.   The report from Proofpoint was published March 27, 2019, and summarized findings of recent healthcare industry cyber threat surveys and recounted good, common sense steps that the targeted healthcare companies should follow to prevent email-related cyberattacks.

298.   One of the best protections against email related threats is security awareness training and testing on a regular basis. This should be a key part of a company's on-going training of its employees. "[S]ince phishing is still a significant, initial point of compromise, additional work needs to be done to further lower the click rate," the HIMSS report states. "This can be done through more frequent security awareness training, phishing simulation, and better monitoring of metrics pertaining to phishing (including whether there are any particular repeat offenders)."[22]

299.   ProtonMail Technologies publishes a guide for IT Security to small businesses (i.e., companies without the heightened standard of care applicable in the healthcare industry). In its 2019 guide, ProtonMail dedicates a full chapter of its Book guide to the danger of phishing and ways to prevent a small business from falling prey to it. It reports:

> Phishing and fraud are becoming ever more extensive problems. A recent threat survey from the cybersecurity firm Proofpoint stated that between 2017 and 2018, email-based attacks on businesses increased 476 percent. The FBI reported that these types of attacks cost companies around the world $12 billion annually.

---

[21]  Aaron Jensen, Healthcare Phishing Statistics: 2019 HIMSS Survey Results (Mar. 27, 2019),     https://www.proofpoint.com/us/security-awareness/post/healthcare-phishing-statistics-2019-himss-survey-results (last visited Sept. 7, 2020).
[22] *Id.*

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Similar to your overall IT security, your email security relies on training your employees to implement security best practices and to recognize possible phishing attempts. This must be deeply ingrained into every staff member so that every time they check their emails, they are alert to the possibility of malicious action.[23]

300. The guidance that ProtonMail provides non-healthcare industry small businesses is likely still not adequate for a company like Ambry, with the heightened healthcare standard of care based on HIPAA, CMIA, and the increased danger from the sensitivity and wealth of Private Information it retains, but ProtonMail's guidance is informative for showing how inadequately Ambry protected the Private Information of the Plaintiffs and Class Members. ProofPoint lists numerous tools under the heading, "How to Prevent Phishing":

a. **Training:** "Training your employees on how to recognize phishing emails and what to do when they encounter one is the first and most important step in maintaining email security. *This training should be continuous as well. . . .*"

b. **Limit Public Information:** "Attackers cannot target your employees if they don't know their email addresses. Don't publish non-essential contact details on your website or any public directories . . . ."

c. **Carefully check emails:** "First off, your employees should be skeptical anytime they receive an email from an unknown sender. Second, most phishing emails are riddled with typos, odd syntax, or stilted language. Finally, check the 'From' address to see if it is odd . . . . If an email looks suspicious, employees should report it."

---

[23] *The ProtonMail Guide to IT Security for Small Businesses*, ProtonMail (2019), *available at* https://protonmail.com/it-security-complete-guide-for-businesses (last visited Sept. 7, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

d.  **Beware of links and attachments:** "Do not click on links or download attachments without verifying the source first and establishing the legitimacy of the link or attachment. . . ."

e.  **Do not automatically download remote content:** "Remote content in emails, like photos, can run scripts on your computer that you are not expecting, and advanced hackers can hide malicious code in them. You should configure your email service provider to not automatically download remote content. This will allow you to verify an email is legitimate before you run any unknown scripts contained in it."

f.  **Hover over hyperlinks:** "Never click on hyperlinked text without hovering your cursor over the link first to check the destination URL, which should appear in the lower corner of your window. Sometimes the hacker might disguise a malicious link as a short URL." [Proofpoint notes that there are tools online available for retrieving original URLs from shortened ones.]

g.  **If in doubt, investigate:** "Often phishing emails will try to create a false sense of urgency by saying something requires your immediate action. However, if your employees are not sure if an email is genuine, they should not be afraid to take extra time to verify the email. This might include asking a colleague, your IT security lead, looking up the website of the service the email is purportedly from, or, if they have a phone number, calling the institution, colleague, or client that sent the email."

h.  **Take preventative measures:** "Using an end-to-end encrypted email service gives your business's emails an added layer of protection in the case of a data breach. A spam filter will remove the numerous random emails that you might receive, making it more difficult for a phishing attack to get through. Finally, other tools, like Domain-based Message Authentication, Reporting, and Conformance (DMARC) help you be sure that the email came from the person it claims to come from, making it easier to identify potential phishing attacks."[24]

---

[24] *Id.*

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

301.   These are basic, common-sense email security measures that every business, not only healthcare businesses, should be doing. Ambry, with its heightened standard of care should be doing even more. But by adequately taking these common-sense solutions, Ambry could have prevented this Data Breach from occurring.

302.   As a healthcare provider, Ambry knew, or should have known, the importance of safeguarding the patients' Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Ambry's patients as a result of a breach. Ambry failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**F. Ambry Acquires, Collects and Stores Its Patients' Private Information.**

303.   Ambry acquires, collects, and stores a massive amount of its patients' protected health information and other personally identifiable data.

304.   As a condition of engaging in health services, Ambry requires that these patients entrust them with highly confidential Private Information.

305.   By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Ambry assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

306.   Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information, and, as current and former patients, they relied on Ambry to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

///

///

///

///

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

### G.     The Value of Private Information and the Effects of Unauthorized Disclosure.

307.   At all relevant times, Defendants were well aware that the Private Information it collects from Plaintiffs and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

308.   Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[25] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and PHI on multiple underground Internet websites, commonly referred to as the dark web.

309.   While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363 according to the Infosec Institute.[26]

310.   PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

311.   Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they

---

[25] Federal Trade Commission, *Warning Signs of Identity Theft, available at:* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed Apr. 21, 2020).

[26] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at:* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last accessed Apr. 21, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[27]

312.  Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

313.  The ramifications of Ambry's failure to keep its patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

314.  Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

315.  Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[28] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[29]

---

[27] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited Sept. 7 , 2020).

[28] *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last accessed Sept. 7, 2020).

[29] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:*

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

316.   Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[30] Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[31] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[32]

317.   As a healthcare provider, Ambry knew, or should have known, the importance of safeguarding its patients' Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Ambry's patients as a result of a breach. Ambry failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accesses Sept. 7, 2020).

[30] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://notified.idtheftcenter.org/s/resource (last accessed Sept.7, 2020).

[31] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Sept. 7, 2020); *see also*, National Survey on Medical Identity Theft, Feb. 22, 2010, cited at p. 2.

[32] *Id.*

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

318.   The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways.  Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves.  Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[33]  For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[34] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information of Plaintiffs and Class Members that were misused.

319.   Further, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible.  This is known as the "mosaic effect."

320.   Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiffs.

---

[33] Fed. Trade Comm'n, Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report 35-38 (Dec. 2010), *available at*: https://www.ftc.gov/sites/default/files/documents/ reports/federal-trade-commission-bureau-consumer-protection-preliminary-ftc-staff-report-protecting-consumer/101201privacyreport.pdf (as of April 18, 2021).

[34] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

321.   The Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breaches can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

### H.     *Ambry's Conduct Violates HIPAA.*

322.   HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[35]

323.   Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

324.   The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[36]

325.   Based on information and belief, including the breach reports produced by Defendants, Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations. Ambry's security failures include, but are not limited to, the following:

---

[35] HIPAA Journal, *What is Considered Protected Health Information Under HIPAA?, available at:* https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last accessed Sept. 7, 2020).

[36]   Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited Sept. 7, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

a.      Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

b.      Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

c.      Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

d.      Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e.      Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f.      Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g.      Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

h.      Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

i.      Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j.    Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

### I.    *Ambry Failed to Comply with FTC Guidelines*.

326.   Ambry was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

327.   The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[37]

328.   In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[38] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

329.   The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private

---

[37] Federal Trade Commission, *Start With Security: A Guide for Business*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Sept. 7, 2020).

[38] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Sept. 7, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[39]

330.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

331.    Ambry failed to properly implement basic data security practices. Ambry's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

332.    Ambry was at all times fully aware of its obligation to protect the Private Information of patients because of its position as a trusted healthcare provider. Ambry was also aware of the significant repercussions that would result from its failure to do so.

**J.    *Ambry Failed to Comply with Healthcare Industry Standards.***

333.    HHS's Office for Civil Rights notes:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[40]

334.    HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial

---

[39] FTC, *Start With Security*, *supra* note 16.
[40] HIPAA Journal, Cybersecurity Best Practices for Healthcare Organizations, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last accessed Sept. 7, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

335. Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because the of value of the Private Information which they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[41] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

336. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Ambry chose to ignore them. These best practices were known, or should have been known by Ambry, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

### K. Plaintiffs and Class Members Suffered Damages.

337. The ramifications of Ambry's failure to keep patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[42]

338. According to one security consulting agency who reported about the Data Breach at Ambry:

---

[41] *See e.g.*, INFOSEC, *10 Best Practices For Healthcare Security, available at:* https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref (last accessed Sept. 7, 2020).

[42] *2014 LexisNexis True Cost of Fraud Study, available at:* https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last accessed Sept. 7, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Genetic information is considered to be especially private because it is unique to the individual, cannot be de-identified and will forever be linked to only one person in the world.

***

Federal laws recognize the harmful effects from the use of genetic information by prohibiting the use of this data in the offering or underwriting of health insurance and in employment decisions. Some states go further in prohibiting discrimination on the basis of genetic data in most circumstances including housing, education and financial services.[43]

339.   The state of California generally prohibits healthcare providers from negligently releasing a patient's confidential medical information without prior authorization. California's Confidentiality of Medical Information Act ("CMIA") (Cal. Civ. Code § 56.101(a)) states that "[e]very provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein.   Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." (*See also* Cal. Civ. Code §§ 1798.80, *et seq.*)

340.   In addition to their obligations under state laws and regulations, Defendants owed a common law duty to Plaintiffs and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing,

---

[43] Genetic Testing Lab Hack Affects 2333,000, Data Breach Today (Apr. 24, 2020), https://www.databreachtoday.com/genetic-testing-lab-hack-affects-233000-a-14182?highlight=true (last accessed Sept. 17, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

341.   Defendants further owed and breached its duty to Plaintiffs and Class Members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

342.   As a direct result of Defendants' intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiffs' and Class Members' Private Information as detailed above, and Plaintiffs are now at a heightened and increased risk of identity theft and fraud.

343.   The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

344.   Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

345.   None of the Plaintiffs had their genetic information compromised through any other data breaches, to their knowledge.

346.   Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in their agreements with Ambry and they were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

///

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

347.   As a result of the Data Breach, Plaintiffs' and Class Members' Private Information has diminished in value.

348.   The Private Information belonging to Plaintiffs and Class Members is private, private in nature, and was left inadequately protected by Defendants who did not obtain Plaintiffs' or Class Members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.

349.   Plaintiffs' and Class Members' Private Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing, particularly scam marketing which several Plaintiffs have experienced, without the approval of Plaintiff and Class Members. Due to the Data Breach, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

350.   The Data Breach was a direct and proximate result of Defendants' failure to (a) properly safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

351.   Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect patient data.

352.   Defendants did not properly train their employees to identify and avoid phishing attempts.

353.   Defendants did not employ multi-factor authentication for accessing email accounts, which the forensic investigator employed by Defendants after the Data Breach noted may have prevented the exfiltration of Plaintiffs' and Class Members' information.

354.   Defendants did not employ email security protocols, such as Domain-based

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Message Authentication Reporting and Conformance ("DMARC"), Sender Policy Framework (SPF), or DomainKeys Identified Mail ("DKIM"), which work against phishing and email spam. The forensic investigator recommended that Amby implement these protocols to prevent future breaches.

355.   Had Defendants remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiffs' and Class Members' Private Information.

356.   As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

357.   The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[44]

358.   In the Data Breach Notice, Ambry made an ambiguous and vague offer of identity monitoring service to patients without providing information as to the terms of service, benefits offered, or length of service. Ambry has not offered or provided victims any fraud insurance or medical identity theft protection. Ambry's offer fails to address the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud, and it entirely fails

---

[44] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013, *available at*: https://www.bjs.gov/content/pub/pdf/vit12.pdf (last accessed Sept. 7, 2020).

to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information.

359. Other than providing 12 months of credit monitoring, Defendants do not appear to be taking any measures to assist Plaintiffs and Class Members other than telling them to simply do the following:

- "remain vigilant for incidents of fraud and identity theft";
- "review[] account statements and monitor[] your credit report for unauthorized activity";
- obtain a copy of free credit reports;
- contact the FTC and/or the state Attorney General's office;
- enact a security freeze on credit files; and
- create a fraud alert.

None of these recommendations, however, require Defendants to expend any effort to protect Plaintiffs' and Class Members' Private Information.

360. Defendants' failure to adequately protect Plaintiffs' and Class Members' Private Information has resulted in Plaintiffs and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money – while Defendants sit by and do nothing to assist those affected by the incident. Instead, as Ambry's Data Breach Notice indicates, it is putting the burden on Plaintiffs and Class Members to discover possible fraudulent activity and identity theft.

361. Ambry's offer of 12 months of identity monitoring to Plaintiffs and Class Members is woefully inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is acquired and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's

///

Private Information) – it does not prevent identity theft.[45] This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

362.    Plaintiffs and Class Members have been damaged in several other ways as well. All Plaintiffs and Class Members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiffs and Class Members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Certain Plaintiffs and Class Members have also purchased credit monitoring and other identity protection services, purchased credit reports, placed credit freezes and fraud alerts on their credit reports, and spent time investigating and disputing fraudulent or suspicious activity on their accounts. Plaintiffs and Class Members also suffered a loss of the inherent value of their Private Information.

363.    The Private Information stolen in the Data Breach can be misused on its own, or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to Class members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

364.    As a result of Defendants' failures to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, and are at increased risk of suffering:

---

[45] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html (last visited Apr. 30, 2020).

a. The compromise, publication, theft and/or unauthorized use of their Private Information;

b. Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

c. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

d. The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect the Private Information in their possession;

e. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and

f.  Anxiety and distress resulting from fear of misuse of their genetic medical information, and additional anxiety and distress resulting from fear that Defendants will release their personal and medical information in the future.

365.   In addition to a remedy for the economic harm, Plaintiffs and Class Members maintain an undeniable interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

**L.    *Ambry's Delay in Identifying & Reporting the Breach Caused Additional Harm.***

366.   It is axiomatic that:

The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account,

the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act.[46]

367.   Indeed, once a data breach has occurred:

[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills, insurance invoices, and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves (internal citations omitted).[47]

368.   Although their Private Information was improperly exposed on or about January 22-24, 2020, Plaintiffs and Class Members were not notified of the Data Breach until mid-April 2020, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

369.   Defendants notified HHS on or about March 22, 2020, but waited almost an entire month to notify the California Attorney General, Plaintiffs, and Class Members.[48]

370.   As a result of Defendants' delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiffs and Class Members has been driven even higher.

[46] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire, *available at:* https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million (last accessed Sept. 7, 2020).

[47] Consumer Reports, *The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too*, January 31, 2019, *available at:* https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last accessed Sept. 7, 2020).

[48] U.S. Department of Health and Human Services, *Cases Currently Under Investigation, available at:* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sept. 7, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## V.   CHOICE OF LAW

371.   The State of California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of all California residents and citizens of the United States against a company headquartered and doing business in California. California has a greater interest in the nationwide claims of Plaintiffs and members of the Nationwide Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

372.   The corporate headquarters of Ambry and Realm IDX, located in Aliso Viejo, California, is the "nerve center" of their business activities – the place where their officers direct, control, and coordinate the companies' activities, including their data security functions and policy, financial, and legal decisions.

373.   Ambry's response to the Data Breach at issue here, and corporate decisions surrounding such response, were made from and in California.

374.   Ambry's breaches of duty to Plaintiffs and Nationwide Class members emanated from California.

375.   Application of California law to the Nationwide Class with respect to Plaintiffs' and Class Members' claims is neither arbitrary nor fundamentally unfair because California has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Nationwide Class.

376.   Under California's choice of law principles, which are applicable to this action, the common law of California applies to the nationwide common law claims of all Nationwide Class members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's Unfair Competition Law and Confidentiality of Medical Information Act may be applied to non-resident plaintiffs as against Ambry.

## VI.   CLASS ALLEGATIONS

377.   Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal

1    Rules of Civil Procedure.

2        378.   The Nationwide Class that Plaintiffs seek to represent is defined as follows:

3
4        **Nationwide Class: All individuals whose Private Information was
         compromised in the data breach first announced by Ambry on or
         about April 15, 2020.**
5

6        379.   In the alternative to the Nationwide Class,[49] Plaintiffs seek certification of
7    the following additional Nationwide Sub-Classes:
8
9        **Nationwide Adult Sub-Class: All adult individuals in the United
         States whose Private Information was compromised in the data
10       breach first announced by Ambry on or about April 15, 2020.**
11
         **Nationwide Minor Sub-Class: All minor individuals in the United
12       States whose Private Information was compromised in the data
         breach first announced by Ambry on or about April 15, 2020.**
13

14       380.   In the alternative to the Nationwide Class, Plaintiffs seek certification of the
15   following state Sub-Classes:
16
         **Arizona Sub-Class: All persons residing in Arizona whose Private
17       Information was compromised in the data breach first announced by
         Ambry on or about April 15, 2020.**
18

19       **California Sub-Class: All persons residing in California whose
20       Private Information was compromised in the data breach first
21       announced by Ambry on or about April 15, 2020.**
22

23       **Florida Sub-Class: All persons residing in Florida whose Private
24       Information was compromised in the data breach first announced by
25       Ambry on or about April 15, 2020.**
26

27   ───────────────
     [49] Plaintiffs anticipate seeking to certify only a Nationwide Class, California Sub-Class,
     and Illinois Sub-Class. However, Plaintiffs allege additional Sub-Classes in order to
28   preserve the right to certify such additional classes in the event that any court
     determines that a Nationwide Class cannot be certified.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**Georgia Sub-Class**: All persons residing in Georgia whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**Illinois Sub-Class**: All persons residing in Illinois whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**Indiana Sub-Class**: All persons residing in Indiana whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**Michigan Sub-Class**: All persons residing in Michigan whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**Minnesota Sub-Class**: All persons residing in Minnesota whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**New Jersey Sub-Class**: All persons residing in New Jersey whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

**New York Sub-Class**: All persons residing in New York whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**Ohio Sub-Class:** **All persons residing in Ohio whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Pennsylvania Sub-Class:** **All persons residing in Pennsylvania whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Tennessee Sub-Class:** **All persons residing in Tennessee whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**Virginia Sub-Class:** **All persons residing in Virginia whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

**West Virginia Sub-Class:** **All persons residing in West Virginia whose Private Information was compromised in the data breach first announced by Ambry on or about April 15, 2020.**

381.   Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

382.   Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

383.   <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Nationwide Class, Nationwide Sub-Classes, and State Subclasses (the "Classes") are so numerous that joinder of all members is impracticable. Defendants have identified hundreds of thousands of patients whose Private Information may have been improperly accessed in the Data Breach, and the Classes are apparently identifiable within Defendants' records.

384.   <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

     a.     Whether and when Defendants actually learned of the Data Breach and whether their response was adequate;

     b.     Whether Defendants owed a duty to the Classes to exercise due care in collecting, storing, safeguarding and/or obtaining their Private Information;

     c.     Whether Defendants breached that duty;

     d.     Whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiffs' and Class Members' Private Information;

     e.     Whether Defendants acted negligently in connection with the monitoring and/or protecting of Plaintiffs' and Class Members' PII/PHI;

     f.     Whether Defendants knew or should have known that they did not employ reasonable measures to keep Plaintiffs' and Class Members' PII/PHI secure and prevent loss or misuse of that Private Information;

     g.     Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

     h.     Whether Defendants caused Plaintiffs' and Class Members' damages;

     i.     Whether Defendants violated the law by failing to promptly notify Class Members that their Private Information had been compromised;

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

j.   Whether Plaintiffs' and the Class Members' Private Information were recorded onto Defendants' internet portal on or before March 3, 2020;

k.   Whether Plaintiffs and the other Class Members are entitled to actual damages, credit monitoring, and other monetary relief;

l.   Whether Defendants violated the California Unfair Competition Law (Business & Professions Code § 17200, *et seq.*); and

m.   Whether Defendants violated the Confidentiality of Medical Information Act (Cal. Civ. Code § 56.101(a).).

385.   Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendants' misfeasance.

386.   Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

387.   Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

388.   Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

389.   The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

390.   Ambry and Realm IDX are based in Aliso Viejo, California, and on information and belief, all managerial decisions emanate from there, the representations on Ambry's website originate from there, Ambry's misrepresentations originated from California, and therefore application of California law to the Nationwide Class is appropriate.

391.   The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

manageability problems with prosecuting this lawsuit as a class action.

392.  Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

393.  Unless a Class-wide injunction is issued, Plaintiffs and Class Members remain at risk that Defendants will continue to fail to properly secure the Private Information of Plaintiffs and Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Complaint.

394.  Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

395.  Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

        a.  Whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

        b.  Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

        c.  Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

        d.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

e. Whether Class Members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiffs and the Classes)

396. Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

397. As a condition of receiving services, Plaintiffs and Class Members were obligated to provide Ambry directly, or through their other healthcare providers, with their Private Information.

398. Plaintiffs and Class Members entrusted their Private Information to Ambry with the understanding that Ambry would safeguard their information.

399. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

400. Defendants had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining and testing its security protocols to ensure that Private Information in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on relevant cybersecurity measures.

401. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew of or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and Class Members, the critical importance of providing adequate security of that Private Information, the current cyber scams being perpetrated, and that they had inadequate

- 98 -

employee training and education and IT security protocols in place to secure the Private Information of Plaintiffs and Class Members.

402.   Defendants' own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendants' misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decision not to comply with HIPAA and industry standards for the safekeeping and encrypted authorized disclosure of the Private Information of Plaintiffs and Class Members.

403.   Plaintiffs and Class Members had no ability to protect their Private Information that was in Defendants' possession.

404.   Defendants were in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

405.   Defendants had a duty to put proper procedures in place to prevent the unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

406.   Defendants have admitted that Plaintiffs' and Class Members' Private Information was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

407.   Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information while it was within Defendants' possession or control.

408.   Defendants improperly and inadequately safeguarded Plaintiffs' and Class Members' Private Information in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

409.   Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its Plaintiffs' and Class Members' Private Information.

410.   Defendants, through their actions and/or omissions, unlawfully breached their duty to adequately disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

411.   But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' Private Information would not have been compromised and/or subsequently misused by unauthorized third parties to engage in fraudulent activity further harming Plaintiffs and Class Members.

412.   There is a temporal and close causal connection between Defendants' failure to implement security measures to protect the Private Information and the harm suffered, or risk of imminent harm suffered, by Plaintiffs and the Class.

413.   As a result of Defendants' negligence, unauthorized parties acquired Plaintiffs' Private Information and used that specific information to harm Plaintiffs and Class Members as described above.  As a further result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer damages and injury including, but not limited to, (a) actual identity theft; (b) an increased risk of identity theft, fraud, and/or misuse of their Private Information; (c) the loss of the opportunity of how their Private Information is used; (d) the compromise, publication, and/or theft of their Private Information; (e) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (f) diminished value of the Private Information; (g) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (h) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (i) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

414. Violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se*.

415. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Ambry, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

416. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

417. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

418. Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

419. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

420. Defendants' violation of HIPAA also independently constitutes negligence *per se*.

///

421. HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

422. Plaintiffs and Class Members are within the class of persons that HIPAA privacy laws were intended to protect.

423. The harm that occurred as a result of the Data Breach is the type of harm HIPAA privacy laws were intended to guard against.

424. As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to an increased risk of identity theft, fraud, and/or misuse of their Private Information and damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

425. Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

///

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## COUNT II
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Classes)

426.   Plaintiffs restate and realleges all of the foregoing Paragraphs as if fully set forth herein.

427.   California established the right to privacy in Article 1, Section 1 of the California Constitution.

428.   The State of California recognizes the tort of Intrusion into Private Affairs, and adopts the formulation of that tort found in the Restatement (Second) of Torts which states:

429.   One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652B (1977).

430.   Plaintiffs and Class Members had a legitimate and reasonable expectation of privacy with respect to their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

431.   Defendants owed a duty to patients in their network, including Plaintiffs and Class Members, to keep their Private Information confidential.

432.   The unauthorized release of Private Information, especially the type related to personal health information, is highly offensive to a reasonable person.

433.   The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class Members disclosed their Private Information to Defendants as part of their use of Defendants' services, but privately, with the intention that the Private Information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

434.   The Data Breach constitutes an intentional interference with Plaintiffs' and

- 103 -

Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

435.   Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew its information security practices were inadequate and would likely result in a data breach such as the one that harmed Plaintiffs and Class Members.

436.   Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and Class Members.

437.   As a proximate result of Defendants' acts and omissions, Plaintiffs' and Class Members' Private Information was disclosed to and used by third parties without authorization in the manner described above, causing Plaintiffs and Class Members to suffer damages.

438.   Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons.

439.   Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and Class Members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Classes, in the Alternative to Count III)

440.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

441.   Plaintiffs and Class Members were required to provide their Private Information, including their names, genetic information, Social Security numbers, addresses, medical record numbers, dates of birth, telephone numbers, email addresses, and various health related information to Defendants as a condition of their use of Defendants' services.  By providing their Private Information, and upon Defendants'

acceptance of such information, Plaintiffs and all Class Members, on one hand, and Defendants, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contracts concerning genetic testing or other services to be provided by Defendants to Plaintiffs.

442.   These implied-in-fact contracts obligated Defendants to take reasonable steps to secure and safeguard Plaintiffs' and other Class Members' Private Information. The terms of these implied contracts are further described in the federal laws, state laws, and industry standards alleged above, and Defendants expressly assented to these terms in their Notice of Privacy Practices and other public statement described above.

443.   Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services, along with Defendants' promise to protect their health information and other Private Information from unauthorized disclosure.

444.   In their written privacy policies, Ambry expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

445.   Ambry promised to comply with HIPAA standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

446.   Implicit in the agreement between Plaintiffs and Class Members and the Defendants to provide Private Information was Defendants' obligation to (a) use such Private Information for business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized disclosures of the Private Information; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses; and (f) retain the Private Information only under conditions that kept such information secure and confidential.

447.   Without such implied contracts, Plaintiffs and Class Members would not have provided their Private Information to Defendants.

448.   Plaintiffs and Class Members fully performed their obligations under the implied contract with Defendants; however, Defendants did not.

449.   Defendants breached the implied contracts with Plaintiffs and Class Members by failing to conduct the following:

    a.   reasonably safeguard and protect Plaintiffs' and Class Members' Private Information, which was compromised as a result of the Data Breach;

    b.   comply with their promise to abide by HIPAA;

    c.   ensure the confidentiality and integrity of electronic protected health information that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R 164.306(a)(1);

    d.   implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R 164.312(a)(1);

    e.   implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R 164.308(a)(1);

    f.   identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R 164.308(a)(6)(ii); and

    g.   protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R 164.306(a)(2).

450.   As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs and other Class Members have suffered a variety of damages including but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendants; they lost the difference in the value of the secure health services Defendants promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on

their lives, including, *inter alia*, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiffs and other Class Members have been put at an increased risk of identity theft, fraud, and/or misuse of their Private Information, which may take months if not years to manifest, discover, and detect.

## COUNT IV
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Classes)

451.  Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

452.  Plaintiffs and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased goods and services from Defendants and in so doing provided Defendants with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendants the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

453.  Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

454.  The amounts Plaintiffs and Class Members paid for goods and services were used, in part, to pay for use of Defendants' network and the administrative costs of data management and security.

455.  Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

456.   Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

457.   Defendants acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

458.   If Plaintiffs and Class Members knew that Defendants had not reasonably secured their Private Information, they would not have agreed to Defendants' services.

459.   Plaintiffs and Class Members have no adequate remedy at law.

460.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to (a) actual identity theft; (b) an increased risk of identity theft, fraud, and/or misuse of their Private Information; (c) the loss of the opportunity of how their Private Information is used; (d) the compromise, publication, and/or theft of their Private Information; (e) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (f) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (g) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (h) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

461.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

462.   Defendants should be compelled to disgorge into a common fund or

- 108 -

constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

## COUNT V

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. – UNLAWFUL, FRAUDULENT, AND UNFAIR BUSINESS PRACTICES

**(On Behalf of Plaintiffs and the Nationwide Class and Nationwide Subclasses, or, alternatively, Plaintiffs Cercas, Pascoe and Nakagoshi and the California Subclass)**

463.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.The California Unfair Competition Law, Cal. Bus. & Prof. Code sections 17200 et seq. ("UCL"), prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

464.   By reason of Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiffs and Class members' Private Information, Defendants engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

465.   Defendants have violated Cal. Bus. and Prof. Code § 17200, *et seq*., by engaging in unlawful, unfair, or fraudulent business acts and practices and unfair, deceptive, untrue, or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Nationwide Class.

466.   Defendants' business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, in that the Private Information of Plaintiffs and Class Members has been compromised for unauthorized parties to see, use, and otherwise exploit.

467.   Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information also constitute "unfair" business acts and practices within the meaning of Business & Professions Code sections 17200 *et seq.*, in that Defendants' conduct was substantially injurious to Plaintiffs and Class Members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct.

468.   Defendants engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class Members' Private Information with knowledge that the information would not be adequately protected; by violating the California Confidentiality Of Medical Information Act, Cal. Civ. Code § 56.101(a); by violating the other statutes described above; and by storing Plaintiffs' and Class Members' Private Information in an unsecure electronic environment in violation of HIPAA and California's data breach statute, Cal. Civ. Code § 1798.81.5, which require Defendants to take reasonable methods of safeguarding the Private Information of Plaintiffs and the Class Members.

469.   Defendants' practices were also unlawful and in violation of Civil Code sections 1798 *et seq.* and Defendants' own privacy policy because Defendants failed to take reasonable measures to protect Plaintiffs' and Class Members' Private Information and failed to take remedial measures such as notifying its users when it first discovered that their Private Information may have been compromised.

470.   In addition, Defendants engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82 and Cal. Health & Safety Code §1280.15(b)(2).[50]

---

[50] Ambry's Notice of Privacy acknowledges its duty to report a breach of medical information to affected patients within five (5) business days.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

471.   Defendants' business practices as alleged herein are fraudulent because they are likely to deceive consumers into believing that the Private Information they provided to Defendants will remain private and secure, when in fact it has not been maintained in a private and secure manner, and that Defendants would take proper measures to investigate and remediate a data breach, when Defendants did not do so.

472.   Plaintiffs and Class Members suffered (and continue to suffer) injury in fact and lost money or property as a direct and proximate result of Defendants' above-described wrongful actions, inaction, and omissions including, *inter alia*, the unauthorized release and disclosure of their Private Information and lack of notice.

473.   But for Defendants' misrepresentations and omissions, Plaintiffs and Class Members would not have provided their Private Information to Defendants, or would have insisted that their Private Information be more securely protected.

474.   As a direct and proximate result of Defendants' unlawful practices and acts, Plaintiffs and Class Members were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of Plaintiffs' and Class Members' legally protected interest in the confidentiality and privacy of their Private Information, nominal damages, and additional losses as described herein.

475.   Defendants knew or should have known that Defendants' computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class Members' Private Information and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class Members.

476.   Plaintiffs seek prospective injunctive relief, including improvements to Defendants' data security systems and practices, in order to ensure that such security is

https://www.ambrygen.com/assets/pdf/licenses/notice_of_privacy.pdf   (last   accessed Sept. 18, 2020).

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

reasonably sufficient to safeguard patients' Private Information that remains in Defendants' custody, including but not limited to the following:

a. Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

d. Ordering that Defendants segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants' systems;

e. Ordering that Defendants not transmit Private Information via unencrypted email;

f. Ordering that Defendants not store Private Information in email accounts;

g. Ordering that Defendants purge, delete, and destroy in a reasonably secure manner patient data not necessary for provisions of Defendants' services;

h. Ordering that Defendants conduct regular computer system scanning and security checks;

i. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

j.   Ordering Defendants to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

477.   Unless such Class-wide injunctive relief is issued, Plaintiffs and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiffs (and other consumers) can rely on Defendants' representations regarding its data security in the future.

478.   Furthermore, in the alternative to all legal remedies sought herein, Plaintiffs, on behalf of the Class, seek monetary relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including but not limited to restitution to Plaintiffs and Class Members of money or property that Defendants may have acquired by means of Defendants' unlawful, and unfair business practices; restitutionary disgorgement of all profits accruing to Defendants because of Defendants' unlawful and unfair business practices; declaratory relief; and attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## COUNT VI

## VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT,

## CAL. CIV. CODE § 56.101

**(On Behalf of Plaintiffs and the Nationwide Class and Nationwide Subclasses, or, alternatively, Plaintiffs Cercas, Pascoe and Nakagoshi and the California Subclass)**

479.   Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

480.   At all relevant times, Defendants were health care providers because they had the "purpose of maintaining medical information to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage his or her information, or for the diagnosis or treatment of the individual."

- 113 -

481.   Defendants are providers of healthcare within the meaning of Civil Code § 56.06(a) and maintains medical information as defined by Civil Code § 56.05.

482.   Plaintiffs and Class Members are patients of Defendants, as defined in Civil Code § 56.05(k).

483.   Plaintiffs and Class Members provided their personal medical information to Defendants.

484.   At all relevant times, Defendants created, maintained, preserved, stored, abandoned, destroyed, and/or disposed of Plaintiffs' and Class Members' personal medical information.

485.   As a result of the Data Breach, Defendants negligently maintained, preserved, stored, released, and otherwise misused Plaintiffs and Class Members' medical information, allowing third parties to access and view Plaintiffs' and Class Members' personal medical information without their written authorization in accordance with the provisions of Civil Code §§ 56, *et seq.*

486.   The hacker or hackers who committed the Data Breach obtained Plaintiffs' and Class Members' personal medical information, viewed it, and now have it available to them to sell to others bad actors or otherwise misuse.

487.   As a further result of the Data Breach, the confidential nature of the plaintiff's medical information was breached as a result of Defendants' negligence. Specifically, Defendants knowingly allowed and affirmatively acted in a manner that actually allowed unauthorized parties to access and view Plaintiffs' and Class Members' Private Information (including personal medical information), which was viewed and used when the unauthorized parties engaged in the above-described fraudulent activity.

488.   Defendants negligently maintained, preserved, stored, released, and otherwise misused Plaintiffs and Class Members' medical information constitutes a violation of Civil Code §§ 56.101, 56.13, and 56.36.

489.   As a direct and proximate result of Defendants' wrongful actions, inaction, omissions, and want of ordinary care, Plaintiffs' and Class Members' personal medical

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

information was negligently released without written authorization.

490.   By negligently releasing Plaintiffs' and Class Members' Private Information without their written authorization, Defendants violated California Civil Code §§ 56.101 and 56.36, and their legal duty to protect the confidentiality of such information.

491.   Defendants also violated 56.101 of the California CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction, disposal, or release of confidential personal medical information.

492.   As a direct and proximate result of Defendants' wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs' and Class Members' personal medical information was viewed by, released to, and accessed by third parties without Plaintiffs' and Class Members' written authorization.

493.   As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violation of the CMIA, Plaintiffs and Class Members suffered economic losses.

494.   As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violation of the CMIA, Plaintiffs and Class Members are entitled to (i) actual damages, (ii) nominal damages of $1,000 per Plaintiff and Class Member, and (iii) and all other damages and remedies allowed for a violation  California Civil Code § 56.101 and under California Civil Code § 56.36 that the Court deems appropriate.

///

///

///

///

///

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## **COUNT VII**

## **VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
## **CAL. CIV. CODE § 1750, *ET SEQ*.**

**(On Behalf of Plaintiffs and the Nationwide Class and Nationwide Subclasses, or,
alternatively, Plaintiffs Cercas, Pascoe, Nakagoshi and the California Subclass)**

495.   Plaintiffs restate and reallege all the foregoing paragraphs as if fully set forth herein.

496.   This cause of action is brought pursuant to the California Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, et seq.

497.   Defendants have long had notice of Plaintiffs' allegations, claims and demands, including from the filing of numerous underlying actions against it arising from the Data Breach, the first of which were filed on or about April 22, 2020. Further, Defendants are the parties with the most knowledge of the underlying facts giving rise to Plaintiffs' allegations, so that any pre-suit notice would not put Defendants in a better position to evaluate those claims. As the Court found Plaintiffs did not meet the statutory requirements of Cal. Civ. Code § 1782(a), Plaintiffs formally provided Defendants with notice on November 1, 2021, prior to filing this Complaint.

498.   To the extent the Court finds Plaintiffs have still not met the CLRA notice requirements, Plaintiffs in the alternative seek only injunctive relief pursuant to Cal. Civ. Code § 1782, subdivision (d), which provides that "[a]n action for injunctive relief brought under the specific provisions of Section 1770 may be commenced without compliance with subdivision (a)."

499.   Plaintiffs and Class Members are "consumers," as the term is defined by California Civil Code § 1761(d).

500.   Plaintiffs, Class Members, and Defendants have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

501.   The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and

the conduct was undertaken by Defendants was likely to deceive consumers.

502.   Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

503.   Defendants violated this provision by representing that it took appropriate measures to protect Plaintiffs' and the Class Members' Private Information. Additionally, Defendants improperly handled, stored, or protected either unencrypted or partially encrypted data.

504.   Plaintiffs and the Class members relied upon Ambry's representations and were induced to sign up for Ambry's services, and provide their Private Information which contains value in order to obtain services from Ambry.

505.   As a result, Plaintiffs and Class Members were induced to enter into a relationship with Defendant and provide their Private Information.

506.   As a result of engaging in such conduct, Defendants have violated Civil Code § 1770.

507.   Pursuant to Civil Code § 1780(a)(2) and (a)(5), Plaintiffs seek an order of this Court that includes, but is not limited to, an order enjoining Defendants from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

508.   Plaintiffs and Class Members suffered injuries caused by Defendants' misrepresentations, because they provided their Private Information believing that Defendants would adequately protect this information.

509.   Plaintiffs and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

510.   The unfair and deceptive acts and practices of Defendants, as described above, present a serious threat to Plaintiffs and Class Members.

511.   Plaintiffs seek prospective injunctive relief, including improvements to Defendants' data security systems and practices, in order to ensure that such security is

- 117 -

reasonably sufficient to safeguard patients' Private Information that remains in Defendants' custody, including but not limited to the following:

    a. Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    b. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

    c. Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

    d. Ordering that Defendants segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants' systems;

    e. Ordering that Defendants not transmit Private Information via unencrypted email;

    f. Ordering that Defendants not store Private Information in email accounts;

    g. Ordering that Defendants purge, delete, and destroy in a reasonably secure manner patient data not necessary for provisions of Defendants' services;

    h. Ordering that Defendants conduct regular computer system scanning and security checks;

    i. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

- 118 -

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

j.  Ordering Defendants to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

512.  Unless such Class-wide injunctive relief is issued, Plaintiffs and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiffs (and other consumers) can rely on Defendants' representations regarding its data security in the future.

513.  Furthermore, in the alternative to all legal remedies sought herein, Plaintiffs, on behalf of the Class, seek monetary relief including but not limited to restitution to Plaintiffs and Class Members of money or property that Defendants may have acquired by means of Defendants' unlawful, and unfair business practices; restitutionary disgorgement of all profits accruing to Defendants because of Defendants' unlawful and unfair business practices; declaratory relief; and attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## COUNT VIII
## VIOLATION OF CALIFORNIA CONSUMER RECORDS ACT
## CAL. CIV. CODE § 1798.80 *ET SEQ*.
**(On Behalf of Plaintiffs Cercas, Pascoe and Nakagoshi and the California Subclass)**

514.  Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

515.  Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under section 1798.82, the disclosure

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

"shall be made in the most expedient time possible and without unreasonable delay . . . ."

516.   The CCRA further provides: "Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b).

517.   Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

      a.    The security breach notification shall be written in plain language;

      b.    The security breach notification shall include, at a minimum, the following information:

          i.    The name and contact information of the reporting person or business subject to this section;

          ii.    A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

          iii.    If the information is possible to determine at the time the notice is provided, then any of the following:

             1.  The date of the breach;

             2.  The estimated date of the breach; or

             3.  The date range within which the breach occurred. The notification shall also include the date of the notice.

          iv.    Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

          v.    A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

          vi.    The toll-free telephone numbers and addresses of the major credit

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

518. The Data Breach described herein constituted a "breach of the security system" of Defendants.

519. As alleged above, Defendants unreasonably delayed informing Plaintiffs and Class Members about the Data Breach, affecting their Personal and Medical Information, after Defendants knew the Data Breach had occurred.

520. Defendants failed to disclose to Plaintiffs and Class Members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Personal and Medical Information when Defendants knew or reasonably believed such information had been compromised.

521. Defendants' ongoing business interests gave Defendants incentive to conceal the Data Breach from the public to ensure continued revenue.

522. Upon information and belief, no law enforcement agency instructed Defendants that timely notification to Plaintiffs and Class Members would impede its investigation.

523. As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiffs and Class Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiffs and Class Members because their stolen information would have had less value to identity thieves.

524. As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiffs and Class Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

525. Plaintiffs and Class Members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to the damages suffered by Plaintiffs and Class Members as alleged above and equitable relief.

526.   Defendants' misconduct as alleged herein is fraud under Cal. Civ. Code § 3294(c)(3) in that it was deceit or concealment of a material fact known to the Defendants conducted with the intent on the part of Defendants of depriving Plaintiffs and Class Members of "legal rights or otherwise causing injury." In addition, Defendants' misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) in that it was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights or safety of Plaintiffs and Class Members and despicable conduct that has subjected Plaintiffs and Class Members to hardship in conscious disregard of their rights. As a result, Plaintiffs and Class Members are entitled to punitive damages against Defendants under Cal. Civ. Code § 3294(a).

## COUNT IX

## VIOLATION OF THE ILLINOIS GENETIC INFORMATION PRIVACY ACT, 410 Ill. Comp. Stat. Ann. 513/15

### (On Behalf of Plaintiff Ariann Taglioli and the Illinois Sub-Class)

527.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

528.   This count is brought on behalf of Plaintiff Ariann Taglioli and the Illinois Sub-Class.

529.   Under the Illinois Genetic Information Privacy Act, 410 Ill. Comp. Stat. Ann. 513 ("GIPA"):

> Except as otherwise provided in this Act, genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information. Except as otherwise provided in subsection (b) and in Section 30, this information shall not be admissible as evidence, nor discoverable in any action of any kind in any court, or before

- 122 -

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

any tribunal, board, agency, or person pursuant to Part 21 of Article VIII of the Code of Civil Procedure. No liability shall attach to any hospital, physician, or other health care provider for compliance with the provisions of this Act including a specific written release by the individual in accordance with this Act.

410 Ill. Comp. Stat. Ann. 513/15.

530. By negligently and recklessly releasing Plaintiffs' and Class Members' Private Information (including information derived from genetic testing performed by Defendants) to unauthorized parties, as alleged above, Defendants violated each of these provisions of GIPA.

531. As a result, GIPA affords Plaintiff Taglioli and each member of the Illinois Sub-Class a right of action, and provides for liquidated damages in the amount of "$2,500 or actual damages, whichever is greater," for each negligent violation of the Act, or "$15,000 or actual damages, whichever is greater," for each intentional or reckless violation of the Act, as well as attorney's fees and costs, including expert witness fees and other litigation expenses. 410 Ill. Comp. Stat. Ann. 513/40.

532. GIPA also allows Plaintiff Taglioli to secure preliminary and permanent injunctive relief under the Act, in order to prevent future violations.

## COUNT X
## INJUNCTIVE / DECLARATORY RELIEF
### (On Behalf of Plaintiffs and the Nationwide Class)

533. Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

534. This count is brought on behalf of all Classes.

535. This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

536. As previously alleged, Plaintiffs and Class Members entered into an implied

- 123 -

contract that required Defendants to provide adequate security for the Private Information they collected from Plaintiffs and Class Members.

537.   Defendants owe a duty of care to Plaintiffs and Class Members requiring them to adequately secure Private Information.

538.   Defendants still possesses Private Information regarding Plaintiffs and Class Members.

539.   Since the Data Breach, Defendants have announced few if any changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent further attacks.

540.   Defendants have not satisfied their contractual obligations and legal duties to Plaintiffs and Class Members. In fact, now that Defendants' insufficient data security is known to hackers, the Private Information in Defendants' possession is even more vulnerable to cyberattack.

541.   Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendants' failure to address the security failings that lead to such exposure.

542.   There is no reason to believe that Defendants' security measures are any more adequate now than they were before the Data Breach to meet Defendants' contractual obligations and legal duties.

543.   Plaintiffs, therefore, seek a declaration (1) that Defendants' existing security measures do not comply with their contractual obligations and duties of care to provide adequate security, and (2) that to comply with their contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

k. Ordering that Defendants engage third-party security

auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

l.  Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

m. Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

n.  Ordering that Defendants segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants' systems;

o.  Ordering that Defendants not transmit Private Information via unencrypted email;

p.  Ordering that Defendants not store Private Information in email accounts;

q.  Ordering that Defendants purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

r.  Ordering that Defendants conduct regular computer system scanning and security checks;

s.  Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

t.  Ordering Defendants to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Classes, request judgment against the Defendants and that the Court grant the following relief:

A.     An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

B.     Injunctive relief requiring Defendants to (1) strengthen their data security systems that maintain personally identifying information to comply with the applicable state laws alleged herein (including, but not limited to, the California Customer Records Act) and best practices under industry standards; (2) engage third-party auditors and internal personnel to conduct security testing and audits on Defendants' systems on a periodic basis; (3) promptly correct any problems or issues detected by such audits and testing; and (4) routinely and continually conduct training to inform internal security personnel how to prevent, identify and contain a breach, and how to appropriately respond;

C.     An order requiring Defendant to pay all costs associated with class notice and administration of class-wide relief;

D.     An award to Plaintiffs and all members of the Classes of compensatory, consequential, incidental, nominal, and statutory damages, restitution, and disgorgement, in an amount to be determined at trial;

E.     An award of nominal damages of $1,000 per Plaintiff and Class Member to Plaintiffs and all members of the Classes under California Civil Code § 56.36(b), and all other damages and remedies allowed for a violation California Civil Code § 56.101 and under California Civil Code § 56.36 that the Court deems appropriate;

F.     Liquidated damages, attorney's fees, and costs to each Plaintiff Taglioli and

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    each member of the Illinois Sub-Class in accordance with GIPA, 410 Ill.

2    Comp. Stat. Ann. 513/40.

3    G.    An award of credit monitoring and identity theft protection services to

4    Plaintiffs and all members of the Classes;

5    H.    An award of attorneys' fees, costs, and expenses, as provided by law or

6    equity;

7    I.    An award for equitable relief requiring restitution and disgorgement of

8    the revenues wrongfully retained as a result of Defendants' wrongful

9    conduct;

10    J.    An order requiring Defendants to pay pre-judgment and post-judgment

11    interest, as provided by law or equity; and

12    K.    Such other and further relief as this Court may deem just and proper.

14    Dated: December 13, 2021    By*:*   */s/ Daniel S. Robinson*
Daniel S. Robinson (SBN 244245)
Wesley K. Polischuk (SBN 254121)
Michael W. Olson (SBN 312857)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax (949) 720-1292
drobinson@robinsonfirm.com
wpolischuk@robinsonfirm.com
molson@robinsonfirm.com

Tina Wolfson (SBN 174806)
Theodore Walter Maya (SBN 223242)
Bradley K. King (SBN 274399)
**AHDOOT & WOLFSON, PC**
2600 West Olive Ave., Suite 500
Burbank, CA 91505
(310) 474-9111; Fax: 310.474.8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Jean Martin (*Pro Hac Vice*)
Ryan J. McGee (*Pro Hac Vice*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
(813) 559-4908; Fax: (813) 223-5402
jeanmartin@ForThePeople.com
rmcgee@ForThePeople.com

*Plaintiffs' Co-Lead Counsel*

Gary E. Mason (*Pro Hac Vice* Forthcoming)
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Ave., NW, Ste. 305
Washington, DC 20016
(202) 640-1160
gmason@masonllp.com

Melissa R. Emert (*Pro Hac Vice* Forthcoming)
**KANTROWITZ GOLDHAMER &**
**GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
(845) 356-2570; Fax (845) 356-4335
ggraifman@kgglaw.com

*Plaintiffs' Executive Committee*

*Attorneys for Plaintiffs and the*
*Proposed Class*

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

## DEMAND FOR JURY TRIAL

2     Plaintiffs demand a trial by jury of all issues in this action so triable of right.

3     Dated: December 13, 2021          By*:*    */s/ Daniel S. Robinson*

4                                        Daniel S. Robinson (SBN 244245)
                                         Wesley K. Polischuk (SBN 254121)
5                                        Michael W. Olson (SBN 312857)
                                         **ROBINSON CALCAGNIE, INC.**
6                                        19 Corporate Plaza Drive
                                         Newport Beach, CA 92660
7                                        (949) 720-1288; Fax (949) 720-1292
                                         drobinson@robinsonfirm.com
8                                        wpolischuk@robinsonfirm.com
                                         molson@robinsonfirm.com
9

10                                       Tina Wolfson (SBN 174806)
                                         Theodore Walter Maya (SBN 223242)
11                                       Bradley K. King (SBN 274399)
                                         **AHDOOT & WOLFSON, PC**
12                                       2600 West Olive Ave., Suite 500
                                         Burbank, CA 91505
13                                       (310) 474-9111; Fax: 310.474.8585
                                         twolfson@ahdootwolfson.com
14                                       tmaya@ahdootwolfson.com
                                         bking@ahdootwolfson.com
15

16                                       Jean Martin (*Pro Hac Vice*)
                                         Ryan J. McGee (*Pro Hac Vice*)
17                                       **MORGAN & MORGAN**
                                         **COMPLEX LITIGATION GROUP**
18                                       201 N. Franklin St., 7th Floor
                                         Tampa, FL 33602
19                                       (813) 559-4908; Fax: (813) 223-5402
                                         jeanmartin@ForThePeople.com
20                                       rmcgee@ForThePeople.com
21

22                                       *Plaintiffs' Co-Lead Counsel*

23                                       Gary E. Mason (*Pro Hac Vice* Forthcoming)
                                         **MASON LIETZ & KLINGER LLP**
24                                       5101 Wisconsin Ave., NW, Ste. 305
                                         Washington, DC 20016
25                                       (202) 640-1160
                                         gmason@masonllp.com
26

27

28

FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Melissa R. Emert (*Pro Hac Vice* Forthcoming)
**KANTROWITZ GOLDHAMER & GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
(845) 356-2570; Fax (845) 356-4335
ggraifman@kgglaw.com

*Plaintiffs' Executive Committee*

*Attorneys for Plaintiffs and the Proposed Class*

- 130 -