**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| *In Re: Ambry Genetics Data Breach Litigation* | **Lead Case No.: SACV 20-00791-CJC (KESx)** |
| | **ORDER GRANTING PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT [Dkt. 143]** |

## I.   INTRODUCTION

In this consolidated putative class action, Plaintiffs[1] from fifteen different states assert ten claims against Defendants Ambry Genetics Corporation ("Ambry") and Realm IDX, Inc. (formerly known as Konica Minolta Precision Medicine, Inc.) arising out of a

---

[1] Plaintiffs are Michael Annoni, Sandra Brodsky, Colette Domingues, Marion Farrier, Lisa Neumann, Rosemary O'Hara, Deborah Pancoast, Michele Pascoe, Cheryl Terrano, Jill Barduca, Alma Fidela Cercas, Jonee Coleman, Benjamin Cooperson, Rachel Harkness, Debera Hensley, Ann Hoekstra, Laura Jasielum, Rula Kanawati, Elizabeth Nakagoshi, Kaitlyn Nakagoshi, Linda Stewart, Ariann Tagioli, Beth Velardi, and Debra Volk.

2020 data breach.  (Dkt. 126 [Fourth Amended Complaint, hereinafter "4AC"].)  After extensive motion practice, discovery, a full-day mediation before the Honorable Jay C. Gandhi (Retired), and nearly six months of additional settlement discussions, the parties have reached a proposed settlement agreement (the "Settlement").  (Dkt. 144 [Settlement Agreement, hereinafter "SA"].)  Before the Court is Plaintiffs' unopposed motion for preliminary approval of the Settlement.  (Dkt. 71 [Motion for Preliminary Approval of Class Action Settlement, hereinafter "Mot."].)  For the following reasons, Plaintiffs' motion is **GRANTED**.[2]

## II.    BACKGROUND

### A.    Factual Background

Ambry provides genetic testing that screens and diagnoses medical issues, including hereditary cancer, hereditary cardiovascular disease, neurodevelopmental disorders, and epilepsy.  (4AC ¶¶ 1, 49.)  Between January 22 and 24, 2020, it experienced a data breach involving names, dates of birth, Ambry account numbers, health insurance information, confidential medical information, medical diagnoses, billing information including addresses, email addresses, telephone numbers, and Social Security numbers.  (*Id.* ¶¶ 2–3, 13, 24–48, 68, 72, 77).  Specifically, hackers accessed through a phishing incident the email account of an Ambry employee for multiple days, giving the hackers access to about 233,000 customers' information.  (*Id.* ¶¶ 67–68, 383.)  Plaintiffs allege that "[t]he Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' Private Information."  (*Id.* ¶ 17.)  Nearly three months after the breach,

---

[2]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for October 17, 2022, at 1:30 p.m. is hereby vacated and off calendar.

on April 15, 2020, Ambry sent a Notice of Data Breach to the affected individuals.  (*Id.* ¶¶ 71–72, 75.)

## B.      Procedural Background

Four different putative class actions were filed in response to the data breach. (Mot. at 2.)  Counsel in the four cases cooperated to request that the Court consolidate the cases and appoint interim class counsel in accordance with Federal Rule of Civil Procedure 23(g).  The Court granted those requests and appointed co-lead counsel and a steering committee.  (*Id.* at 2–3.)  Plaintiffs then filed a consolidated class action complaint on September 21, 2020.  (Dkt. 39.)

After Defendants moved to dismiss Plaintiffs' consolidated class action complaint (Dkt. 43), Plaintiffs filed a First Amended Complaint.  (Dkt. 57.)  Defendants filed a motion to dismiss Plaintiffs' First Amended Complaint, which the Court granted, explaining that "Plaintiffs fail[ed] to plausibly allege that their injuries were caused by Defendants' actions."  (Dkt. 68 at 4.)  The Court granted Plaintiffs leave to amend, and Plaintiffs filed a Second Amended Complaint.  (Dkt. 70.)  Defendants filed motions to strike and dismiss the Second Amended Complaint (Dkt. 75; Dkt. 76), both of which the Court denied without prejudice.  (Dkt. 92.)  Defendants then filed another motion to dismiss the Second Amended Complaint, and in a 26-page order issued after a hearing, the Court granted the motion in part and denied it in part with leave to amend certain claims.  (Dkt. 109.)  Plaintiffs then filed a Third Amended Complaint.  (Dkt. 115.)  After Defendants again moved to dismiss, the parties filed a stipulation to permit Plaintiffs to file a Fourth Amended Complaint, which the Court approved.  (Dkt. 125.)

Plaintiffs then filed the operative Fourth Amended Complaint on December 13, 2021.  (Dkt. 126.)  In the that complaint, Plaintiffs assert claims for (1) negligence,

(2) invasion of privacy, (3) breach of implied contract, (4) unjust enrichment, (5) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–10, (6) violation of the California Confidentiality of Medical Information Act (the "CMIA"), Cal. Civ. Code §§ 56–56.37, (7) violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750–84, (8) violation of the California Consumer Records Act, Cal. Civ. Code §§ 1798.100–1798.199.95, (9) violation of the Illinois Genetic Information Privacy Act (the "IGIPA"), 410 Ill. Comp. Stat. 513 / 1–50, and (10) injunctive and declaratory relief.

Defendants then filed yet another motion to dismiss, (Dkt. 128), which Plaintiffs opposed, (Dkt. 130). After this latest motion but before the Court ruled on it, the parties reached the Settlement.

Between the time these consolidated cases were filed and the parties' Settlement, the parties also conducted significant discovery. Ambry produced approximately 27,000 pages of documents in electronic format in response to Plaintiffs' requests for production of documents, including two reports from two different forensic investigators that Ambry retained to investigate and help respond to the data breach. (Mot. at 5.) Plaintiffs also obtained under the Freedom of Information Act and similar state public records acts copies of Ambry's disclosures to governmental regulators. (*Id.* at 4–5.) Moreover, Plaintiffs produced ninety-five separate responses to interrogatories and responded to requests for production of documents.

## C.    The Proposed Settlement

On January 26, 2022, the parties participated in a full-day mediation session before Judge Gandhi, with the benefit of comprehensive mediation briefs. (Mot. at 1, 6.) After

nearly six months of continued negotiations following the mediation session, the parties reached the Settlement.  (*Id.*)

The Settlement provides for a non-reversionary cash fund of $12.25 million. (SA ¶ 55.)  Under the Settlement, class members who submit a claim form will receive three years of free credit monitoring and identity theft insurance services through Identity Defense Total+ (valued at $19.99 per month), plus up to $10,000 in cash for out-of-pocket costs fairly traceable to the data breach, a cash payment for time spent addressing or remedying issues fairly traceable to the data breach in the amount of $30 per documented hour or three hours of "default time" if a class member does not have documentation of the time spent.  (Mot. at 8–10; SA ¶¶ 73, 80.)  In addition, members of the California Subclass and the Illinois Subclass will automatically receive an additional cash payment of up to $150 as a Subclass Payment for their claims under the CMIA and the IGIPA, which provide for statutory damages.  (Mot. at 8–10; SA ¶ 80.)  The Settlement fund will also be used to pay administrative expenses (estimated at about $340,000), any taxes, any service awards the Court approves (estimated at $2,500 per class representative), and any Court-approved award of fees and costs to class counsel (with Ambry agreeing not to oppose a request that does not exceed $4.9 million).  (SA ¶¶ 55, 70–73, 111, 114.)  All told, the parties estimate that each of the 225,370 settlement class members could receive payments ranging between $62 and $88 per person.  (Mot. at 1.)

If there is not enough money in the Settlement fund to make all these payments, payments to participating class members will be reduced on a pro rata basis.  (SA ¶ 87.) If money remains in the fund after making the appropriate distributions, however, participating class members will receive a second distribution so long as the average payment amount is at least $5.  (*Id.* ¶ 89.)  If there are not sufficient funds to allow a $5 second distribution, class members will receive extended credit monitoring and identity

theft insurance.  (*Id.*)  Any remaining amount will then be distributed to the Non-Profit Residual Recipient, the Electronic Frontier Foundation.  (*Id.*)

In addition, the Settlement recognizes that Ambry has spent between $800,000 and $1.4 million in response to these cases regarding the data breach, including to complete an investigation into the cause and scope of the breach; implement additional security-related measures to ensure continued compliance with state and federal authorities; enhance policies, procedures, and training to staff on how to appropriately manage Protected Health Information ("PHI"); continue annual security-awareness training and individual training to certain employees and individuals handling PHI; enhance restrictions to access to PHI; institute prominent red-flag warnings for emails from an external source; enhance security applications by replacing old applications and adding additional security systems; and retain vendors that ensure Ambry meets all Service Organization Control 2-certification requirements; and perform third-party risk assessments, penetration testing, and phish-testing emails to all employees.  (SA ¶ 92.)

## III.    DISCUSSION

To determine whether preliminary approval of a settlement agreement is appropriate, the Court reviews (1) the requirements for class certification, (2) the fairness of the proposed settlement, including attorney fees, (3) adequacy of the proposed notice, and (4) appointment of a settlement administrator.

### A.    Rules 23(a) and (b): Provisional Class Certification

When a plaintiff seeks provisional class certification for the purpose of settlement, the Court must ensure that the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b) are met.  *See Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003).  Under Rule 23(a), the plaintiff must show that the class is sufficiently numerous, that there are questions of law or fact common to the class, that the claims or defenses of the representative parties are typical of those of the class, and that the representative parties will fairly and adequately protect the class's interests.  Under Rule 23(b), the plaintiff must show that the action falls within one of the three authorized categories.  Here, Plaintiffs seek certification under Rule 23(b)(3), which allows certification when (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### 1.     Rule 23(a) Requirements

Plaintiffs seek to certify the following class:

> [T]he approximately 225,370 patients who are identified on the Settlement Class List, including Plaintiffs, whose PHI and PII was allegedly contained in an employee's compromised email account in the Data Breach.  Excluded from the Settlement Class are: (1) the Judges presiding over the Action, and members of their families; (2) the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former officers, directors, and employees; (3) Persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded Persons.

They also seek to certify the following California and Illinois subclasses:

> [T]he 25,754 patients who were citizens or residents of California as identified on the Settlement Class List and those Settlement Class Members who can provide Reasonable Documentation demonstrating they were a California citizen or resident during the Settlement Class Period.

[T]he 7,172 patients who were citizens or residents of Illinois as identified on the Settlement Class List and those Class Members who can provide Reasonable Documentation demonstrating they were an Illinois citizen or residents during the Settlement Class Period.

### a. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No exact numerical cut-off is required; rather, the specific facts of each case must be considered." *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) (citing *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)). "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members." *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 602–03 (C.D. Cal. 2015); *see Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473–74 (C.D. Cal. 2012).

Based on Defendants' disclosures in this litigation, Plaintiffs estimate that the class would include approximately 225,370 people and that the subclasses would include approximately 25,754 and 7,172 people. (SA ¶¶ 5, 24, 50.) Such a large class size would make joinder impracticable, and proceeding as a class would promote the efficiency and economy of this action. *See, e.g.*, *Hashemi v. Bosley, Inc.*, 2022 WL 2155117, at *2 (C.D. Cal. Feb. 22, 2022) (finding numerosity in data breach case with approximately 100,000 people in the class); *Koenig v. Lime Crime, Inc.*, 2017 WL 11635955, at *3 (C.D. Cal. Nov. 20, 2017) (finding numerosity in data breach case with more than 100,000 people in the class). This is sufficient to satisfy Rule 23(a)'s numerosity requirement.

//

//

### b.    Common Questions of Law and Fact

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The plaintiff must "demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Rather, the plaintiff's claim must depend on a "common contention" that is capable of class-wide resolution.  *Id.*  This means "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Plaintiffs assert that commonality is satisfied because their claims turn on, among other common questions, whether Ambry was negligent in its security practices before and after the data breach.  The Court agrees.  Because the data breach and the adequacy of Defendants' security environment are common causes of Plaintiffs' and the class members' alleged injuries, Plaintiffs' allegations give rise to common questions of law and fact.  *See Hashemi*, 2022 WL 2155117, at *3 (finding commonality when there were common questions of "whether Defendant breached its duty to safeguard the Class's PII, whether Defendant unreasonably delayed in notifying the Class about the data breach, and whether Defendant's security measures or lack thereof violated various statutory provisions"); *Koenig*, 2017 WL 11635955, at *3 ("The core allegation of all Class Members is that Lime Crime did not reasonably protect their PII and failed to notify them in a timely manner.  Commonality is therefore satisfied."  (citation omitted)).

### c.    Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Representative claims are "typical" if they

are "reasonably coextensive with those of the absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other Class Members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (cleaned up). Here, Plaintiffs allege that, like every other class member, their protected health information was compromised during the data breach which was caused by the same allegedly deficient security practices. Plaintiffs' claims are thus "reasonably coextensive" with those of the class. *Hanlon*, 150 F.3d at 1020; *Koenig*, 2017 WL 11635955, at *4 (finding typicality satisfied when "Lead Plaintiffs were customers of Lime Crime and their PII was potentially exposed during the Incident; their claims derive from the same set of facts and legal theories as all Class Members"); *Hashemi*, 2022 WL 2155117, at *3 (similar).

### d.    Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor requires (1) a lack of conflicts of interest between the proposed class and the proposed representative plaintiffs and (2) representation by qualified and competent counsel that will prosecute the action vigorously on behalf of the class. *Staton*, 327 F.3d at 957. The focus in the context of a class action settlement is on ensuring that there is no collusion between the defendant, class counsel, and the class representatives pursuing their own interests at the expense of the interests of the class. *Id.* at 958 n.12.

There is no evidence of a conflict of interest between Plaintiffs and the class. Plaintiffs' claims are identical to those of the other class members, and they have every incentive to vigorously pursue those claims. Nor is there any evidence that Plaintiffs'

counsel will not adequately represent or protect the interests of the class.  Plaintiffs are represented by multiple law firms that are experienced in class action and data breach cases, and counsel has vigorously and ably prosecuted Plaintiffs' case to date.  *See Koenig*, 2017 WL 11635955, at *4 (finding adequacy when there was no apparent conflict of interest and plaintiffs were represented by counsel with extensive consumer class action litigation experience, including data breach cases); *Hashemi*, 2022 WL 2155117, at *3 (similar).  Adequacy is also satisfied here.

## 2.    Rule 23(b) Requirements

In addition to the requirements of Rule 23(a), Plaintiffs must satisfy the requirements of Rule 23(b).  Here, Plaintiffs seek certification under Rule 23(b)(3).  Rule 23(b)(3) allows certification when (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).

### a.    Predominance

Although the predominance requirement overlaps with Rule 23(a)(2)'s commonality requirement, it is a more demanding inquiry.  *Hanlon*, 150 F.3d at 1019.  The "main concern in the predominance inquiry . . . [is] the balance between individual and common issues."  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009).  The plaintiff must show that "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

Plaintiffs argue that common issues predominate here because the primary issue in this case is whether Defendants' security environment was adequate to protect the class members' protected health information, which can be resolved using the same evidence for all class members.  (Mot. at 22.)  Courts in similar data breach cases have found common questions like this sufficient to satisfy the predominance requirement.  *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *7 (N.D. Cal. July 22, 2020), *aff'd,* 2022 WL 2304236 (9th Cir. June 27, 2022) (ruling predominance satisfied because plaintiffs' case turned "on whether Yahoo used reasonable data security to protect Plaintiffs' Personal Information, and on whether Yahoo provided timely notice in connection with the Data Breaches"); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 312 (N.D. Cal. 2018) (finding predominance satisfied because "the focus would remain on the extent and sufficiency of the specific security measures [defendant] employed"); *Hashemi*, 2022 WL 2155117, at *4 (finding predominance in data breach case); *Koenig*, 2017 WL 11635955, at *4 ("[T]he question of whether Lime Crime exposed Class Members' PII and failed to timely notify them is common to the entire class, and predominates over individual issues.").  The adequacy of Defendants' data security practices constitutes a question common to all class members that predominates over any individual issues.

### b.    Superiority

Class actions certified under Rule 23(b)(3) must also be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Courts consider four nonexclusive factors in evaluating whether a class action is the superior method for adjudicating a plaintiff's claims: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class, (3) the desirability of concentrating the litigation of the claims in the

particular forum, and (4) the difficulties likely to be encountered in the management of a class action. *Id.*

In this case, proceeding as a class is superior to other methods of resolving Plaintiffs' claims. A class action may be superior when "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). A class action may also be superior when "no realistic alternative" to a class action exists. *Id.* at 1234–35. Given the common issues presented by all class members, adjudicating these claims on an individual basis for hundreds of thousands of potential plaintiffs would be not only inefficient but also unrealistic. *See, e.g.*, *Hashemi*, 2022 WL 2155117, at *4 (finding superiority in data breach case because "requiring more than 100,000 Class Members to litigate their claims separately would be inefficient and costly, resulting in duplicative and potentially conflicting proceedings").

Accordingly, Plaintiffs have satisfied the requirements of Rule 23(a) and Rule 23(b)(3). The Court **GRANTS** provisional certification of the class and California and Illinois subclasses for settlement purposes.

### B.     Rule 23(e): Settlement Approval

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e). This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named

plaintiffs, may not be given due regard by the negotiating parties." *Staton*, 327 F.3d at 959 (cleaned up).

Approval of class action settlements is governed by Federal Rule of Civil Procedure 23(e).  A district court may approve class action settlements only when they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Courts must consider whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other. *Id.* 23(e)(2)(A–D).  In determining whether the class's relief is "adequate," courts must analyze "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).[3]

### 1.   Adequacy of Class Representatives and Counsel

As stated in the Court's analysis of the Rule 23(a) factors, the class representatives and class counsel have ably represented the class.  They have managed to reach a significant settlement even after Defendants filed *seven* motions to dismiss or strike their claims.  Indeed, at one point, the Court had dismissed all of Plaintiffs' claims as

---

[3] Before Congress codified these factors in 2018, the Ninth Circuit instructed district courts to apply the following factors in determining whether a settlement agreement was fair, reasonable, and accurate: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement."  *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003).  The Court still considers these factors to the extent that they shed light on the inquiry mandated by Rule 23(e).

insufficiently pled, but counsel still succeeded in alleging sufficient facts to withstand multiple subsequent motions to dismiss.  With the help of the class representatives, counsel have also conducted and responded to significant discovery.

There is no evidence of a conflict of interest between Plaintiffs and the class.  Plaintiffs' claims are identical to those of the class, and they have every incentive to vigorously pursue those claims.  Nor is there any evidence that Plaintiffs' counsel will not adequately represent or protect the interests of the class.  Plaintiffs' attorneys—co-lead counsel Daniel S. Robinson of Robinson Calcagnie, Inc., Tina Wolfson of Ahdoot & Wolfson, PC, and Jean Martin of Morgan & Morgan Complex Litigation Group, and steering committee members Gary E. Mason of Mason LLP, and Melissa R. Emert of Kantrowitz, Goldhamer & Graifman—have extensive experience litigating complex matters, including privacy and security class actions.  (*See* Dkt. 143 [Joint Declaration of Daniel S. Robinson, Tina Wolfson and Jean Martin], hereinafter "Counsel Decl."].)  And as discussed, the record indicates that counsel have represented the class capably and adequately.

### 2.    Arm's Length Negotiation

At this stage, the Court has found no evidence of collusion during the parties' settlement negotiations.  The Settlement is the product of months of negotiations between counsel that vigorously litigated the viability of Plaintiffs' claims and engaged in contentious discovery.  *See Hashemi*, 2022 WL 2155117, at *6 ("The parties extensively negotiated the Settlement over several months prior to mediation and ultimately reached a final agreement only after arms-length negotiations before mediator Mr. Picker.").  Although the "mere presence of a neutral mediator" does not definitively show a lack of collusion, the parties reached this settlement after a full-day mediation with Judge Gandhi, a retired Magistrate Judge of this District with experience presiding over and

mediating class actions, including data privacy cases.  *Cf. In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (noting that "the presence of a governmental participant" weighs in favor of a fairness finding).  At this time, the Court is sufficiently satisfied that the Settlement was negotiated at arm's length.  However, at the final approval stage, the Court will closely examine issues identified below regarding the clear sailing agreement and the proportionality between the class's recovery and the attorney fees requested, which could shed light on whether the Settlement was truly negotiated at arm's length.

### 3.    Adequacy of Relief for the Class

In determining whether the class's relief is "adequate," courts consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  *Id.* 23(e)(2)(C).  The Court finds the proposed relief to be adequate at this stage.

### a.    Costs, Risks, and Delay of Trial and Appeal

The Settlement reflects a substantial outcome for the hundreds of thousands of people affected by Ambry's data breach, with class members projected to receive between $62 and $88 per person, plus three years of credit monitoring and identity theft insurance services, not to mention the significant changes to security practices Defendants have implemented.  The significance of the Settlement is further underscored by the fact that numerous privacy class actions have settled for non-monetary relief only and that this Court once dismissed Plaintiffs' complaint in its entirety.  (*See* Mot. at 16 [collecting cases].)  Indeed, other courts have approved settlements in privacy and

security cases with far less recovery per person.  *See, e.g.*, *In re Yahoo!*, 2020 WL 4212811, at *10 (approving a Settlement Fund of $117.5 million with a settlement class size of approximately 194 million and collecting cases where recovery was only a few dollars per person or less); *Hashemi.*, 2022 WL 2155117, at *7 (approving data breach settlement, finding that the estimated $15 to $275 per class member value "greatly exceed[ed] the settlement value per class member in comparable data breach cases," and collecting cases with estimated settlement values of less than $1 per class member).

The benefits class members will receive present a fair compromise given the costs, risks, and delay of trial and appeal.  Litigation had reached a stage where the parties had a clear view of the strengths and weaknesses of their positions given that Defendants had filed seven motions to dismiss or strike Plaintiffs' claims and the Court ruled on four of those—at one point granting Defendants' motion to dismiss in its entirety.  The parties also had the benefit of significant discovery, which included FOIA requests for Defendants' government disclosures and obtaining 27,000 pages of documents from Ambry, including two reports from two different forensic investigators that Ambry retained to investigate and aid its response to the data breach.  (Counsel Decl. ¶ 28.)  And the parties attended a full-day mediation session with Judge Gandhi after preparing comprehensive mediation briefs.

With all that information, the parties were able to realistically value the scope of Defendants' potential liability and assess the costs, risks, and delay of moving forward with class certification, motion practice, and trial.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (explaining that approving the settlement is favored when the "parties have sufficient information to make an informed decision about settlement" (cleaned up)).  Those costs and risks are not insignificant.  This case has already involved substantial litigation costs, and those costs would be only just the beginning.  Additional discovery, including discovery-related motion practice, would be

required.  For example, the parties note that if this case proceeds, Plaintiffs will move to compel the production of a forensic image of the employee's laptop whose email account was accessed during the data breach.  (Mot. at 5.)   The parties have not even begun deposition practice, and with so many class representatives, the costs of conducting depositions will be high.  Extensive and expensive expert analysis would also be required for class certification and trial.  There are also significant risks associated with class certification, summary judgment, and trial, especially in this data breach case when tying the Plaintiffs' alleged injuries to this particular data breach may be difficult.  *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement."); *Hashemi*, 2022 WL 2155117, at *7 (explaining that "data breach class actions are a relatively new type of litigation and that damages methodologies in data breach cases are largely untested and have yet to be presented to a jury"); *Gaston v. FabFitFun, Inc.*, 2021 WL 6496734, at *3 (C.D. Cal. Dec. 9, 2021) ("Historically, data breach cases have experienced minimal success in moving for class certification.").  Even if Plaintiffs could secure a better result than the Settlement represents at trial, any result obtained after additional litigation or trial would take significantly longer and there is a risk that Plaintiffs could have received much less, or nothing at all. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041–42 (N.D. Cal. 2008) (discussing how a class action settlement offered an "immediate and certain award" in light of significant obstacles posed through continued litigation).

### b.   Effectiveness of Proposed Method of Distributing Relief to The Class

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."

Fed. R. Civ. P. 23(e)(2)(C).  "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  *Id.*

Here, the relief distribution is straightforward.  Class members will be able to easily complete and submit a claim form for credit monitoring and identity theft insurance services, plus out-of-pocket costs and compensation for time spent addressing the data breach.  They may mail the claim form attached to the notice they receive in the mail, download a claim form from the settlement website, or submit a claim form online. (SA ¶ 98; Mot. at 11.)  The Settlement Administrator will also email class members for whom email addresses are available claim forms and reminders to submit those claim forms.  (SA ¶ 99; Mot. at 11–12.)  This procedure for filing claims is not unduly demanding.

### c.    Attorney Fees

Next, the Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment," in determining whether the class's relief is adequate.  Fed. R. Civ. P. 23(e)(2)(c).  When reviewing attorney fees requests in class action settlements, courts have discretion to apply the percentage-of-the-fund method or the lodestar method to determine reasonable attorney fees.  *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944–45 (9th Cir. 2011).  In considering the proposed award of attorney fees, the Court must scrutinize the Settlement for three factors that tend to show collusion: (1) when counsel receives a disproportionate distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for

agreed-upon attorney fees, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.  *Briseno v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1022 (9th Cir. 2021).  The Court "cannot, however, fully assess such factors until the final approval hearing."  *Dixon v. Cushman & Wakefield W., Inc*, 2021 WL 3861465, at *10 (N.D. Cal. Aug. 30, 2021).

Beginning with the markers of collusion, the agreement does not contain a reverter clause that returns unawarded fees to the defendant.  *See Briseno*, 998 F.3d at 1022.  Rather, any unawarded fees remain in the fund to be distributed to the class in a second distribution.  However, the agreement does have a "clear sailing" arrangement.  (SA ¶ 89.)  This is not a "death knell" but rather means that the Court must scrutinize the agreement for signs that the fees counsel requests are unreasonably high.  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021).  Specifically, the Court must "peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class" even when the settlement has been negotiated "with a neutral mediator before turning to fees."  *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021).

Plaintiffs do not yet ask the Court to approve an award of fees, but Defendants have agreed not to oppose an attorney fee and cost request of $4.9 million.  The Ninth Circuit has held that 25% of the fund is the "benchmark" for a reasonable fee award, and courts must provide adequate explanation in the record of any "special circumstances" to justify a departure from this benchmark.  *Bluetooth*, 654 F.3d at 942–43; *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ("We note with approval that one court has concluded that the 'bench mark' percentage for the fee award should be 25 percent.  That percentage amount can then be adjusted upward or downward to account for any unusual circumstances involved in this case." (citation omitted)).

Plaintiffs contend that the Settlement is worth over $20 million, counting the $12.25 million settlement fund, the $800,000 to $1.4 million value of Ambry's changes in security practices, and the expected value of credit monitoring and identity protection insurance services if 4% of the class claim those services (calculated at $19.99 per month with each class member entitled to three years, or $1,621,852.67 for every 1% of class members receiving the service).  If the Settlement is valued at $20 million, the $4.9 expected fee request would comprise about 20% of the common fund and would favor approval.  *See, e.g.*, *Gaston v. FabFitFun, Inc.*, 2021 WL 6496734, at *3 (C.D. Cal. Dec. 9, 2021) (approving data breach settlement when fee request was "within the 25% benchmark considered reasonable).  But if the Settlement is valued at less—say, $15 million—the expected fee request would comprise 33% of the common fund.  This produces a starkly different result, which would require additional showings.

The Court must look closely at the value of the Settlement to ensure that there are no signs that the fees counsel requests are unreasonably high, examining in particular the relationship between fees and the benefit to the class, especially because of the clear sailing agreement.  *McKinney-Drobnis*, 16 F.4th at 610; *Kim*, 8 F.4th at 1180.  And the Court has questions about whether the $20 million valuation is appropriate.  For example, the $800,000 to $1.4 million Plaintiffs attribute to remedial measures Defendants have taken includes actions Defendants were already taking despite this case.  (*See, e.g.*, Mot. at 10 [listing as one of the items valued in the $800,000 to $1.4 million estimate "continuing to require that Ambry's Chief Compliance Officer or the Chief Compliance Officer's delegate(s) approve employee access to PHI by employee type and/or by employee"].)  The $800,000 to $1.4 million estimate also includes the cost of "provid[ing] notice to Class Members of the Data Breach."  (*Id.*)  It might not be appropriate to include in a valuation of benefit to class members the cost of providing notice to those class members of the data breach—in other words, including the cost of notice might inflate the value of the Settlement in a way that may not be fair.  Moreover,

if counsel expects the claims rate to be less than 4%, it might be unreasonable to value

the settlement based on a calculation of 4% of class members claiming the identity

protection services. *Cf. Briseno v. Henderson*, 998 F.3d at 1026 ("So little goes to the

class members in a claims-made settlement, such as this one, because the redemption rate

is notoriously low, especially when it involves small-ticket items."). What is more, the

parties estimate that each of the 225,370 settlement class members could receive

payments ranging between $62 and $88 per person. (Mot. at 1.) But it is not clear how

they reach that estimate. By the Court's calculations, even if the $12.25 cash fund were

divided equally among all 225,370 class members (without paying administrative costs,

incentive payments, and attorney fees, as the Settlement provides), each class member

would receive about $54. Additionally, the parties also do not address why it is

appropriate that if there is not enough money in the Settlement fund to make all the

required payments, payments to class members are the payments that will be reduced

rather than payments to counsel or the Settlement Administrator. (SA ¶ 87.) Finally,

courts commonly perform a lodestar cross-check to assess the reasonableness of the

percentage award. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002)

("Calculation of the lodestar, which measures the lawyer's investment of time in the

litigation, provides a check on the reasonableness of the percentage award."); *Bluetooth*,

654 F.3d at 943 (encouraging a "comparison between the lodestar amount and a

reasonable percentage award"). However, class counsel do not provide briefing using the

lodestar method to support their expected request.

The Court will not deny preliminary approval based on its concerns over the clear

sailing agreement together with the possible inflation of the Settlement value. However,

at the final approval stage, the Court will closely scrutinize the value of the benefits to

class members in deciding an appropriate fee, and expects counsel to provide a fuller

explanation of why the Settlement should be valued at $20 million, why the clear sailing

agreement does not raise collusion concerns in this case (with reference to recent cases in

which courts have approved settlements with clear sailing provisions), data sufficient to perform a lodestar cross-check, and any other provision or fact bearing on the propriety of the negotiations.

In addition to the amount of counsel's fees and costs, the Court must scrutinize the timing of payment.  Fed. R. Civ. P. 23(e)(2)(c).  The Settlement provides that the Settlement Administrator must pay class counsel no later than five business days after the Effective Date.  (*See* SA ¶ 114.)  That date is well in advance of when class members can expect to be compensated.  (*See* SA ¶ 85 [providing that California and Illinois Subclass members will be paid within 90 days after the Effective Date, then will have 90 days to cash or deposit their checks, and then 30 days after that, the rest of the class members will be paid).  This could cast a slight shadow on the proposed fee and cost arrangements.  *See, e.g.*, *Salas Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as Class Members, and the timing of payment does not weigh against preliminary approval of the Class Settlement.").  Counsel shall address this issue as well in their final approval briefing.

### d.  Any Agreement Required to Be Identified Under Rule 23(e)(3)

The Court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3).  The parties have identified no agreement other than the proposed Settlement.

//

//

//

### 4. Equitable Class Member Treatment

The final Rule 23(e) factor turns on whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Under the Settlement, class members may receive differing payouts depending on what documentation they have of their out-of-pocket costs and the time they spent responding to the data breach. This difference in treatment is appropriate and reasonable. The Settlement also treats California and Illinois class members differently than class members from other states based on their claims under the CMIA and the IGIPA, which provide for statutory damages. This distinction is also reasonable. The release is also the same for all class members. The Court finds that the Settlement treats class members equitably.

### 5. Named Plaintiff Incentive Awards

Next, Plaintiffs state that they "may seek Service Awards to be awarded to the Class Representatives, not to exceed $2,500." (Mot. at 13.) Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit. *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013). Courts routinely approve this type of award to compensate representative plaintiffs for the services they provide and the risks they incur during class action litigation. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 499 (E.D. Cal. 2010). Incentive awards in this district typically

range from $3,000 to $5,000.  *See In re Toys R Us-Del., Inc.-Fair & Accurate Credit Transactions Act Litig.*, 295 F.R.D. 438, 470 (C.D. Cal. 2014) (collecting cases).  When evaluating the reasonableness of an incentive award, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and the time the plaintiff spent pursing the litigation. *Staton*, 327 F.3d at 977.

Here, there are 25 named Plaintiffs, so although the $2,500 proposed incentive awards seem modest, they take a total of $62,500 from the Settlement fund.  Counsel do not describe why these incentive payments would be appropriate, nor explain the work each named Plaintiff performed and why the class benefitted from their actions.  At this stage, the Court will grant preliminary approval of the incentive payments, but the Court will expect a fuller showing of why they are appropriate—especially for so many named Plaintiffs—at the final approval stage.  *See Gaston*, 2021 WL 6496734, at *5 (approving $10,000 incentive awards to two named plaintiffs in data breach class action); *Hashemi v. Bosley, Inc.*, 2022 WL 2155117, at *8 (preliminarily approving service awards of $1,250 for 6 named plaintiffs in a data breach class action and examining both the percentage of the common fund that the total service awards represented and the difference between a class representative's recovery and an ordinary class member's recovery); *Sandoval Ortega v. Aho Enterprises, Inc.*, 2021 WL 5584761, at *12 (N.D. Cal. Nov. 30, 2021) (preliminarily approving $7,500 incentive awards for ten named plaintiffs).

In sum, based on the Rule 23(e)(2) factors, the Court preliminarily concludes that the Settlement is "fair, reasonable, and accurate."  However, a fuller showing on the numerous issues identified above will be required at the final approval stage.

//

//

### C.     Notice of the Proposed Settlement

Plaintiffs also seek approval of the proposed manner and form of the notice that will be sent to the class members.  For Rule 23(b)(3) classes, courts "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

The Court finds that the proposed manner of notice is adequate.  Plaintiffs propose a notice protocol centering on direct mail and email.  Within fourteen days after preliminary approval, Defendants will provide a list of class members to the Settlement Administrator.  (SA ¶ 96.)  Within 21 days after that, the Settlement Administrator will disseminate a summary notice via U.S. Mail.  (SA ¶ 98.)  The Settlement Administrator will also periodically email any Settlement class member for whom an email address is available and who has not submitted a valid Claim Form.  (SA ¶ 99.)  The mailings sent to class members will identify the data breach at issue, describe the class benefits and how to obtain them, and direct class members to the settlement website for more information.  (*See* Dkt. 144-6; Dkt. 144-7.)

The form of notice also meets the requirements of Rule 23(c)(2)(B), which requires that Notice to class members "clearly and concisely state, in plain, easily understood language (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that the class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).  The Summary Notice postcards contain most of this information, and the Long Form Notice contains all this information.  (*See* Dkts. 144-5–144-7.)

### D.    Settlement Administrator

After Class Counsel solicited competing bids from three different qualified class action settlement administrators, they selected, and propose that the Court appoint, Simpluris as the Settlement Administrator.  (Mot. at 12.)  Simpluris estimates that the total amount of the Settlement Administration Expenses here will be $329,706 but have agreed not to exceed $345,000.  (*Id.*)  The Court appoints Simpluris as Settlement Administrator.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** provisional certification of the class for settlement purposes and **GRANTS** preliminary approval of the Settlement.  The Court further **ORDERS** the following:

A.    The Court **APPOINTS** Plaintiffs Michael Annoni, Sandra Brodsky, Colette Domingues, Marion Farrier, Lisa Neumann, Rosemary O'Hara, Deborah Pancoast, Michele Pascoe, Cheryl Terrano, Jill Barduca, Alma Fidela Cercas, Jonee Coleman, Benjamin Cooperson, Rachel Harkness, Debera Hensley, Ann Hoekstra, Laura Jasielum, Rula Kanawati, Elizabeth Nakagoshi, Kaitlyn Nakagoshi, Linda Stewart, Ariann Tagioli, Beth Velardi, and Debra Volk as Class Representatives;

B.    The Court **APPOINTS** Daniel S. Robinson of Robinson Calcagnie, Inc., Tina Wolfson of Ahdoot & Wolfson, PC, and Jean Martin of Morgan & Morgan Complex Litigation Group as Co-Lead Class Counsel, and Gary E. Mason of Mason LLP (previously Mason Lietz & Klinger LLP) and Melissa R. Emert of Kantrowitz, Goldhamer & Graifman as the Steering Committee;

C.    The Court **APPOINTS** Simpluris as the Settlement Administrator;

D.     The Court preliminarily approves the Settlement, subject to further consideration at the final approval stage;

E.     The Court approves the form of the notice and directs the parties and the Settlement Administrator to carry out their obligations under this Order and the Settlement; and

F.     The Court sets the Final Approval Hearing for **Monday, March 6, 2023, at 1:30 p.m.**

DATED:     October 5, 2022

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE