# JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| *In Re: Ambry Genetics Data Breach Litigation* | ) **Lead Case No.: SACV 20-00791-CJC (KESx)**<br>)<br>)<br>) **ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [Dkt. 157] AND GRANTING PLAINTIFF'S MOTION FOR ATTORNEY FEES, COSTS, AND SERVICE AWARDS [Dkt. 155]**<br>)<br>)<br>)<br>)<br>)<br>) |

## I.    INTRODUCTION

In this consolidated putative class action, Plaintiffs[1] from fifteen different states assert ten claims against Defendants Ambry Genetics Corporation ("Ambry") and Realm

---

[1] Plaintiffs are Michael Annoni, Sandra Brodsky, Colette Domingues, Marion Farrier, Lisa Neumann, Rosemary O'Hara, Deborah Pancoast, Michele Pascoe, Cheryl Terrano, Jill Barduca, Alma Fidela Cercas, Jonee Coleman, Benjamin Cooperson, Rachel Harkness, Debera Hensley, Ann Hoekstra, Laura Jasielum, Rula Kanawati, Elizabeth Nakagoshi, Kaitlyn Nakagoshi, Linda Stewart, Ariann Tagioli, Beth Velardi, and Debra Volk.

IDX, Inc. (formerly known as Konica Minolta Precision Medicine, Inc.) arising out of a 2020 data breach.  (Dkt. 126 [Fourth Amended Complaint].)  After extensive motion practice, discovery, a full-day mediation before Retired Magistrate Judge Jay C. Gandhi, and nearly six months of additional settlement discussions, the parties have reached a proposed settlement agreement (the "Settlement").  (Dkt. 144 [Settlement Agreement, hereinafter "SA"].)

In October 2022, the Court conditionally certified a class and preliminarily approved the Settlement, which provides for a three-year subscription to credit monitoring and identity theft protection services, a cash payment of up to $300 for time spent addressing or remedying issues fairly traceable to the data breach, and reimbursement of up to $10,000 for documented losses or expenditures fairly traceable to the data breach.  (Dkt. 145 [hereinafter "Order"].)  The settlement administrator, Simpluris, Inc. ("Simpluris") then gave notice to the 225,370 class members.  (*See* Dkt. 157-1 [Declaration of Meagan Brunner on Behalf of Simpluris, Inc., Settlement Administrator, hereinafter "Brunner Decl."] ¶ 6; Dkt. 157 [Motion for Final Approval of Class Action Settlement, hereinafter "Mot."] at 8.)  The deadline to opt-out or object passed on January 9, 2023, and only 36 requests for exclusion were received, and no one objected to the Settlement.  (Brunner Decl. ¶¶ 13–14; Mot. at 18.)  The deadline to file claims passed on February 7, 2023, and 14,674 valid claims were received, meaning about 6.51% of the settlement class filed a valid claim.  (Dkt. 165-1 [Supplemental Declaration of Megan Brunner, hereinafter "Supp. Brunner Decl."] ¶ 2.)  Now before the Court is Plaintiff's unopposed motion for final approval of the Settlement, (Mot.), and unopposed motion for attorney fees, costs, and service awards, (Dkt. 155 [hereinafter "Fee Mot."]).  For the following reasons, both motions are **GRANTED**.

//

//

## II.   BACKGROUND

### A.   Factual Allegations and Procedural Background

Ambry provides genetic testing that screens and diagnoses medical issues, including hereditary cancer, hereditary cardiovascular disease, neurodevelopmental disorders, and epilepsy.  (4AC ¶¶ 1, 49.)  Between January 22 and 24, 2020, it experienced a data breach involving names, dates of birth, Ambry account numbers, health insurance information, confidential medical information, medical diagnoses, billing information including addresses, email addresses, telephone numbers, and Social Security numbers.  (*Id.* ¶¶ 2–3, 13, 24–48, 68, 72, 77).  Specifically, hackers accessed through a phishing incident the email account of an Ambry employee for multiple days, giving the hackers access to about 233,000 customers' information.  (*Id.* ¶¶ 67–68, 383.)  Plaintiffs allege that "[t]he Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' Private Information."  (*Id.* ¶ 17.)  Nearly three months after the breach, on April 15, 2020, Ambry sent a Notice of Data Breach to the affected individuals.  (*Id.* ¶¶ 71–72, 75.)

Four different putative class actions were filed in response to the data breach.  (*See* Dkt. 30.)  Counsel in the four cases cooperated to request that the Court consolidate the cases and appoint interim class counsel in accordance with Federal Rule of Civil Procedure 23(g).  The Court granted those requests and appointed co-lead counsel and a steering committee.  (*See* Dkt. 38.)  Plaintiffs then filed a consolidated class action complaint on September 21, 2020.  (Dkt. 39.)

After Defendants moved to dismiss Plaintiffs' consolidated class action complaint (Dkt. 43), Plaintiffs filed a First Amended Complaint.  (Dkt. 57.)  Defendants filed a

motion to dismiss Plaintiffs' First Amended Complaint, which the Court granted, explaining that "Plaintiffs fail[ed] to plausibly allege that their injuries were caused by Defendants' actions."  (Dkt. 68 at 4.)  The Court granted Plaintiffs leave to amend, and Plaintiffs filed a Second Amended Complaint.  (Dkt. 70.)  Defendants filed motions to strike and dismiss the Second Amended Complaint (Dkt. 75; Dkt. 76), both of which the Court denied without prejudice.  (Dkt. 92.)  Defendants then filed another motion to dismiss the Second Amended Complaint, and in a 26-page order issued after a hearing, the Court granted the motion in part and denied it in part with leave to amend certain claims.  (Dkt. 109.)  Plaintiffs then filed a Third Amended Complaint.  (Dkt. 115.)  After Defendants again moved to dismiss, the parties filed a stipulation to permit Plaintiffs to file a Fourth Amended Complaint, which the Court approved.  (Dkt. 125.)

Plaintiffs then filed the operative Fourth Amended Complaint on December 13, 2021.  (Dkt. 126.)  In the that complaint, Plaintiffs assert claims for (1) negligence, (2) invasion of privacy, (3) breach of implied contract, (4) unjust enrichment, (5) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–10, (6) violation of the California Confidentiality of Medical Information Act (the "CMIA"), Cal. Civ. Code §§ 56–56.37, (7) violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750–84, (8) violation of the California Consumer Records Act, Cal. Civ. Code §§ 1798.100–1798.199.95, (9) violation of the Illinois Genetic Information Privacy Act (the "IGIPA"), 410 Ill. Comp. Stat. 513 / 1–50, and (10) injunctive and declaratory relief.

Defendants then filed yet another motion to dismiss, (Dkt. 128), which Plaintiffs opposed, (Dkt. 130).  After this latest motion but before the Court ruled on it, the parties reached the Settlement.

Between the time these consolidated cases were filed and the parties' Settlement, the parties also conducted significant discovery.  Ambry produced approximately 27,000 pages of documents in electronic format in response to Plaintiffs' requests for production of documents, including two reports from two different forensic investigators that Ambry retained to investigate and help respond to the data breach.  (Mot. at 4.)  Plaintiffs also obtained under the Freedom of Information Act and similar state public records acts copies of Ambry's disclosures to governmental regulators.  (*Id.* at 3.)  Moreover, Plaintiffs produced ninety-five separate responses to interrogatories and responded to requests for production of documents.

### B.      Terms of the Proposed Settlement

On January 26, 2022, the parties participated in a full-day mediation session before retired Magistrate Judge Gandhi, with the benefit of comprehensive mediation briefs.  (Mot. at 5.)  After nearly six months of continued negotiations following the mediation session, the parties reached the Settlement.  (*Id.*)

The Settlement provides for a non-reversionary cash fund of $12.25 million.  (SA ¶ 55.)  Under the Settlement, class members who submit a claim form will receive three years of free credit monitoring and identity theft insurance services through Identity Defense Total+ (valued at $19.99 per month), plus up to $10,000 in cash for out-of-pocket costs fairly traceable to the data breach, a cash payment for time spent addressing or remedying issues fairly traceable to the data breach in the amount of $30 per documented hour or three hours of "default time" if a class member does not have documentation of the time spent.  (SA ¶¶ 73, 80.)  In addition, members of the California Subclass and the Illinois Subclass will automatically receive an additional cash payment of up to $150 as a Subclass Payment for their claims under the CMIA and the IGIPA, which provide for statutory damages.  (Mot. at 1–2; SA ¶ 80.)  The Settlement fund will

also be used to pay administrative expenses (estimated at about $340,000), any taxes, any service awards the Court approves (estimated at $2,500 per class representative), and any Court-approved award of fees and costs to class counsel (with Ambry agreeing not to oppose a request that does not exceed $4.9 million).  (SA ¶¶ 55, 70–73, 111, 114.)  All told, the parties estimate that each of the class members who submitted valid claims could receive payments ranging between $33.45 and $142.67 per person, depending on how many Subclass Payments are cashed, with California and Illinois Subclass members also receiving a $149.95 Subclass Payment.  (Dkt. 164 [Statement Regarding Final Claims Numbers] at 2.)

If there is not enough money in the Settlement fund to make all these payments, payments to participating class members will be reduced on a pro rata basis.  (SA ¶ 87.)  If money remains in the fund after making the appropriate distributions, however, participating class members will receive a second distribution so long as the average payment amount is at least $5.  (*Id.* ¶ 89.)  If there are not sufficient funds to allow a $5 second distribution, class members will receive extended credit monitoring and identity theft insurance.  (*Id.*)  Any remaining amount will then be distributed to the Non-Profit Residual Recipient, the Electronic Frontier Foundation.  (*Id.*)

In addition, the Settlement recognizes that Ambry has spent between $800,000 and $1.4 million in response to these cases regarding the data breach, including to complete an investigation into the cause and scope of the breach; implement additional security-related measures to ensure continued compliance with state and federal authorities; enhance policies, procedures, and training to staff on how to appropriately manage Protected Health Information ("PHI"); continue annual security-awareness training and individual training to certain employees and individuals handling PHI; enhance restrictions to access to PHI; institute prominent red-flag warnings for emails from an external source; enhance security applications by replacing old applications and adding

additional security systems; and retain vendors that ensure Ambry meets all Service Organization Control 2-certification requirements; and perform third-party risk assessments, penetration testing, and phish-testing emails to all employees.  (SA ¶ 92.)

## C.   Notice

Simpluris mailed notice to the 225,370 class members on the settlement class list. (Brunner Decl. ¶ 6; Mot. at 8.)  In addition, it "implemented a substitute notice utilizing a 30-day campaign of social media ads, programmatic display ads, and Google Search ads which were targeted to reach potential Class Members for whom Defendants lacked contact information."  (*Id.* ¶ 7.)  "This campaign resulted in 2,378,363 digital impressions through Facebook, Google Search, and other website banners."  (*Id.*)  Moreover, Ambry posted about the Settlement, including a link to the settlement website, on the top of its website.  (*Id.*)

The deadline to object or opt-out was January 9, 2023.  (*Id.* ¶ 13.)  Simpluris received only 36 requests for exclusion, and no one objected to the settlement.  (*Id.* ¶¶ 13–14.)  The deadline to submit a claim form was February 7, 2023.  (*Id.* ¶ 10.)  In total, Simpluris received 14,996 claims, with 14,674 of those deemed valid after deduplication, accepting opt-outs, and rejecting late claims.  (Supp. Brunner Decl. ¶ 2.) Of the valid claims, 10,646 people submitted a claim for credit monitoring and insurance, 14,550 people submitted a claim for a default time payment, 124 people submitted a claim for a documented time payment, and 69 people submitted a claim for out-of-pocket costs.  (*Id.* ¶¶ 3–6.)

//
//
//

## III.   DISCUSSION

In deciding whether to grant the motion for final approval and the motion for attorney fees, the Court analyzes (1) whether to certify a class for purposes of settlement, (2) the fairness of the settlement, and (3) the class's response to the notice regarding the settlement agreement.

### A.   Class Certification

A plaintiff seeking class certification must satisfy two sets of requirements under Federal Rule of Civil Procedure 23: (1) Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and (2) the requirement that the action fall within one of the three "types" of classes described in Rule 23(b)'s subsections.  In this case, Plaintiff seeks certification under Rule 23(b)(3), which allows certification if a court "finds the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  The Court previously concluded that Plaintiff presented sufficient evidence to show that the proposed class satisfies the Rule 23(a) and (b)(3) requirements.  (*See* Order at 6–11.)  Having reviewed those requirements again, the Court adopts its prior analysis regarding class certification and grants certification of the proposed class for settlement purposes only.  *See Atzin v. Anthem, Inc.*, 2022 WL 4238053, at *3 (C.D. Cal. Sept. 14, 2022) ("Nothing has changed to disturb that conclusion, and class certification remains appropriate.").

### B.   Fairness of the Settlement

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*,

151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e).  This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties."  *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

Approval of class action settlements is governed by Federal Rule of Civil Procedure 23(e).  A district court may approve class action settlements only when they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Courts must consider whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other. *Id.* 23(e)(2)(A–D).

### 1.   Adequacy of Class Representatives and Counsel

The class representatives and class counsel have ably represented the class to date. They managed to reach a significant settlement even after Defendants filed *seven* motions to dismiss or strike their claims.  Indeed, at one point, the Court had dismissed all of Plaintiffs' claims as insufficiently pled, but counsel still succeeded in alleging sufficient facts to withstand multiple subsequent motions to dismiss.  With the help of the class representatives, counsel have also conducted and responded to significant discovery.

There is no evidence of a conflict of interest between Plaintiffs and the class. Plaintiffs' claims are identical to those of the class, and they have every incentive to vigorously pursue those claims.  Nor is there any evidence that Plaintiffs' counsel will not adequately represent or protect the interests of the class.  Plaintiffs' attorneys—co-

lead counsel Daniel S. Robinson of Robinson Calcagnie, Inc., Tina Wolfson of Ahdoot & Wolfson, PC, and Jean Martin of Morgan & Morgan Complex Litigation Group, and steering committee members Gary E. Mason of Mason LLP, and Melissa R. Emert of Kantrowitz, Goldhamer & Graifman—have extensive experience litigating complex matters, including privacy and security class actions.  (*See* Dkt. 155-1 [Declaration of Class Counsel In Support of Motion for Award of Attorneys' Fees and Costs, and Service Awards], hereinafter "Counsel Decl."], Exs. 1–3 [law firm resumes].)  And as discussed, the record indicates that counsel have represented the class capably and adequately.

## 2.    Arm's Length Negotiation

As discussed in more detail later in this order, the Court has found no evidence of collusion during the parties' settlement negotiations.  The Settlement is the product of months of negotiations between counsel that vigorously litigated the viability of Plaintiffs' claims and engaged in contentious discovery.  *See Hashemi v. Bosley, Inc.*, 2022 WL 2155117, at *6 (C.D. Cal. Feb. 22, 2022) ("The parties extensively negotiated the Settlement over several months prior to mediation and ultimately reached a final agreement only after arms-length negotiations before mediator Mr. Picker.").  Although the "mere presence of a neutral mediator" does not definitively show a lack of collusion, the parties reached the Settlement after a full-day mediation with retired Magistrate Judge Gandhi, who has experience presiding over and mediating class actions, including data privacy cases.  *Cf. In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (noting that "the presence of a governmental participant" weighs in favor of a fairness finding).  The Court is satisfied that the negotiation of the Settlement was conducted at arm's length.

//

//

### 3.     Adequacy of Relief for the Class

In determining whether the class's relief is "adequate," courts consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).[2]   The Court finds the proposed relief to be adequate.

### a.     Costs, Risks, and Delay of Trial and Appeal

The Settlement reflects a substantial outcome for the hundreds of thousands of people affected by Ambry's data breach, with class members projected to receive between $33.45 and $142.67 per person, depending on how many Subclass Payments are cashed, plus three years of credit monitoring and identity theft insurance services, not to mention the significant changes to security practices Ambry has implemented.  *See Gaston v. FabFitFun, Inc.*, 2021 WL 6496734, at *2 (C.D. Cal. Dec. 9, 2021) ("Improved data security will benefit those class members whose information remains in Defendant's possession and protect future customers.").  The significance of the Settlement is further underscored by the fact that numerous privacy class actions have settled for non-monetary relief only and that this Court once dismissed Plaintiffs' complaint in its entirety.  *See, e.g.*, *Campbell v. Facebook Inc.*, 2017 WL 3581179, at *8 (N.D. Cal. Aug.

---

[2] Before Congress codified these factors in 2018, the Ninth Circuit instructed district courts to apply the following factors in determining whether a settlement agreement was fair, reasonable, and accurate: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement."  *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003).  The Court still considers these factors to the extent that they shed light on the inquiry mandated by Rule 23(e).

18, 2017) (granting final approval of settlement providing for declaratory and injunctive relief in litigation alleging Facebook engaged in user privacy violations), *aff'd*, 951 F.3d 1106 (9th Cir. 2020); *In re Google LLC St. View Elec. Commc'ns Litig.*, 2020 WL 1288377, at *16 (N.D. Cal. Mar. 18, 2020) (granting final approval of settlement providing injunctive relief and creating a non-distributable *cy pres* settlement fund in litigation alleging Google violated privacy by illegally gathering Wi-Fi network data). Indeed, other courts have approved settlements in privacy and security cases with far less recovery per person. *See, e.g.*, *In re Yahoo!*, 2020 WL 4212811, at *10 (approving a Settlement Fund of $117.5 million with a settlement class size of approximately 194 million and collecting cases where recovery was only a few dollars per person or less); *Hashemi*, 2022 WL 2155117, at *7 (approving data breach settlement, finding that the estimated $15 to $275 per class member value "greatly exceed[ed] the settlement value per class member in comparable data breach cases," and collecting cases with estimated settlement values of less than $1 per class member); *Hashemi v. Bosley, Inc.*, 2022 WL 18278431, at *5 (C.D. Cal. Nov. 21, 2022) (granting final approval in data breach case with $500,000 made available for over 100,000 class members.

The benefits class members will receive present a fair compromise given the costs, risks, and delay of trial and appeal. Litigation had reached a stage where the parties had a clear view of the strengths and weaknesses of their positions given that Defendants had filed seven motions to dismiss or strike Plaintiffs' claims and the Court ruled on four of those—at one point granting Defendants' motion to dismiss in its entirety. The parties also had the benefit of significant discovery, which included FOIA requests for Defendants' government disclosures and obtaining 27,000 pages of documents from Ambry, including two reports from two different forensic investigators that Ambry retained to investigate and aid its response to the data breach. (Mot. at 4; Counsel Decl. ¶ 28.) And the parties attended a full-day mediation session with retired Magistrate Judge Gandhi after preparing comprehensive mediation briefs. With all that information,

the parties were able to realistically value the scope of Defendants' potential liability and assess the costs, risks, and delay of moving forward with class certification, motion practice, and trial.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (explaining that approving the settlement is favored when the "parties have sufficient information to make an informed decision about settlement" (cleaned up)).

Those costs and risks are not insignificant.  This case has already involved substantial litigation costs, and those costs would be only just the beginning.  Additional discovery, including discovery-related motion practice, would be required.  For example, the parties note that if this case proceeds, Plaintiffs will move to compel the production of a forensic image of the employee's laptop whose email account was accessed during the data breach.  (Dkt. 143 at 5.)   The parties have not even begun deposition practice, and with so many class representatives, the costs of conducting depositions will be high. Extensive and expensive expert analysis would also be required for class certification and trial.  There are also significant risks associated with class certification, summary judgment, and trial, especially in this data breach case when tying the Plaintiffs' alleged injuries to this particular data breach may be difficult.  *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement."); *Hashemi*, 2022 WL 2155117, at *7 (explaining that "data breach class actions are a relatively new type of litigation and that damages methodologies in data breach cases are largely untested and have yet to be presented to a jury"); *Gaston v. FabFitFun, Inc.*, 2021 WL 6496734, at *3 (C.D. Cal. Dec. 9, 2021) ("Historically, data breach cases have experienced minimal success in moving for class certification.").  Even if Plaintiffs could secure a better result than the Settlement represents at trial, any result obtained after additional litigation or trial would take significantly longer and there is a risk that Plaintiffs could have received much less, or nothing at all.  *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036,

1041–42 (N.D. Cal. 2008) (discussing how a class action settlement offered an "immediate and certain award" in light of significant obstacles posed through continued litigation).

### b.   Effectiveness of Proposed Method of Distributing Relief to The Class

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C).  "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  *Id.*

Here, the relief distribution is straightforward.  To submit a claim for relief, class members were able to simply fill out the claim form mailed to them to receive credit monitoring and identify theft insurance services and a payment for default time, or submit a claim form on the settlement website to receive those benefits and/or reimbursement for out-of-pocket costs and a documented time payment, so long as they submitted reasonable documentation.  (SA ¶ 98; Mot. at 21.)  California and Illinois Subclass Members will automatically be mailed a Subclass Payment, and depositing the payment will automatically entitle them to a default time payment.  (Mot. at 21.)  This procedure for filing claims and receiving relief is not unduly demanding.

### c.   Attorney Fees and Costs

Next, the Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment," in determining whether the class's relief is adequate.  Fed.

R. Civ. P. 23(e)(2)(c).  When reviewing attorney fees requests in class action settlements, courts have discretion to apply the percentage-of-the-fund method or the lodestar method to determine reasonable attorney fees.  *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944–45 (9th Cir. 2011).  In considering the proposed award of attorney fees, the Court must also scrutinize the Settlement for three factors that tend to show collusion: (1) when counsel receives a disproportionate distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for agreed-upon attorney fees, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.  *Briseno v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1022 (9th Cir. 2021).

Beginning with the markers of collusion, the Settlement does not contain a reverter clause that returns unawarded fees to the defendant.  *See Briseno*, 998 F.3d at 1022.  However, the agreement does have a "clear sailing" arrangement.  (SA ¶ 89.)  This is not a "death knell" but rather means that the Court must scrutinize the agreement for signs that the fees counsel requests are unreasonably high.  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021); *see, e.g.*, *Hashemi*, 2022 WL 18278431, at *7 ("Although the Settlement contains a clear sailing arrangement, its presence is not dispositive in the Court's analysis.  Rather, any potential for collusion that could come from the arrangement is offset because neither the attorneys' fees are excessively high nor is there a "reverter" clause.").  Specifically, the Court must "peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class" even when the settlement has been negotiated "with a neutral mediator before turning to fees."  *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021).

Plaintiffs request an award of $4,875,644.90 in attorney fees and $24,355.10 in costs, for a total of $4.9 million.  (Defendants agreed not to oppose an attorney fee and

cost request of $4.9 million.)  The Ninth Circuit has held that 25% of the fund is the "benchmark" for a reasonable fee award, and courts must provide adequate explanation in the record of any "special circumstances" to justify a departure from this benchmark. *Bluetooth*, 654 F.3d at 942–43; *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ("We note with approval that one court has concluded that the 'bench mark' percentage for the fee award should be 25 percent.  That percentage amount can then be adjusted upward or downward to account for any unusual circumstances involved in this case." (citation omitted)).

The Court must look closely at the value of the Settlement to ensure that there are no signs that the fees counsel requests are unreasonably high, examining in particular the relationship between fees and the benefit to the class, especially because of the clear sailing agreement.  *McKinney-Drobnis*, 16 F.4th at 610; *Kim*, 8 F.4th at 1180.  Plaintiffs contend that the Settlement is worth $20,833,287.44, counting the $12.25 million settlement fund, $1.4 million value of Ambry's changes in security practices, and $7,183,287.44 in value of the claimed credit monitoring and insurance services (calculated at $19.99 per month for three years minus the cost of providing the service). If the Settlement is valued as Plaintiff's suggest, the $4.9 million fee request comprises about 23.5% of the common fund and favors approval.  *See, e.g.*, *Gaston v. FabFitFun, Inc.*, 2021 WL 6496734, at *3 (C.D. Cal. Dec. 9, 2021) (approving data breach settlement when fee request was "within the 25% benchmark considered reasonable).

But as explained at the preliminary approval stage, (Dkt. 145 at 21–22), the Court is not persuaded that the appropriate value of Ambry's security practice changes is $1.4 million.  For example, this amount includes the cost of actions Defendants were already taking despite this case.  (*See, e.g.*, Dkt. 143 at 10 [listing as one of the items valued in the $800,000 to $1.4 million estimate "continuing to require that Ambry's Chief Compliance Officer or the Chief Compliance Officer's delegate(s) approve employee

access to PHI by employee type and/or by employee"].)  The $1.4 million also includes the cost of "provid[ing] notice to Class Members of the Data Breach."  (*Id.*)  It does not seem appropriate to the Court to include in a valuation of benefit to class members the cost of providing notice to those class members of the data breach.  In other words, including the cost of notice seems to unfairly inflate the value of the Settlement.  Nevertheless, even if the Court cuts the $1.4 million estimate in half to account for its concerns, the value of the Settlement is $20,133,287.44.  The fees requested constitute 24.33% of that amount, and therefore still appear reasonable.

Performing a lodestar cross-check confirms the reasonableness of the percentage award.  Courts commonly perform a lodestar cross-check to assess the reasonableness of the percentage award.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyer's investment of time in the litigation, provides a check on the reasonableness of the percentage award."); *Bluetooth*, 654 F.3d at 943 (encouraging a "comparison between the lodestar amount and a reasonable percentage award").  Plaintiffs' counsel submit evidence of a lodestar fee of $2,519,530.10 because they spent 3455.60 hours at reasonable hourly rates between $225 and $950.  (Counsel Decl. ¶¶ 88–89.)  This lodestar was reached after deducting nearly 500 hours spent on the case based on the review of retired Superior Court Judge Thierry Patrick Colaw and the billing partners' judgment, and after counsel reduced their hourly rates from rates awarded in other cases.  (*Id.* ¶¶ 83–91.)  Plaintiffs seek a 1.94 multiplier on their lodestar based on the quality of their representation, the benefit obtained for the class, the complexity of the issues presented, and the risk of nonpayment.

The Court has reviewed the information provided and concludes that the lodestar amount with the requested multiplier fairly compensates the attorneys in this case, given the excellent result they achieved for the class, the very able representation of counsel (including defeating multiple motions to dismiss), and the work reflected in the

information provided.  *See In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) (explaining that comparing the lodestar fee to the 25% benchmark "resembles what lawyers commonly do when they draft a bill based on hours spent, consider the bottom line as compared with the value of the result, then cut the bill if the total seems excessive as compared with the results obtained"); Mot. at 19–20 (collecting cases with multipliers between 3.65 and 5.2).  Counsel's lodestar therefore confirms the reasonableness of the fees sought.

In addition to the amount of counsel's fees and costs, the Court must scrutinize the timing of payment.  Fed. R. Civ. P. 23(e)(2)(c).  The Settlement provides that the Settlement Administrator must pay class counsel no later than five business days after the Effective Date.  (*See* SA ¶ 114.)  That date is well in advance of when class members can expect to be compensated.  (*See* SA ¶ 85 [providing that California and Illinois Subclass members will be paid within 90 days after the Effective Date, then will have 90 days to cash or deposit their checks, and then 30 days after that, the rest of the class members will be paid).  This could cast a slight shadow on the proposed fee and cost arrangements. *See, e.g.*, *Salas Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as class members, and the timing of payment does not weigh against preliminary approval of the Class Settlement.").  However, to address this concern, counsel has agreed to "refrain from receiving payment of any court-approved attorneys' fees and costs until the Settlement Administrator begins disseminating payments to California and Illinois Subclass Members."  (Mot. at 7.)  This assuages any concerns regarding the appearance of collusion.

//

//

//

### d.    Any Agreement Required to Be Identified Under Rule 23(e)(3)

The Court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3).  The parties have identified no agreement other than the proposed Settlement.

### e.    Incentive Awards

Finally, Plaintiffs request incentive awards of $2,500 to each of the twenty-five class representatives, for a total of $62,500.  (Dkt. 155 at 28–29.)  Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit.  *See Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).  They both "encourage individuals to undertake the responsibilities and risks of representing the class and recognize the time and effort spent in the case." *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *30 (N.D. Cal. Aug. 17, 2018).  Such awards "are fairly typical in class action cases" and are discretionary.  *Rodriguez v. W. Pub. Corp.*, 563 F.3d 948, 958 (9th Cir. 2009).  In the Ninth Circuit, a $5,000 incentive award is "presumptively reasonable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015); *see also Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases and explaining that in the Ninth Circuit, $5,000 is a presumptively reasonable service award).

Plaintiffs assert that the incentive awards will compensate them for their work "investigating the matter prior to and after retaining their respective attorneys; participating in the plaintiff vetting process implemented by Class Counsel; reviewing and approving their original complaints and the consolidated and amended complaints;

participating in discovery by providing responses to interrogatories and collecting documents and gathering evidence in response requests for production served on each of them; and corresponding and communicating with counsel to monitor the progress of the litigation and settlement."  (Fee Mot. at 29.)  Plaintiffs' requested incentive award appears reasonable given the work they performed on this case.  *See In re Anthem*, 2018 WL 3960068, at *31 (awarding $5,000 for each of 76 named plaintiffs in data breach case and $7,500 for 29 named plaintiffs whose computers and electronic devices were forensically examined); *Gaston*, 2021 WL 6496734, at *4 (awarding $5,000 for each of two named representatives in data breach case); *Pfeiffer v. RadNet, Inc.*, 2022 WL 2189533, at *4 (C.D. Cal. Feb. 15, 2022) (approving a service award of $1,500 for each of seven representative plaintiffs).  Accordingly, the Court approves the requested $2,500 incentive awards.

### 4.     Equitable Class Member Treatment

The final Rule 23(e) factor turns on whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Under the Settlement, class members may receive differing payouts depending on what documentation they have of their out-of-pocket costs and the time they spent responding to the data breach.  This difference in treatment is appropriate and reasonable. The Settlement also treats California and Illinois class members differently than class members from other states based on their claims under the CMIA and the IGIPA, which provide for statutory damages.  This distinction is also reasonable.  The release is also the

same for all class members.  The Court finds that the Settlement treats class members equitably.

### C.    Response to Notice

As explained, Simpluris mailed notice to the 225,370 class members on the settlement class list and implemented a social media notice campaign, and Ambry also posted about the Settlement, including a link to the settlement website, on its website. (Brunner Decl. ¶ 6.)  Simpluris also created a settlement website, a toll-free help line, and a dedicated email address.  (*Id.* ¶¶ 8–9; Supp. Brunner Decl. ¶ 8.)  The hotline received 1,108 calls.  (Brunner Decl. ¶ 9.)  And the email address received 295 emails.  (Supp. Brunner Decl. ¶ 8.)  Simpluris received 14,996 claim forms requesting recovery from the settlement fund, and deemed 14,674 of those to be valid claims.  (Supp. Brunner Decl. ¶ 2.)  This amounts to an approximately 6.51% claims rate.

Simpluris received only 36 requests for exclusion, and no one objected to the settlement.  (Brunner Decl. ¶¶ 13–14; Supp. Brunner Decl. ¶¶ 9–10.)  This indicates very strong overall support for the Settlement and supports final approval.  *See, e.g.*, *Hashemi*, 2022 WL 18278431, at *6 ("Very few objections and opt-outs create a strong presumption that the Settlement is beneficial to the Class and thus warrants final approval."); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, 2010 WL 3715138, at *6 (D. Ariz. Aug. 31, 2010) (explaining that low number of timely written objections and requests for exclusion supported settlement approval); *National Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("The absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement.  It is established that the absence of a large number of objections to a proposed class action settlement raises a strong

presumption that the terms of a proposed class settlement action are favorable to the class members.").

**IV.  CONCLUSION**

For the foregoing reasons, Plaintiff's motions for final approval of the Settlement and for attorney fees and costs are **GRANTED**.

DATED:     March 6, 2023

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE